# EXHIBIT "A"

000007

## 76 BRANDED - LEASE/CONTRACT COVER SHEET

```
LESSEE.............................................  HOUTAN PETROLEUM INC
SOLD TO NUMBER................................  10041936
SHIP TO NUMBER................................  804988
SERVICE STATION..............................  255661
CLASS OF TRADE................................  0012
EFFECTIVE DATE..................................  September 1, 2007
EXPIRATION DATE................................  August 31, 2010
```

After execution return to:  Contract Administration, Cynthia Townley, TR-1064B,
P.O. Box 2197, Houston, TX 77252-2197

ENCLOSED ARE THE FOLLOWING:

| | |
|---|---|
| X | Union 76 Dealer Station Lease and Motor Fuel Supply Agreement w/PMPA |
| | Union 76 Branded Reseller Agreement w/PMPA |
| | Union 76 Dealer Station Lease/Lease Back-Motor Fuel Supply Agmt. w/PMPA |
| X | Underground Storage Tanks/Owner/Operating Agreement (addendum 2 of Lease/Supply Agreement) |
| | Car Wash Addendum to Union 76 Dealer Station Lease and Motor Fuel Supply Agreement |
| | Car Wash Addendum to Union 76 Dealer Station Lease/Lease Back and Motor Fuel Supply Agreement |
| | C-Store Addendum to Union 76 Dealer Station Lease-Motor Fuel Supply Agmt. |
| X | Snack Shop Addendum to Union 76 Dealer Station Lease and Motor Fuel Supply Agreement |
| | Facility Allowance Agreement |
| | 76 Branded Dealer or Reseller EPOS Equipment Amendment |
| X | 76 Branded Temperature Adjustment Agreement |
| X | Federal Tire Registration-Dealer |
| | ConocoPhillips San Diego A.P.C.D. Definition of Responsibility |
| | LPG Agreement |
| | Workers Compensation Insurance Waiver of Subrogation-NEVADA |
| X | Tax Exemption Certificate |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

000008

1



UNION 76 DEALER STATION LEASE and
MOTOR FUEL SUPPLY AGREEMENT
Unit # 0012 / 255661

### TABLE OF CONTENTS

**SUBJECT**                                                    **SECTIONS**

STATION PROPERTY ....................................................1
TERM .........................................................................2
RENTAL .....................................................................3
CREDIT CARDS, OTHER PAYMENT METHODS, EPOS AND
NETWORK ACCESS......................................................4
SERVICES, USES AND DEFINITIONS ...........................5

PROHIBITED USES .....................................................6
IMAGE AND OPERATIONS STANDARDS PROGRAM .......7
OPERATING EXPENSES ...........................................8
TAXES.......................................................................9
TRADEMARKS...........................................................10

MOTOR FUELS BRANDS, GRADES AND QUANTITY..............11
DELIVERY..................................................................12
TITLE TO MOTOR FUEL AND STOCK LOSSES...........13
ALLOCATION..............................................................14
PURCHASE PRICE .....................................................15

TERMS OF PAYMENT/ CREDIT REQUIREMENTS .......16
SIGNS ......................................................................17
NO EXCLUSIVE AREA.................................................18

MAINTENANCE AND REPAIRS.....................................19
TELECOMMUNICATIONS ...........................................20
MAJOR REPAIRS .......................................................21
ALTERATIONS AND BUSINESS CHANGES ...................22
ENVIRONMENTAL COMPLIANCE.................................23
INSPECTION OF STATION AND RESERVATION OF RIGHTS ....24
RECORDS AND AUDITS ..............................................25
INDEMNIFICATION .....................................................26
INSURANCE ..............................................................27
ASSIGNMENTS, SUBLETTING AND TRANSFERS.......28

TERMINATION BY CONOCOPHILLIPS...........................29
TERMINATION BY DEALER ........................................30
MUTUAL TERMINATION .............................................31
SURRENDER OF STATION..........................................32
REPURCHASE OF INVENTORY ...................................33
CONDEMNATION .......................................................34



BANKRUPTCY ...................................................35
INDEPENDENT CONTRACTOR.................................36
NOTICE............................................................37
FORCE MAJEURE ...............................................38

REVIEW OF AGREEMENT .....................................39
SECTION TITLES ...............................................40
WAIVER ...........................................................41
WARRANTY .......................................................42
CONFIDENTIALITY...............................................43

SEVERABLITY ....................................................44
SECURITY INTEREST ..........................................45
EXHIBITS .........................................................46
CONTRACTING ENTITY..........................................47
ATTORNEY FEES.................................................48

ENTIRETY..........................................................49

**EXHIBITS**

| | |
|---|---|
| Description of Real Property | Exhibit A-I |
| Buildings, Improvements, Fixtures & Equipment | Exhibit A-II |
| Rental Schedule | Exhibit B |
| Maintenance Responsibility | Exhibit C |
| Hours of Operation | Exhibit D |
| Quarterly/Annual Minimum Volume | Exhibit E |
| Petroleum Marketing Practices Act (PMPA) | Exhibit F |

**ADDENDUMS**

| | |
|---|---|
| Underlying Lease | Addendum 1 |
| Underground Storage Tanks/Owner/Operator Agreement | Addendum 2 |

Revised 10/11/2006

000010

3



## UNION 76 DEALER STATION LEASE and MOTOR FUEL SUPPLY AGREEMENT

THIS UNION 76 Dealer Station Lease and Motor Fuel Supply Agreement ("Agreement") dated March 30, 2007 ("Contract Date") is by and between ConocoPhillips Company, and the individual(s) and / or entity named below ("DEALER") at this service station ("Station" as defined below)

### HOUTAN PETROLEUM INC

### RECITALS

A.   WHEREAS, DEALER does hereby enter into this Agreement for the purpose of operating the Station as a Union 76 branded outlet offering petroleum products and the highest quality of service to the motoring public;

B.   WHEREAS, CONOCOPHILLIPS and DEALER agree that the successful operation of an automotive service Station (as defined below) depends on the ability of the parties to consistently generate customer acceptance of products and services. The responsibility for acceptance of CONOCOPHILLIPS' Union 76 products is primarily CONOCOPHILLIPS', through the development and implementation of marketing, dealer training, advertising and sales promotions and other programs to promote the Union 76 service station business. The responsibility to develop and retain product acceptance is CONOCOPHILLIPS' responsibility and the responsibility for service acceptance by the motoring public is primarily DEALER's. Service acceptance is generated through DEALER's consistently offering courteous, convenient and efficient customer service; the maintenance of a clean, neat and orderly run business establishment; the adherence to regularly scheduled hours of operation; DEALER's personal attention to the operation of the Station; fair and honest selling techniques; and the maintenance of a complete inventory of good quality merchandise to serve adequately and quickly the needs and desires of customers; and

C.   WHEREAS, CONOCOPHILLIPS has expended substantial amounts of time, money and expertise in developing quality credit card and other marketing programs and quality merchandise to be sold under the Union 76 trade name, service marks and trademarks ("Marks"). DEALER may use said Marks and credit card programs in the resale of Union 76 branded merchandise; therefore, DEALER agrees to render the type of courteous, convenient and efficient service that will maintain the integrity and good reputation which said Marks and credit card programs have attained.

NOW, THEREFORE, in consideration of the mutual promises contained herein, CONOCOPHILLIPS and DEALER agree as follows:

### 1.   STATION PROPERTY

CONOCOPHILLIPS hereby leases to DEALER and DEALER leases from CONOCOPHILLIPS the real property located in the County of SANTA CLARA, State of CA, commonly known as 101 E EL CAMINO REAL, MOUNTAIN VIEW, CA 94040 and further described in the attached **Exhibit A-I**, together with the buildings, improvements, fixtures, and equipment listed in the attached **Exhibit A-II** (the real property, buildings, improvements, fixtures, and equipment collectively referred to hereinafter as the "Station"). DEALER acknowledges inspecting the Station and with respect to those facilities, fixtures and equipment that are reasonably susceptible to visual inspection, DEALER finds them to be in reasonably good condition.

### 2.   TERM

(a)   The term of this Agreement commences on **September 1, 2007** and expires on **August 31, 2010** ("Term"); provided, however, that if CONOCOPHILLIPS has an underlying lease for the Station

000011

4



from a third party (as stated in **Addendum 1** attached hereto) and if CONOCOPHILLIPS' underlying lease expires, is cancelled or terminates for any reason on or prior to the stated expiration date of this Agreement, then this Agreement shall terminate consistent with the cancellation or termination of said underlying lease.

     (b)    Except as may be required of CONOCOPHILLIPS pursuant to applicable law, this Agreement is not self-renewing and expires automatically on the date set forth above without the necessity of notice. DEALER acknowledges that no representation as to the continuation or renewal of this Agreement beyond the Term has been made by CONOCOPHILLIPS to DEALER.

**3.    RENTAL**

     (a)  CONOCOPHILLIPS shall charge and DEALER agrees to pay to CONOCOPHILLIPS rent for the Station as determined in accordance with CONOCOPHILLIPS' Rent Policy. "CONOCOPHILLIPS' Rent Policy" means such written policy adopted by CONOCOPHILLIPS in good faith and in the ordinary course of business regarding the rent to be charged CONOCOPHILLIPS' lessee dealers, which policy may be amended or modified by CONOCOPHILLIPS at any time or from time to time. DEALER shall pay all Rent legally owes to CONOCOPHILLIPS for the current month of operation on the last business day of each month for which Rent is due and owing. In the event the Rent is not paid when due, and providing such failure to pay is not due to an event caused by CONOCOPHILLIPS, DEALER shall be subject to a late payment charge. The late payment charge shall be $60.00 for each late payment and may be charged by CONOCOPHILLIPS at CONOCOPHILLIPS' option.

     (b)  Upon any renewal of this Agreement, the Rent will be determined in accordance with CONOCOPHILLIPS' Rent Policy or any successor CONOCOPHILLIPS policy or program in effect at the time of renewal.

     (c)  DEALER shall pay to CONOCOPHILLIPS Rent as specified in the attached **Exhibit B.**

     (d)  CONOCOPHILLIPS shall notify DEALER of all Rent increases at least 90 days prior to the implementation of any such increases in Rent. DEALER acknowledges that Rent may, at CONOCOPHILLIPS' discretion, be subject to an adjustment based on changes in the Consumer Price Index–All Urban Consumers ("CPIU), published by the U.S. Department of Labor, Bureau of Labor Statistics for the nearest geographical region in which DEALER's Station is located;

     (e)  Any Rent payable hereunder shall be payable when due, without notice, demand, deduction, or offset at such place as CONOCOPHILLIPS may from time to time designate to DEALER. Rent payable with respect to any period consisting of less than a full calendar month shall be prorated.

     (f)  If DEALER holds over in possession of the Station without CONOCOPHILLIPS' consent, DEALER shall, at CONOCOPHILLIPS' election, be a tenant at will or a tenant from month-to-month. In either case Rent shall be payable monthly in advance at a rate equal to one hundred fifty percent (150%) of the Rent in effect immediately before the hold over period began.

     (g)    No provision of this Agreement may be construed to prevent or limit CONOCOPHILLIPS' right to modify the terms or conditions of the Agreement, or offer additional or different terms to DEALER, upon a renewal of the Agreement, including CONOCOPHILLIPS' right to offer any modification or new terms relating to rent, or modify Rent any time during the Term because of the substantial rebuilding of the Station or due to capital improvements that may be made by CONOCOPHILLIPS at the station.



**4.    CREDIT CARDS, OTHER PAYMENT METHODS, EPOS AND NETWORK ACCESS**

DEALER acknowledges and agrees that CONOCOPHILLIPS shall, at CONOCOPHILLIPS' sole determination and expense, install electronic point of sale ("EPOS") equipment for the processing of credit card and debit card transactions.  DEALER shall pay to CONOCOPHILLIPS all reasonable charges for the operation, updating and maintenance of said EPOS equipment required by CONOCOPHILLIPS, which shall be set forth on the ConocoPhillips Marketing website. CONOCOPHILLIPS shall have the right to change any existing rent and fee structure contained on ConocoPhillips Marketing website upon providing DEALER with thirty (30) days prior notice.

(a) Certain terms used in this Section 4 are defined below:

Card Transaction - means a Credit Transaction, Debit Transaction, and/or transaction involving a Prepaid Card.

Credit Card -- means a card or other evidence of credit, authorizing the cardholder to obtain goods and services on credit. It includes off-line debit cards that authorize electronic transfer of funds from the cardholder's account but generally does not require use of the cardholder's personal identification number.

Credit Transaction -- means the process of data capture and transaction processing that allows a consumer to use a Credit Card for payment of authorized purchases.

Debit Card -- means a card or access device issued by a financial institution that authorizes an electronic transfer of funds from the cardholder's account for payment of authorized purchases. It generally requires use of the cardholder's personal identification number and may commonly be known as an on-line debit card.

Debit Transaction — means the process of data capture, authorization and electronic transfer of funds from the cardholder's account for payment of authorized purchases.

EPOS -- means electronic point of sale - equipment used to process credit and debit card transactions.

NSP -- means Network Service Provider or its assignee or successor with respect to the NSP's functions related to this policy.

Prepaid Card -- means a retail cash card that can be activated and then redeemed at Marketer Supplied Outlets.

(b)    DEALER shall accept Prepaid Cards and Debit Cards and shall grant credit to holders of all ConocoPhillips Accepted Credit Cards at the Station where ConocoPhillips marketing standards are maintained, as outlined in the then current ConocoPhillips Credit Card Guide with the applicable ConocoPhillips Brand, and subject to the terms thereof. "ConocoPhillips Accepted Credit Cards" are defined in the applicable ConocoPhillips Credit Card Guide, which is incorporated herein by this reference and which may be revised from time to time or discontinued at ConocoPhillips' sole discretion, and which may be supplemented with the ConocoPhillips Marketing website communications, and other forms of notification to DEALER (all referred to collectively as the "Credit Card Guide"). DEALER shall accept other payment methods designated by ConocoPhillips from time to time in the applicable ConocoPhillips Credit Card Guide ("Payment Methods").  It is the responsibility of DEALER to comply with such applicable Credit Card Guide and all amendments thereto for use at the Station.

(c)    ConocoPhillips shall accept assignment of ConocoPhillips Accepted Credit Card invoices from all ConocoPhillips Accepted Credit Cards, subject to the terms and conditions in the applicable Credit Card Guide.  DEALER shall refuse to honor ConocoPhillips Accepted Credit Cards for purchases made at locations other than the Station.  DEALER shall accept and promptly reimburse ConocoPhillips for invoices refused by ConocoPhillips in accordance with the provisions of the applicable Credit Card Guide.    Except as otherwise stated in this Section 4 C, assigned credit card invoices shall be automatically applied to DEALER's outstanding account balance for product purchases and any other amounts owing to ConocoPhillips.

(d)    DEALER shall ensure that DEALER has and uses at the Station ConocoPhillips "Endorsed" or "Limited-Endorsed" Electronic Point of Sale ("EPOS") equipment in accordance with the provisions of this Section 4. DEALER shall further ensure that DEALER has and uses at the Station the most current version software for such EPOS equipment. Such "Endorsed" or "Limited-Endorsed" EPOS equipment and the most current version software are listed on the ConocoPhillips Marketing website,

000013

6



and such list may be revised from time to time at ConocoPhillips' sole discretion. DEALER shall maintain and repair at its sole expense all EPOS equipment used at the Station for transaction processing.

(e)    DEALER shall receive access to a NSP designated by ConocoPhillips for on-line transactions for consumer purchases made with ConocoPhillips Accepted Credit Cards or Payment Methods. Processing requirements through the designated NSP as set forth in this Section. DEALER agrees to process all consumer purchases of Gasoline and Distillate that use ConocoPhillips Accepted Credit Cards through the NSP designated by ConocoPhillips. For all other consumer purchases except Gasoline and Distillate, DEALER must process, at a minimum, the Licensed ConocoPhillips Brand proprietary cards (including but not limited to proprietary fleet cards and the ConocoPhillips MasterCard), Voyager and Wright Express cards through the NSP designated by ConocoPhillips. DEALER agrees to pay network fees associated with the processing of Card Transactions electronically, which fees are set forth on the ConocoPhillips Marketing website.

(f)    Network Access can be obtained through the following communication methods. NSP and ConocoPhillips shall arrange for satellite (VSAT) communication to the Station at DEALER's expense. DEALER shall execute a separate Satellite Services Agreement with ConocoPhillips for the Station. If dial-up communication is chosen for the Station then DEALER shall arrange for, and shall pay fees and charges associated with the installation of the necessary telephone line for autodial devices and connection to the ConocoPhillips EPOS equipment.

(g)    DEALER shall pay the fees and charges associated with transaction processing at the Station, as set forth on the ConocoPhillips Marketing website, and as such fees and charges may be adjusted by ConocoPhillips periodically. ConocoPhillips shall deduct all processing or network fees or charges from DEALER's total automated sales. Subject to applicable law, ConocoPhillips may change any or all of its fees, charges or both at any time upon not less than ten (10) days' advance written notice to DEALER.

DEALER agrees that this Section 4 is reasonable and of material significance to this Agreement and to the consumers who patronize the Station. DEALER further understands and acknowledges that it is reasonable for ConocoPhillips to terminate this Agreement if DEALER does not comply with this Section 4 upon written notice to DEALER in accordance with the Petroleum Marketing Practices Act.

## 5.    SERVICES, USES AND DEFINITIONS

(a)  DEALER hereby agrees and acknowledges that the Union 76 Marks, unique color combinations, design and appearance, represent an image of high standards of product quality to the Station appearance (inside and out) and customer service. DEALER's failure to diligently promote the Union 76 Marks would:

(1)    Adversely affect the consuming public's patronage of the goods and services offered by DEALER and CONOCOPHILLIPS at the Station;

(2)    Could adversely affect the consuming public's patronage of other Union 76 branded retail service stations; and

(3)    Could adversely affect the value of the Union 76 Marks in the marketplace.

(b)  DEALER shall:

(1)    Resell all motor fuel, certified by the supplier thereof as being Union 76 motor fuel, under Union 76's brand name;

(2)    Maintain Union 76 Marks on the equipment used to store and dispense Union 76 motor fuel;

000014

7



   (3) Not sell or pass off the motor fuel of others as Union 76 motor fuel or otherwise misbrand or mislabel Union 76 motor fuel or products, and

   (4) Manage, operate and maintain the Station in a manner which will maintain and enhance all Union 76 Marks and will comply with CONOCOPHILLIPS' image and operational standards for Union 76 Marks as updated from time to time. Accordingly, DEALER expressly agrees to consistently operate the Station in a manner that will:

   (A) Diligently promote the resale of all motor fuels generally offered by CONOCOPHILLIPS under the Union 76 Marks in DEALER's trading area;

   (B) Provide quality merchandise and courteous and efficient service from a clean and orderly kept business establishment that is within the standard of care and professionalism offered by other Union 76 service stations and automotive service outlets in DEALER's trading area;

   (C) Sell all merchandise and services with care, prudence and courtesy and not engage in dishonest, fraudulent or scare selling practices;

   (D) Perform all services in a good workmanlike manner;

   (E) Keep the approaches, driveways and service areas open, usable and uncluttered and free of parked vehicles, trailers, and other obstructions, including ice or snow, at all times;

   (F) Maintain adequate inventory of motor fuel (including such quantity of each Union 76 branded motor fuel offered for resale by CONOCOPHILLIPS in the geographic area in which the Station is located, as is required to serve customer demand for such motor fuels) and other petroleum products and, if appropriate, tires, batteries and accessories normally offered for sale from a first class, full service, automotive service station;

   (G) Keep the Station (interior and exterior), sidewalks, pump islands, pin corner, approaches and driveways properly lighted, clean, safe, sanitary and free of trash, rubbish and other debris. Perform, at DEALER's sole cost and expense, all repairs, replacements and maintenance required of DEALER pursuant to **Exhibit C**. Keep any and all yard, lawn, shrubs, and other plantings unobstructed, clean, neat, orderly and free from weeds and debris. If DEALER fails to perform these maintenance obligations, and CONOCOPHILLIPS has given DEALER at least verbal notice and adequate time to correct the failure to perform the maintenance obligations, CONOCOPHILLIPS may perform the obligation(s) and charge the reasonable cost to DEALER's account as additional rent;

   (H) Keep the rest rooms properly identified, well-lighted, clean, functional and odor free. Customary restroom supplies shall be stocked in dispensers that are clean and operational;

   (I) Keep the Station open for business with the interior and exterior properly lighted during the hours of operation as set forth in **Exhibit D**. If applicable, service bay doors are to remain open during normal automotive repair hours. DEALER shall not fail to keep the Station open for operation for seven (7) or more consecutive days or any lesser period which under the facts and circumstances constitutes an unreasonable period of time;

   (J) Maintain sufficiently trained and qualified employees (including DEALER) who must at all times, while on duty at the Station, be dressed in approved uniforms. In addition, each employee who, in the course of their employment might be called upon to communicate with customers, law enforcement officials, fire officials, government officials and other persons who may have business dealings with the Station shall have the ability to personally understand, write and speak the English language. DEALER shall maintain a sufficient number of trained, courteous and neat appearing

000015



personnel at the Station required to consistently operate the Station in an efficient and organized manner. DEALER shall, at CONOCOPHILLIPS' request, participate in subsequent training programs as may be offered by CONOCOPHILLIPS from time to time;

(K)    Maintain an environmentally compliant and safe place to work for DEALER's employees and customers, and maintain and operate the Station in compliance with all applicable laws, regulations and rules concerning environmental compliance and safety of the workplace. DEALER shall provide all employees with adequate training concerning workplace environmentally compliance, safety and safe work practices.  CONOCOPHILLIPS makes no assurances that despite DEALER's proper maintenance of any and all environmental compliance and safety practices, use of the environmental compliance and/or safety information or any additional environmental compliance and/or safety measures offered or suggested by CONOCOPHILLIPS or DEALER, that the Station is guaranteed to be an environmentally compliant or safe work place.    DEALER acknowledges that environmental compliance and safety of the workplace is primarily DEALER's responsibility and not the responsibility of CONOCOPHILLIPS;

(L)    Store and dispense motor fuel only from clean, properly tagged tanks, and properly decaled pumps or containers identified with appropriate trademarks or trade names, if applicable;

(M)    Comply with the requirements of any conditional use permit(s), license or other approvals ("Permit") covering the operation of the Station. If the Station is subject to a Permit, a copy shall be delivered to DEALER and DEALER shall acknowledge receipt of the copy on a form provided by CONOCOPHILLIPS;

(N)    If permitted by law, upon the request of CONOCOPHILLIPS, operate at least one (1) of the fuel islands (or one (1) of the dispensers if the Station has only one (1) fuel island) on a self-service basis during all operating hours;

(O)    DEALER shall comply with all laws, ordinances, rules and regulations of constituted public authority governing the use and occupancy of the Station and the conduct of DEALER's business at the Station;

(P)    Devote full time personal management and business expertise to the operation of the Station. For a full automotive service station, full time shall mean being at the Station for not less than thirty (30) hours of time each seven (7) day week, and devoting not less than four (4) hours of time between the hours of 8:00 AM and 6:00 PM each day Monday through Friday; and for all other service stations, full time shall mean being at the Station not less than ten (10) hours of time each seven (7) day week, and devoting not less than one (1) hour of time between the hours of 8:00 AM to 6:00 PM each day Monday through Friday.  If in the event DEALER operates multiple sites, DEALER may designate one (1) individual who will actively and personally be the site manager responsible for the daily management of DEALER's other station(s).  If this Station is such a station DEALER does hereby designate _____ to act as DEALER in the operation of the Station ("Designee"). Designee shall personally participate in the operation of the Station as is required of DEALER set forth above. DEALER shall be permitted to change the Designee provided, however, that DEALER's shall give reasonably prompt written notice to CONOCOPHILLIPS of the change;

(Q)    Use the Station solely for the sale of motor fuel and other petroleum products, as applicable, including, but not limited to, tires, batteries, accessories and other merchandise and services that customers expect to obtain from a first class retail motor fuel service station;

(R)    Keep telephone booths clean and operative; and located in areas where appropriate and where previously authorized by CONOCOPHILLIPS;

000016

9



(S)    Keep vending machines and storage bins only in locations authorized in writing by CONOCOPHILLIPS;

(T)    Keep air/water hoses clean and operational, and offer air/water to the public pursuant to applicable laws, which may require air/water to be offered without charge to the public;

(U)    Maintain a secure Station for DEALER, DEALER's employees and customers. Subject to CONOCOPHILLIPS' written approval, which shall not be unreasonably withheld, DEALER may install any security equipment and devices at the Station and make security enhancements in and to the Station and employ additional security measures at the Station that DEALER reasonably believes are necessary to enhance security and deter crime. DEALER is solely responsible for the maintenance of any such security enhancements at the Station. CONOCOPHILLIPS makes no assurances against criminal activity at the Station despite CONOCOPHILLIPS' proper maintenance of any and all security enhancements, use of any security information or training which CONOCOPHILLIPS makes available to DEALER, or any other additional security measures;

(V)    Maintain uninterrupted communications, such as a telephone line or other method, to and from any remotely monitored release detection equipment including, but not limited to, all such equipment installed by CONOCOPHILLIPS or its designee;

(W)    Keep the Station in full compliance with the requirements of the American's With Disabilities Act ("ADA"), and other similar State or Federal laws, by not obstructing, blocking or making alterations to wheelchair ramps, special doors and door handles, rest room fixtures and other appurtenance that have been installed at the Station as required by ADA; and

(X)    Keep trash containers and dumpsters clean and covered; and located in areas where appropriate and where previously authorized by CONOCOPHILLIPS.

## 6.    PROHIBITED USES

(a)    DEALER shall not use the Station, or any part thereof, without CONOCOPHILLIPS' prior written consent, for:

(1)    An automobile, truck or equipment rental business;

(2)    A vehicle towing business consisting of two (2) or more tow trucks;

(3)    A business of selling motorized vehicles of any kind;

(4)    A parking lot, or storage of junk, disabled vehicles, and/or used tires and batteries;

(5)    A business that includes engine overhauls, auto body repair, welding, or any other operation that involves an open flame, or

(6)    A franchise or franchise business including, but not limited to, Quick Service Restaurants ("QSR's"), operated on or from the Station other than any franchise or franchise business approved by CONOCOPHILLIPS or offered by CONOCOPHILLIPS to DEALER;

(b)    Without the prior written consent of CONOCOPHILLIPS, said consent to be at CONOCOPHILLIPS' sole discretion, DEALER shall not:

(1)    Obstruct any entrance, exit, pin corner, or pump island, or otherwise restrict access to the Station, or any part thereof, or block delivery carrier's access to storage tank fill pipes;

000017

10



(2)     Store or sell any intoxicating beverage unless the Station has previously been approved for the sale of alcoholic beverages, or unless DEALER has secured CONOCOPHILLIPS' prior written approval and any and all necessary permits and licenses and liquor liability insurance and DEALER and DEALER's employees are trained in the proper procedures of selling intoxicating beverages. Further, no intoxicating beverage shall be consumed by anyone at the Station; and DEALER shall not permit anyone to work at the Station while under the influence of an intoxicating beverage;

(3)     Purchase motor fuel and /or products under this Agreement for resale at any site other than Station;

(4)     Store, sell or consume any illegal drugs, or permit drug paraphernalia to be present or tolerated at the Station; and DEALER shall not permit anyone to work at the Station while under the influence of an illegal drug;

(5)     Conduct any illegal, pornographic, sexually explicit, offensive, noisy or dangerous activities including, but not limited to, the sale or display of any illegal, pornographic or sexually explicit materials;

(6)     Discharge, or permit the discharge of, petroleum products or other products or materials onto the Station, or adjacent properties;

(7)     Maintain or permit animals to be present, or any condition to exist which may endanger the health, safety or well being of persons at the Station;

(8)     Restrict the use of the Station facilities by the installation of coin-operated devices in the rest rooms, on rest room doors, or install or operate any pinball or amusement games of any type;

(9)     Create or permit waste at the Station, or any part thereof, or allow, or condone, any activity on the Station, or any part thereof, that shall be considered to be a nuisance;

(10)     Sell at or from the Station, State Lottery tickets, and in the event Station is approved for State Lottery ticket sells, DEALER shall utilize only signs for such sales as are permitted by local ordinances, and approved by CONOCOPHILLIPS;

(11)     Operate, install or locate any vending machines or storage bins;

(12)     Permit the Station to be used as housing, sleeping, or living quarters. Station is to be used for business purposes only; and/or

(13)     Attach or place anything anywhere which could diminish, interfere with, infringe upon or otherwise dilute the Union 76 Mark(s) or confuse or deceive the public.

## 7.     IMAGE AND OPERATIONS STANDARDS PROGRAM

(a)  CONOCOPHILLIPS has developed and manages a customer service and service station operations quality assurance and image consistency program, as described in the Brand and Image Standards materials, to be provided by CONOCOPHILLIPS to DEALER from time to time via CONOCOPHILLIPS website, which is incorporated into and made a part of this Agreement by this reference. DEALER hereby agrees that compliance with the Brand and Image Standards materials is of material significance to the business relationship created by this Agreement, and that such compliance is intended to ensure that all CONOCOPHILLIPS dealers meet and/or exceed the expectations of their customers. DEALER shall employ such personnel and other resources so as to consistently comply with the Brand and Image Standards materials. CONOCOPHILLIPS shall have the right, from time to time, in its sole discretion to amend, add to or delete any standard, procedure, policy or restriction set forth in such Brand and Image materials.

000018

11



(b)    DEALER acknowledges that providing superior customer service and high quality in the operations of the marketing premises at the Station are essential not only to the success of DEALER's business but also to the reputation and integrity of CONOCOPHILLIPS and the Union 76 Marks. DEALER therefore agrees that DEALER shall:

(1)    Strive to obtain and maintain compliance at all times with the Brand and Image Standards;

(2)    Develop customer responsiveness programs designed to respond to and resolve customer inquiries or complaints within a maximum of fourteen (14) days from the date any inquiry or complain was directly received by DEALER or referred to DEALER for response from CONOCOPHILLIPS;

(3)    Monitor the quality of service, image, and cleanliness at the Station, and

(4)    Participate on the same basis as other DEALERS, and at DEALER's expense, in CONOCOPHILLIPS' Mystery Shopper Program, or such similar programs as CONOCOPHILLIPS may from time to time require of its DEALERS, and promptly take actions to correct or improve any operations at the Station which scores lower than the baseline score as established from time to time by CONOCOPHILLIPS. CONOCOPHILLIPS and DEALER acknowledge and agree that CONOCOPHILLIPS shall not be obligated to develop and implement a Mystery Shopper Program, or other similar program, on a continuous basis throughout the Term hereof.

## 8.    OPERATING EXPENSES

DEALER shall pay all charges and expenses connected with the operation of the Station including, but not limited to, rent, licenses, permits, inspection fees, property taxes, levies, special assessments, common area maintenance and other expenses including, but not limited to, those incurred for the testing for motor fuel shortages, if due to DEALER negligence, or if required by law, ordinance or regulation, the calibration of dispensing equipment, and registration of storage tanks as required by governmental regulations, occupation and license taxes, water, sewer, gas, telephone, electricity, and power, charges assessed, or charged on, or against the Station, DEALER's use, or occupancy thereof, or the business conducted thereon. DEALER shall have all meters, and accounts, for water, sewer, gas, telephone, electricity, power, and other utilities, transferred to and maintained at all times in DEALER's name. If DEALER fails or refuses to make timely payment of any charge, expense, and/or tax, CONOCOPHILLIPS may, but is not obligated to, make payment on behalf of DEALER, and charge the cost to DEALER's account as additional rent payable immediately.

## 9.    TAXES

(a)    If any governmental authority now has, or later places, a tax, excise or charge on CONOCOPHILLIPS because of the manufacture, storage, withdrawal from storage, transportation, distribution, sale or handling of any CONOCOPHILLIPS motor fuel delivered by CONOCOPHILLIPS to DEALER or such tax, excise or charge is measured by the proceeds received by CONOCOPHILLIPS because of its distribution or sale of CONOCOPHILLIPS motor fuel to DEALER, the tax, excise or charge shall be added to the purchase price to be paid by DEALER unless such tax, excise or charge is included in the purchase price of the CONOCOPHILLIPS motor fuel.

(b)    CONOCOPHILLIPS will pay directly to any taxing agency all real property taxes on the Station, except that DEALER will pay directly to any taxing agency: (1) All taxes on any personal property placed on the Station by DEALER; and (2) Any licenses, occupation and inspection fees or charges in connection with DEALER's use or occupancy of the Station. Pursuant to CONOCOPHILLIPS' Rent Policy, CONOCOPHILLIPS reserves the right to charge DEALER for property taxes (and any personal property taxes CONOCOPHILLIPS may pay on DEALER's behalf) as additional rent.

000019



## 10. TRADEMARKS

(a)    It is expressly agreed that any Union 76 Marks used by DEALER hereunder are the sole and exclusive property of CONOCOPHILLIPS, and that nothing in this Agreement grants or shall be construed as granting DEALER or any other any right, title or interest therein.

(b)    DEALER shall not adulterate, add to, mix, commingle or blend with any of CONOCOPHILLIPS' products in connection with which DEALER uses the Union 76 Marks, any other products, additives, materials or substances without first obtaining the prior written consent of CONOCOPHILLIPS. DEALER agrees that under no circumstances will the Marks or distinctive colors of Union 76 licensed under this Agreement be used to identify products originating from any source other than CONOCOPHILLIPS or other than the particular grade or quality corresponding to the designated use. CONOCOPHILLIPS shall have the right from time to time to take samples of motor fuel from the Station for testing purposes, at CONOCOPHILLIPS' option, to ensure compliance.

(c)    The Station and the dispensing equipment used for licensed products under this Agreement, shall be identified and kept clean and legible in accordance with CONOCOPHILLIPS' visual standards. CONOCOPHILLIPS (and/or its agent) shall erect appropriate signs and other identification materials indicating the Station is a branded facility licensed for the sale of Union 76 products, which DEALER shall keep clean and legible, and not modify, alter, obstruct or move in any way. CONOCOPHILLIPS (and/or its agent) shall have the right to enter upon the Station from time to time to adjust, exchange, remove or add to CONOCOPHILLIPS' signs and other identification materials. During the Term of this Agreement, DEALER shall be entitled to use the Union 76 Marks under this Agreement as authorized and approved by CONOCOPHILLIPS from time to time on equipment and vehicles owned by DEALER to identify DEALER as a Union 76 branded dealer of the licensed products and services. Any advertising materials utilized by DEALER shall be in conformity with CONOCOPHILLIPS' standards for the Union 76 Marks.

(d)    Upon expiration, termination, nonrenewal or cancellation of this Agreement, for any reason, DEALER shall immediately cease and discontinue the use of said Union 76 Marks or any marks or names confusingly similar thereto in DEALER's operations or in advertising and promotions and return to CONOCOPHILLIPS all signs or advertising materials containing such Union 76 Marks.

## 11. MOTOR FUEL BRANDS, GRADES AND QUANTITY

(a)    During the Term of this Agreement, DEALER shall continuously stock and offer for sale sufficient quantities of each grade and type of Union 76 branded motor fuels, generally offered by 76 dealers in the geographic area of DEALER's Station, as will satisfy consumer purchase requirements on a prompt basis. CONOCOPHILLIPS shall have the right to change or discontinue, from time to time, such brands or grades of motor fuels without DEALER's permission.

(b)    DEALER shall purchase directly from CONOCOPHILLIPS, or from other authorized sellers of  Union 76 branded motor fuel products as CONOCOPHILLIPS may from time to time authorize, for delivery to the Station all of DEALER's motor fuel products purchase requirements, which must be at least eighty percent (80%) of the Quarterly Minimum and Annual Quantities set forth in **Exhibit E.** CONOCOPHILLIPS may, at CONOCOPHILLIPS' sole option, sell to DEALER more than the quantities set forth in **Exhibit E** upon DEALER's request, but CONOCOPHILLIPS shall not be obligated to do so. In the event any month of the Term of this Agreement is not a full month (hereinafter "Partial Month"), the Quarterly Minimum Quantities shall be prorated for the number of days in the Partial Month. Provided DEALER is not prevented from purchasing motor fuels from CONOCOPHILLIPS due to any Allocation program CONOCOPHILLIPS may implement pursuant to the Allocation Section herein, or due to a force majeure event, DEALER's failure to purchase eighty percent (80%) of the Quarterly Minimum and Annual Quantities set forth in **Exhibit E** will result in DEALER being in default of this Agreement,

000020



and in the event DEALER continuously fails to purchase and receive the Minimum Quantities, CONOCOPHILLIPS may, in addition to all other remedies available to it, terminate or nonrenew this Agreement.

(c) To facilitate deliveries to the Station, DEALER agrees to order products by such method as CONOCOPHILLIPS reasonably determines, in its sole discretion, will best achieve compliance with the requirements set forth in this Motor Fuel Brands, Grades and Quantity Section including, but not limited to, CONOCOPHILLIPS' Automatic Replenishment/Inventory Management Program.

(1) On each day of Station operations including, but not limited to, Saturdays, Sundays and holidays, DEALER shall via a telephone transmission procedure prescribed by CONOCOPHILLIPS, enter into CONOCOPHILLIPS' Automatic Replenishment/Inventory Management Program the following data:

(A) The quantity in gallons of the prior days sales of each grade of motor fuel offered for sale at the Station; and

(B) The quantity in gallons of the ending inventory for the prior day of each grade of motor fuel stored in the underground storage tanks at the Station.

(d) DEALER also agrees to accept delivery at such time, by such method of delivery, and in such minimum quantities per single delivery, as CONOCOPHILLIPS shall elect. DEALER hereby grants CONOCOPHILLIPS twenty-four (24) hour per day access to DEALER's motor fuel storage tanks for purposes of delivery.

## 12. DELIVERY

(a) Deliveries of CONOCOPHILLIPS motor fuel shall be made at times determined by CONOCOPHILLIPS upon DEALER's order of full truck and trailer quantities in single deliveries subject to CONOCOPHILLIPS' equipment and product availability. CONOCOPHILLIPS shall make all reasonable efforts to deliver motor fuels to the Station within twenty-four (24) hours of DEALER's order, or within twenty-four (24) hours after the Automatic Replenishment/Inventory Management Program indicates a full load of fuel may be received at the Station, 365 days per year; however, CONOCOPHILLIPS shall not be required to make deliveries within forty-eight (48) hours following receipt of DEALER order or outside of business hours or on Sunday or holidays.

(b) CONOCOPHILLIPS will fill all orders with reasonable promptness, but shall not be liable for loss or damage due to delays or failure in whole or in part to fill orders resulting from DEALER's banking arrangements, ability for CONOCOPHILLIPS to confirm DEALER's funds, acts of God, acts of publics enemies, laws, regulations, orders, requests, recommendations or rules of civil or military authorities, fires, floods, storms, strikes, labor disputes, accidents, equipment failure, shortage of labor, of crude oil, of refined products or refinery capacity, of materials, or of transportation, or any other cause beyond CONOCOPHILLIPS' reasonable control, either at its own plants or those of its sources of supply, or in connection with the delivery of its products. If because of any of the foregoing causes or other actual or threatened disruption in supply, CONOCOPHILLIPS is prevented or deems it necessary to not supply the full quantities of any one or more of its products hereunder, CONOCOPHILLIPS shall have the right without liability to DEALER to allocate the quantity deliverable hereunder to DEALER, to its other customers for like products, and to its own requirements in such manner as CONOCOPHILLIPS may deem reasonable, or according to any required allocation program, and DEALER shall be bound by such allocation. In no event shall CONOCOPHILLIPS be liable for loss of profits or special or consequential damages because of delay or failure to make deliveries.

(c) If DEALER requests delivery of less than CONOCOPHILLIPS' established minimum volumes, compensatory delivery charges may be imposed at CONOCOPHILLIPS' discretion. If, at that time this Agreement is entered into, the Station is equipped for the handling of only two (2) grades of

000021

14



gasoline, DEALER acknowledges and agrees that CONOCOPHILLIPS has no obligation to supply three (3) grades of gasoline to the Station. In no circumstances is CONOCOPHILLIPS obligated to make deliveries into a tank which is or is suspected of leaking.

(d)    In all instances, CONOCOPHILLIPS reserves the right to charge DEALER a demurrage or administrative charge(s), in such amounts as are reasonable and customary, in the event CONOCOPHILLIPS determines in good faith that DEALER is responsible for delaying the delivery of motor fuel products to the Station including, but not limited to, a determination that the quantity of motor fuel products staged for delivery to the Station could not in fact have been delivered because DEALER failed to comply with or erroneously reported the data to CONOCOPHILLIPS.

### 13.    TITLE TO MOTOR FUEL AND STOCK LOSSES

(a)    Title to and risk of loss of CONOCOPHILLIPS motor fuel delivered by CONOCOPHILLIPS to DEALER under this Agreement passes to DEALER at the time the motor fuel enters the motor fuel storage tanks at the Station.

(b)    DEALER shall make a good faith effort to advise CONOCOPHILLIPS of any claim of which DEALER becomes aware as to quality of CONOCOPHILLIPS motor fuel delivered under this Agreement in writing within five (5) days after discovery thereof.

(c)    DEALER shall make a good faith effort to advise CONOCOPHILLIPS of any claim of which DEALER becomes aware as to quantity of CONOCOPHILLIPS motor fuel delivered under this Agreement in writing within ten (10) days after delivery.

### 14.    ALLOCATION

If at any time the volume of CONOCOPHILLIPS motor fuel CONOCOPHILLIPS has available for sale and delivery to its customers is, for any reason not within CONOCOPHILLIPS' reasonable control, less than the volume needed to supply its customer demands, CONOCOPHILLIPS shall allocate the volume of available CONOCOPHILLIPS motor fuel to itself and its customers under a plan and formula that CONOCOPHILLIPS determines is fair and reasonable as applied to all customers of CONOCOPHILLIPS who have a demand for such products.

### 15.    PURCHASE PRICE

The purchase price to be paid by DEALER for the brand and grade of CONOCOPHILLIPS motor fuel delivered to the Station shall be the price in effect for the Station at the time CONOCOPHILLIPS loads the branded motor fuel at its bulk plant or terminal for delivery to the Station.

### 16.    TERMS OF PAYMENT / CREDIT REQUIREMENTS

(a)    DEALER shall pay for all motor fuel purchased from CONOCOPHILLIPS according to the terms established from time to time by CONOCOPHILLIPS' Treasury/Credit Department. DEALER shall pay any administrative charges as CONOCOPHILLIPS may from time to time specify and as are permitted by law, for any checks or bank or other financial institution debits that are not honored by DEALER's bank or other financial institution or are otherwise returned or reversed by the bank or other financial institution.

(b)    DEALER shall submit to CONOCOPHILLIPS annually, or as requested, current signed and dated personal financial statements for each principal owner of the business, represented and warranted by the officers of a corporation if applicable, under which DEALER operates the Station. The personal financial statements shall be prepared consistent with the format approved by CONOCOPHILLIPS. DEALER shall also submit to CONOCOPHILLIPS annually, or as requested, current business financial statements including, but not limited to, balance sheet, statement of income, and statement of cashflows. DEALER's that operate the Station under a form of business other than a sole proprietorship or general partnership are required to provide CONOCOPHILLIPS with a personal·



guarantee, including spousal signatures. DEALER's failure to respond to any such request may result in CONOCOPHILLIPS' withdrawal or denial of credit privileges to DEALER. If DEALER fails to fulfill the terms of payment or if DEALER's financial condition deteriorates, in the good faith judgment of CONOCOPHILLIPS' Treasury/Credit Department, CONOCOPHILLIPS may, without prejudice to any other lawful remedy, may change credit terms including, but not limited to, defer product shipments until payment is made, demand cash payment, demand payment in advance, nonrenew, or terminate this Agreement.

(c)     DEALER may be required to maintain a security reserve in an amount as is reasonably determined by CONOCOPHILLIPS' Treasury/Credit Department from time to time ("Security Reserve"). DEALER shall deposit the Security Reserve required into DEALER's reserve account with CONOCOPHILLIPS promptly upon request by CONOCOPHILLIPS. In the event DEALER has any outstanding amounts due on DEALER's account and/or any ancillary agreements including, but not limited to, amortization agreements, promissory notes, equipment leasing agreements or facility modification agreements, CONOCOPHILLIPS shall have the option to use any or all of the Security Reserve, without prior notice or demand, to offset or satisfy all or any part of any indebtedness or obligation of DEALER.

(d)     CONOCOPHILLIPS may use, without prior notice or demand, any or all of DEALER's credit card receipts to setoff or satisfy all or any part of any indebtedness or obligation of DEALER.

(e)     No payment made to CONOCOPHILLIPS by check or other instrument shall contain a restrictive endorsement of any kind. A restrictive endorsement shall have no legal effect even if the instrument restrictively endorsed is processed for payment and CONOCOPHILLIPS retains the proceeds.

(f)     DEALER agrees to establish an account with a financial institution that provides electronic fund transfer ("EFT") services and to authorize certain transfers of funds between that account and designated account(s) of CONOCOPHILLIPS under terms and conditions that may be established by CONOCOPHILLIPS from time to time. DEALER shall provide CONOCOPHILLIPS with the information and authorization necessary to debit and credit DEALER's account through EFT transactions. The types of DEALER debiting transactions from which EFT's may be used include, but are not limited to, payment for rent, amortization agreement if any, promissory note if any, motor fuel deliveries, other product purchases, credit card chargebacks, DEALER repairs made by CONOCOPHILLIPS and other monies owned by DEALER to CONOCOPHILLIPS. The types of DEALER credit transactions which may be made through EFT's include, but are not limited to, CONOCOPHILLIPS purchases of credit card invoices and any rebates or other price adjustment for which DEALER may qualify. CONOCOPHILLIPS reserves the right to require DEALER to make or receive payments for other additional types of transactions. DEALER agrees to provide the necessary authorization and assistance to implement such additional EFT's promptly upon the request by CONOCOPHILLIPS.

**17.    SIGNS**

(a)     Subject to applicable laws, ordinances, and regulations, and subject to CONOCOPHILLIPS' prior written approval as to format, location, size, and color scheme DEALER may install advertising materials only for the products, services and promotions available at the Station.

(b)     Further, DEALER agrees that the dispenser posted price of each grade of gasoline, and if applicable, diesel fuel, offered for sale from the Station shall be displayed at all times on appropriately illuminated signs at or near the street(s) fronting the Station, and that the size and color of price sign letters and numerals shall comply with CONOCOPHILLIPS' image requirements and any and all State and Federal requirements. In no instance shall DEALER remove said signs, letters, or numerals without CONOCOPHILLIPS' prior written approval.

000023



**18. NO EXCLUSIVE AREA**

DEALER and CONOCOPHILLIPS hereby agree that nothing herein, shall be construed as giving DEALER an exclusive right to sell in any area. CONOCOPHILLIPS reserves the right to sell its motor fuel, tires, batteries, accessories, lubricating oils, whether branded or unbranded, or any other product anywhere, including in the area or market in which the Station is located.

**19. MAINTENANCE AND REPAIRS**

(a) DEALER acknowledges and accepts the responsibility to maintain all equipment located at the Station which is the personal property of DEALER ("DEALER Owned Equipment") at DEALER's sole cost and expense. DEALER shall at DEALER's sole cost and expense, clean, maintain, repair, replace all of the DEALER Owned Equipment, provided, however, that CONOCOPHILLIPS may clean, maintain, repair and replace any such DEALER Owned Equipment on DEALER's behalf in the event DEALER Owned Equipment is not in compliance with applicable laws, does not meet the image standards of CONOCOPHILLIPS or poses a safety risk, and CONOCOPHILLIPS shall have the right to charge the expense to DEALER's account as additional rent.

(b) DEALER shall, at DEALER's sole cost and expense, clean, maintain, repair and replace all of CONOCOPHILLIPS' equipment at the Station as set forth in **Exhibit C**. IF DEALER fails or refuses to perform any obligations set forth in **Exhibit C**, CONOCOPHILLIPS may do so on DEALER's behalf, and CONOCOPHILLIPS shall have the right to charge the expense to DEALER's account as additional rent.

(c) CONOCOPHILLIPS is responsible for undertaking and performing the cleaning, maintenance, repairs and replacements not required of DEALER and as set forth in **Exhibit C**. Notwithstanding CONOCOPHILLIPS' obligations set forth in **Exhibit C**, because DEALER has the day to day control of the Station, DEALER has the obligation to take all reasonable steps to keep the Station safe for all persons at the Station. Therefore, DEALER shall undertake and perform interim repairs or maintenance, including repairs and maintenance that may be required of CONOCOPHILLIPS under **Exhibit C** in order to keep the Station safe to all persons, and until such time as DEALER notifies CONOCOPHILLIPS of the unsafe condition and CONOCOPHILLIPS performs its required repair and maintenance obligations set forth in **Exhibit C**. Pursuant to CONOCOPHILLIPS' Rent Policy, CONOCOPHILLIPS reserves the right to charge DEALER for all cleaning, maintenance, and repairs performed by CONOCOPHILLIPS at the Station as additional rent.

(d) If the Station, or any part thereof, is damaged or destroyed, DEALER shall advise CONOCOPHILLIPS immediately of such damage or destruction by the fastest means possible, but in no event later than twenty-four (24) hours after the damage or destruction occurs, and shall confirm the damage or destruction within four (4) days of its occurrence by completing and sending to CONOCOPHILLIPS the then applicable property/environmental loss report form. DEALER is responsible for and DEALER's obligation of indemnity and defense shall extend to and include damage to or destruction of the Station, or any part thereof.

**20. TELECOMMUNICATIONS**

CONOCOPHILLIPS reserves the right, from time to time, to require DEALER to obtain telecommunications equipment for the processing and transfer of business data between CONOCOPHILLIPS and DEALER. Data received or transmitted over such equipment may include, but is not limited to, the following: pricing information, credit card processing information, fuel delivery scheduling information, and other information deemed by CONOCOPHILLIPS to be necessary for the facilitation of the business set forth in this Agreement. Telecommunication equipment includes, but is not limited to, the following: electronic facsimile machines, personal computers equipped with telephone modems, satellite transmission and receiving equipment and Card Reader In Dispenser (CRIND) equipment. DEALER agrees to obtain said equipment at DEALER's sole expense, as well as pay any monthly fees for equipment or services, unless otherwise specified by CONOCOPHILLIPS. CONOCOPHILLIPS agrees to

000024



provide DEALER at least sixty (60) days prior written notice of any equipment or service requirement relating to this Section.

## 21.    MAJOR REPAIRS

In the event a major repair or replacement is required, which is the responsibility of CONOCOPHILLIPS and CONOCOPHILLIPS has determined said repair or replacement will cost more than $50,000.00, including particularly replacement of under ground tanks or lines, CONOCOPHILLIPS shall have the right, at CONOCOPHILLIPS' sole option, to elect not to make the repair or replacement if CONOCOPHILLIPS has determined in good faith that the repair or replacement is uneconomical or does not further CONOCOPHILLIPS' legitimate business interests in the continued operation of the Station. In the event CONOCOPHILLIPS elects not to make said repairs and replacement, and CONOCOPHILLIPS determines the Station is no longer usable for the sale of motor fuel, motor oils and other merchandise, products and services customarily sold at such facilities, such event shall constitute appropriate grounds for termination of this Agreement. If the Station is usable for the purposes set forth in this Agreement but has a diminished value without the repair or replacement, CONOCOPHILLIPS will adjust the rent in an equitable manner to reflect the diminished value determined by CONOCOPHILLIPS.

## 22.    ALTERATIONS AND BUSINESS CHANGES

(a)    Except for DEALER's obligations to perform cleaning, maintenance, and repairs at the Station, DEALER shall not make or permit anyone to make any improvements, alterations, decorations, or additions, structural or otherwise, in or to the Station, or any part thereof, without first obtaining the written consent of CONOCOPHILLIPS. All improvements, alterations, decorations, or additions, made by DEALER shall be completed in a good and workmanlike manner in accordance with all applicable laws and requirements, and DEALER shall indemnify and hold CONOCOPHILLIPS harmless from and against any and all costs, expenses, claims, liens, and damages to person or property, resulting from the making of any such improvements, alterations, decorations, or additions, in or to the Station.

(b)    DEALER shall not do or suffer anything to be done whereby the Station may be encumbered by a mechanic's lien or liens. If, however, any mechanic's lien is filed against the Station, DEALER shall discharge the same of record within ten (10) days after the date of filing. If DEALER fails to discharge any such lien as provided herein, excepting those liens created solely by CONOCOPHILLIPS, such failure shall be a default of this Agreement.

(c)    CONOCOPHILLIPS shall not be liable for any labor, or materials, to be furnished to DEALER upon credit, and no mechanic's, or other, lien for any such labor, or materials, shall attach to, or affect the reversionary, or other estate or interests of CONOCOPHILLIPS in and to the Station.

(d)    Due to the dynamic nature of the motor fuel retailing industry, DEALER acknowledges and agrees that during the Term of this Agreement, CONOCOPHILLIPS may, but is not obligated to, review potential changes to the Station which would enhance the Station product and service offering including, but not limited to, gas only, total self serve, convenience store and car wash operations. CONOCOPHILLIPS shall have the right to make changes in the Station including, but not limited to, demolishing, rebuilding, reconstructing, remodeling, modernizing, changing, installing, modifying or making additions to any part of or all of the Station, to expand or narrow the goods and services available either by mutual agreement with DEALER at any time during the Term or this Agreement, or in the alternative upon six (6) months written notice to DEALER, and to alter the rental fees to be consistent with the arrangement then in effect, or then being placed in effect consistent with the Rent section of this Agreement, for all other dealers engaged in the same type of business changes in the marketing area in which the Station is located. Such a change in mode of operation will not affect the DEALER's right, subject to compliance with all the terms and conditions hereof, to continue in the Station for the full Term of this Agreement. DEALER agrees to fully cooperate with CONOCOPHILLIPS during the Station changes.

000025

18



## 23.    ENVIRONMENTAL COMPLIANCE

(a)    DEALER agrees to become informed about, comply and cooperate with and abide by all local, State and Federal laws, statutes, regulations and ordinances related to environmental protection, compliance or regulations and ordinances related to environmental protection, compliance or requirements related thereto, whether currently in effect or which may come into effect in the future including, but not limited to:

(1)    The Resource Conservation and Recovery Act, as amended, 42 USC 6901, et seq., the Clean Water Act, as amended, 33 USC 1251, et seq., the Clean Air Act, as amended, 42 USC 7401, et seq., and the Safe Drinking Water Act, as amended, 42 USC 300 f, et seq.;

(2)    The generation, handling, transportation, treatment, storage and/or disposal of solid or hazardous wastes. DEALER agrees to implement appropriate recycling, waste management and waste minimization practices and procedures;

(3)    The Environmental Protection Act with special attention to the regulations governing the storage, dispensing and sale of unleaded gasoline;

(4)    All local laws and ordinances related to the environment and with the rules, orders and regulations issued and promulgated thereunder. DEALER shall procure and maintain at DEALER's sole cost and expense all permits and licenses required thereunder;

(5)    The underground storage tank ("UST") system compliance requirements, whether currently in effect or which may come into effect in the future including, but not limited to, the following:

(A)    Required inspections of any release detection equipment;

(B)    Required inspections of any automatic tank gauging equipment; and

(C)    Maintenance and required inspections of any vapor recovery equipment.

(6)    DEALER agrees to maintain written records of all maintenance and inspections of the UST system. DEALER will maintain such records at the Station for at least twelve (12) months, or longer if required by law, and make available said records to CONOCOPHILLIPS, and/or CONOCOPHILLIPS' designee, upon request. DEALER shall submit an annual report to CONOCOPHILLIPS, in accordance with CONOCOPHILLIPS' published policy and procedures, documenting all maintenance and inspections of the UST System on each anniversary of this Agreement;

(7)    DEALER shall make daily physical measurements of all products stored in UST's and to perform daily and monthly reconciliation(s) of such measurements with metered sales and product deliveries in accordance with CONOCOPHILLIPS, local, State and Federal requirements. Physical reconciliation does not include any electronic gauging system. DEALER agrees to develop and maintain written records of the daily physical product measurements and daily and monthly reconciliation(s). DEALER shall implement and adhere to a motor fuel inventory reconciliation program that includes: (i) A daily stick measurement to check for water contamination and determine the volume of motor fuel in storage; (ii) Recording of the volume of motor fuel received; (iii) Recording of the volume sold including daily dispenser meter readings for all motor fuel products, which will support daily inventory reconciliation(s); and (iv) Records the factors or reasons for any inventory variations;

(8)    DEALER shall provide in writing an inventory reconciliation report, in accordance with applicable regulations to CONOCOPHILLIPS, and /or to CONOCOPHILLIPS' designee, to be received by CONOCOPHILLIPS, and or its designee, no later than five (5) working days after each

000026

19



month end. DEALER agrees to provide documentation of any factors that may explain any inventory variances. DEALER will maintain such records at the Station for at least twelve (12) months, or longer if required by law. DEALER shall immediately notify CONOCOPHILLIPS and any appropriate local, State or Federal governmental agency after discovery of any inventory loss or other condition which may be the result of a leaking UST or other equipment failure including, but not limited to, a loss of motor fuel or variation of 100 or more gallons on a daily or cumulative basis of up to thirty (30) days is reflected in its daily inventory reconciliation program, or presence of one (1) inch or more of water is found in any gasoline storage tank, or one-half (1/2) inch or more of water is found in any diesel fuel storage tanks. If DEALER's first notification to CONOCOPHILLIPS of a loss is verbal, the DEALER shall confirm such notice in writing immediately after giving the verbal notice. CONOCOPHILLIPS shall have the sole right to determine what tests are requested to confirm any leaks and what corrective measures are to be taken;

(9)     DEALER shall forward to CONOCOPHILLIPS immediately upon receipt, by facsimile or overnight service, copies of all notices from governmental or administrative authorities that may apply to or affect CONOCOPHILLIPS' interest or rights in the Station, or that result from actual or alleged violations of law or standards at the Station. CONOCOPHILLIPS shall have the right to promptly investigate and undertake the appropriate remedy. DEALER agrees to cooperate at all times with CONOCOPHILLIPS, and /or the prior owners of the Station, during any investigation or remedial activity;

(10)    DEALER agrees that representatives of CONOCOPHILLIPS shall be permitted to enter upon the Station form time to time to perform physical measurements and reconciliation(s) of product stored in the UST system and to inspect and /or test any equipment and review any records used for complying with any local, State or Federal environmental protection or environmental compliance requirement including, but not limited to, DEALER's inventory reconciliation(s) and inspection records. However, CONOCOPHILLIPS is not obligated to make any such inspections or tests; and

(11)    DEALER agrees to indemnify, defend, protect and hold harmless CONOCOPHILLIPS, its employees, officers, agents, affiliates and CONOCOPHILLIPS' lessor, if any, from and against any and all liabilities, losses, obligations, claims, damages (consequential or otherwise), penalties, suits, actions, judgments, orders, interest, costs, expenses and claims (including attorneys' fees) of whatever nature for personal injury (including death) of persons (including agents and employees of CONOCOPHILLIPS and DEALER) or property damage (including that of CONOCOPHILLIPS and DEALER), which may be imposed on, incurred by or asserted against CONOCOPHILLIPS (or affiliates) directly or indirectly, caused in whole or in part by DEALER's failure to comply with any local, State or Federal law, statute, regulation, rule, order or ordinance, whether currently in effect or which may come into effect, related to environmental protection or environmental compliance. This indemnity in no way limits and is intended to be within the scope of the general indemnity se forth in the Indemnification Section of this Agreement.

## 24.    INSPECTION OF STATION

(a)     CONOCOPHILLIPS hereby reserves the following rights to the Station:

(1)     The right to enter and inspect the Station at any reasonable time and from time to time with such employees and equipment as CONOCOPHILLIPS considers necessary to: (i) Determine if the obligations of DEALER under this Agreement are being fulfilled; (ii) Perform maintenance, repairs, and replacements required of CONOCOPHILLIPS under this Agreement; and (iii) To conduct such other business as CONOCOPHILLIPS reasonably determines is necessary and appropriate to fulfill its obligations under this Agreement;

(2)     Easement(s) to permit all existing wires, pipes, lines and other conduits now situated on, under or over the Station to remain in the locations in which they are currently situated;

000027



(3)    Easement(s) to install or grant to any third party the right to install and maintain on, under or over the Station, new and additional telephone lines, monitoring equipment, wires, pipes, lines and conduits, so long as the foregoing or the use thereof do not substantially, materially and adversely interfere with DEALER's use and enjoyment of the Station;

(4)    The right to use and grant to any third party the right to use any of the foregoing telephone lines, monitoring equipment, wires, pipes, lines and other conduits for the purpose for which they are intended;

(5)    The right to enter the Station or cause or permit to any third party to enter the same, from time to time, after reasonable notice to DEALER, to install, maintain, repair, enlarge or alter the foregoing telephone lines, monitoring equipment, wires, pipes, lines or other conduits, so long as the foregoing does not substantially, materially and adversely interfere with DEALER's use or enjoyment of the Station; and

(6)    The right to dedicate to governmental authorities and grant easements, licenses or right-of-way to third parties over and otherwise encumber portions of the Station, so long as the foregoing dedication, grants and encumbrances do not substantially, materially and adversely interfere with DEALER's use and enjoyment of the Station.

## 25.    RECORDS AND AUDITS

(a)    DEALER shall maintain permanent and complete records of all sales of motor fuels as required by law and/or this Agreement.    The records shall include sales slips, sales checks, other original sales records and a daily motor fuel inventory that shall include motor fuel deliveries received, motor fuel sales, including daily dispenser meter readings for all motor fuel products, which will support daily inventory reconciliation(s) made at the Station.    If requested by CONOCOPHILLIPS, DEALER shall provide sales records, verified as to completeness and accuracy before a notary public.

(b)    CONOCOPHILLIPS, or their authorized representative, shall have the right to audit DEALER's books, records, reports, or any and all other records to determine DEALER's compliance with this Agreement.    The purpose of such an audit by CONOCOPHILLIPS shall include, but is not limited to: (1) Determining the gallons of motor fuel sold under the Union 76 Mark; (2) Environmental compliance; (3) Verification of credit card receipts; and/or (4) Review of DEALER's inventory reconciliation(s) records.    If requested by CONOCOPHILLIPS, DEALER shall provide a statement of said records verified before a notary public.

## 26.    INDEMNIFICATION

(a)    DEALER shall protect, defend, indemnify and hold CONOCOPHILLIPS, its parent, subsidiaries, employees, officers, agents, affiliates, lessor (if applicable), and its licensor (if applicable) harmless from and against any and all liabilities, losses, obligations, claims, damages (consequential or otherwise), penalties, suits, actions, judgments, costs and expenses (including attorneys' fees) of whatsoever nature for violation of laws, ordinances or regulations, damage to property (including that of CONOCOPHILLIPS or DEALER) or for injury to or death of persons (including agents and employees of CONOCOPHILLIPS or DEALER) which may be imposed upon, incurred by, or asserted against CONOCOPHILLIPS directly or indirectly and resulting from or connected with any occurrence arising out of DEALER's use, non-use, possession, condition, operation, or maintenance of the Station and the business conducted by DEALER thereon; except those liabilities, losses, obligations, claims, damages, penalties, suits, actions, judgments, costs and expenses determined to have been caused by the negligence or willful misconduct of CONOCOPHILLIPS, or its subcontractors, and Acts of God including tornadoes, hurricanes and lightning.

(b)    As DEALER has the day to day occupation and control of the Station, DEALER shall diligently maintain the Station including, but not limited to:

76 kb_fuelsupplyagrmt

Revised 10/11/2006

000028

21



(1)    Immediate clean up and proper disposal of all contaminants, pollutants, toxic substances and hazardous substances which are dumped, spilled or otherwise deposited, or which appear anywhere on the Station from whatever cause or source during day to day operations of the Station. If the substance or material cleaned up and disposed of is determined to have been deposited, dumped or spilled through the sole negligence or misconduct of CONOCOPHILLIPS. CONOCOPHILLIPS or CONOCOPHILLIPS' lessor, if any, shall reimburse DEALER the reasonable cleanup and disposal costs;

(2)    Compliance with the Occupational Safety and Health Act and rules, orders and regulations, issued and promulgated thereunder applicable to DEALER's operation of the Station. DEALER shall also defend, indemnify and hold harmless CONOCOPHILLIPS and CONOCOPHILLIPS' lessor, if any, from and against any and all penalties, interests, costs, expenses, claims, judgments and orders arising out of or incident to non-compliance with said Act and the rules, orders, and regulations issued and promulgated thereunder applicable to DEALER's operation of the Station;

(3)    Immediately advise CONOCOPHILLIPS in writing of defects in or deterioration of those Station Improvements listed on **Exhibit C**, for which CONOCOPHILLIPS has the cleaning, maintenance or replacement responsibility; and

(4)    DEALER acknowledges and agrees to provide CONOCOPHILLIPS written assurance within ten (10) days from CONOCOPHILLIPS' request for DEALER to accept tender of a claim and to notify and instruct DEALER's insurance carriers that CONOCOPHILLIPS is an indemnified party.

## 27.    INSURANCE

(a)    Without limiting DEALER's obligations to indemnify CONOCOPHILLIPS fully as set forth under the Indemnification Section above, DEALER agrees to purchase and maintain at all times, at DEALER's sole cost and expense, and in compliance with any requirement of applicable law, insurance satisfactory to CONOCOPHILLIPS of the following minimum types and limits:

(1)    Commercial General Liability Insurance, or Garage Liability Insurance, or equivalent, covering DEALER's business, premises operations, completed operations and products liability, contractual liability, and occupancy of the Station, in an amount of at least $1,000,000 combined single limit for bodily injury and property damage per occurrence;

(2)    Comprehensive Automobile Liability Insurance covering all hired, owned or otherwise operated non-owned, vehicles with a minimum combined single limit of $1,000,000 for bodily injury and property damage, including personal injury, per occurrence;

(3)    Fire Legal Liability Insurance covering the Station for loss or damage from fire or explosion with a minimum limit of $100,000, or $100,000 per service bay;

(4)    Vehicle Building Damage Insurance or equivalent covering all property damages with a minimum limit of $25,000 per occurrence;

(5)    Garagekeepers Legal Liability Insurance, if applicable, covering customer's vehicles in DEALER's care, custody, and control, including coverage for loss by fire, explosion, theft, vandalism, and/or malicious mischief, and collision or upset with a minimum limit of $50,000 each occurrence;

(6)    (i) Workers' Compensation Insurance as required by law; and (ii) Employers' Liability Insurance with a minimum limit of $500,000 each occurrence or an amount which satisfies statutory requirements (whichever is greater).; and

76 kb_fuelsupplyagrmt                    21

Revised 10/11/2006

000029



(7) Liquor Liability Insurance covering DEALER's business operation for loss or damages with a minimum limit of $1,000,000 per occurrence.

(b) Without in any way limiting the obligation of DEALER to indemnify CONOCOPHILLIPS as specified above or to provide insurance with respect to operations performed pursuant to this Agreement, as further specified herein, CONOCOPHILLIPS may, at its option, upon sixty (60) days notice to DEALER during the Term of this Agreement, and in the event State funded and managed leaking Underground Storage Tank Funds are no longer available to DEALER or CONOCOPHILLIPS, require DEALER to obtain, to the extent reasonable and commercially affordable, Environmental Pollution Liability Insurance and/or Environmental Impairment Liability Insurance which specifically covers, but is not limited to, leaks occurring from the underground tanks and piping system, whether they are sudden or gradual, with coverage extending to any and all expenses of clean-up or recovery, including excavation of contaminated soil, of not less than $500,000 combined single limit of liability.

(c) The insurance policies required by this Insurance Section shall be written by companies satisfactory to CONOCOPHILLIPS. The insurance policies required hereunder shall contain a clause that insurance carried by DEALER is primary to any valid and collectible liability insurance carried by CONOCOPHILLIPS, its parent, subsidiaries and affiliates, and shall specifically name **_ConocoPhillips Company, a Delaware corporation , its subsidiaries, affiliates and assigns_**, as Additional Insureds with a Cross Liability Clause (Severability of Interest). With regards to Workers' Compensation and Employer Liability insurance, subrogation shall be waived against CONOCOPHILLIPS. DEALER's insurance coverage and policies shall state that CONOCOPHILLIPS will receive at least thirty (30) days prior written notice of any cancellation. The original certificate and any notice of cancellation or change shall be sent to the notice address in accordance with the Notice Section herein.

(d) DEALER agrees to increase the amounts of any insurance described herein promptly upon receiving the written notice of CONOCOPHILLIPS to do so.

(e) DEALER agrees that DEALER is solely responsible for any and all damages and/or liabilities to the Station caused by any third parties including, but not limited to, customers, local authorities, and cities.

(f) CONOCOPHILLIPS reserves the right to obtain insurance on behalf of DEALER should DEALER fail to obtain satisfactory insurance coverage. Said insurance coverage obtained by CONOCOPHILLIPS on behalf of DEALER shall be charged /EFT to DEALER's account as additional rent payable immediately. Further, it is the DEALER's obligation to pay the full amount of premiums due and/or any deductible amounts.

## 28. ASSIGNMENTS, SUBLETTING AND TRANSFERS

(a) DEALER may not sell the whole or any part of, assign, mortgage, encumber, sublease, dispose of or transfer the Station or this Agreement without CONOCOPHILLIPS' prior written consent. This Agreement may not be assigned by operation of law. Any attempt by DEALER to Assign this Agreement or the Station, without CONOCOPHILLIPS' prior written consent is void. The Assignment of DEALER's interest, or any part thereof, in the Station, including an Assignment of a controlling interest if DEALER is a corporation or partnership, shall be an Assignment requiring CONOCOPHILLIPS' prior written consent. DEALER's written request for CONOCOPHILLIPS' approval of any Assignment must be received by CONOCOPHILLIPS not less than ninety (90) days prior to the effective date of the proposed Assignment.

(b) CONOCOPHILLIPS shall have the right to meet any bona fide offer of any proposed Assignee, such right to be exercised by CONOCOPHILLIPS within sixty (60) days following the date CONOCOPHILLIPS receives a copy of the DEALER's written request for CONOCOPHILLIPS' approval of any Assignment ("Right of First Refusal"). DEALER shall include in such written request the name

22

000030

23



and address of the proposed Assignee and full disclosure of the price, terms and conditions contained in the bona fide offer, including a full copy of the offer. CONOCOPHILLIPS' failure to exercise its Right of First Refusal shall not terminate this Agreement nor its Right of First Refusal, or release DEALER from any of DEALER's obligations under this Agreement.

(c)     If Federal or State law gives the DEALER the right to Assign this Agreement, then any such transaction will be in accordance with the provisions of such law; provided, however, that if DEALER should, pursuant to this Agreement or Federal or State law as the case may be, assign DEALER's interest in this Agreement, CONOCOPHILLIPS does hereby reserve the right (notwithstanding any other provision hereof) to recalculate the rent or any other fees payable under this Agreement in accordance with CONOCOPHILLIPS' Rent Policy (in effect on the actual date of the Assignment) for retail service stations. Such rental recalculation, if one is made, will be effective on the date DEALER assigns any or all of DEALER's interest in this Agreement (including any sale, assignment or transfer to a corporation, partnership or other entity). CONOCOPHILLIPS will notify DEALER of any rental calculation within sixty (60) days of receipt of written notice from DEALER that DEALER desires to assign any of DEALER's interest in this Agreement. DEALER shall transmit the new rental calculation to any other interested parties. All rentals, whether recalculated or not, are effective only for the Term of this Agreement unless they are modified or amended by CONOCOPHILLIPS or by mutual agreement of DEALER and CONOCOPHILLIPS. If CONOCOPHILLIPS' Rent Policy changes prior to the date of assignment, but after having received notice from DEALER of a proposed assignment, CONOCOPHILLIPS' new Rent Policy will be used to recalculate the rent.

(d)     In the event of an Assignment by DEALER of DEALER's business, which may or may not include the assignment of this Agreement, CONOCOPHILLIPS will charge DEALER a transfer fee ("Transfer Fee"). The Transfer Fee will be based on the number of continuous years that the DEALER has leased the subject Station under this Agreement or prior agreement(s) which this Agreement renews. The Transfer Fee schedule is as follows:

| Beginning The First Day of Month: | Through The Last Day of Month: | Fee: |
| --- | --- | --- |
| 1 | 60 | $7,500 |
| 61 | 84 | $5,000 |
| 85 | | $2,500 |

The Transfer Fee shall be a lien on the business assets assigned and an obligation of assignor and/or assignee.

(e)     A minimum Transfer Fee of $500 will apply, but is not limited to, the following circumstances: (1) If the assignment is to the spouse or adult child of the DEALER; (2) If the assignment is to a corporation in which the DEALER is the principal stockholder and the officer responsible for the full-time personal operation and supervision of the Station; or (3) If the assignment is the transfer of any interest of any partner in a partnership.

(f)     If the assignment is for purposes of leasing another CONOCOPHILLIPS leased station, the Transfer Fee above must be paid at the time of the assignment. If DEALER completes the assignment into the new CONOCOPHILLIPS leased service station within four (4) months from the date of completion of the assignment of this Agreement. Assignment of this Agreement under these conditions is subject to a minimum Transfer Fee of $500 and a credit will be applied to DEALER up to the amount of Transfer Fee paid above.

(g)     Upon receiving written notice from CONOCOPHILLIPS of its waiver of its Right of First Refusal, DEALER agrees to provide to CONOCOPHILLIPS documents, pursuant to CONOCOPHILLIPS' then current dealer change procedures, required by CONOCOPHILLIPS to review and approve the incoming dealer. DEALER shall enter into a bulk sale escrow to facilitate the transfer of

Revised 10/11/2006

000031



the business, said escrow shall not have a closing date prior to the ninety (90) days notice period as required in subsection (a) above. CONOCOPHILLIPS shall place into escrow a demand for the Transfer Fees and any outstanding accounts receivable. In addition, DEALER shall notify the taxing authorities in order to allow for timely receipt of tax releases. CONOCOPHILLIPS shall have the right to demand that the escrow agent or service hold back a percentage of the funds deposited into escrow, post closing, for a period of sixty (60) days to cover adjustment items including, but not limited to, credit card charge backs, maintenance charges, fees, and taxing authorities adjustments upon receipt of release.

## 29. TERMINATION BY CONOCOPHILLIPS

(a)     This Agreement is subject to and governed by Title I of the Petroleum Marketing Practices Act, 15 USC 2801, et seq. ("PMPA"). To the extent any provision of this Agreement conflicts with the PMPA, that provision shall be deemed modified so as to comply with the PMPA. Notice of termination or nonrenewal of this Agreement by CONOCOPHILLIPS shall be provided in the manner prescribed by the PMPA and the franchise created by this Agreement shall continue until the effective date, including any postponement thereof, of such termination or nonrenewal. A copy of the PMPA is attached to this Agreement as **Exhibit F.**

(b)     In addition to any other rights of termination which CONOCOPHILLIPS may have, upon the occurrence of any of the following events, or such other grounds as are set forth in the PMPA, CONOCOPHILLIPS shall have certain rights to terminate this Agreement or nonrenew the franchise relationship created by the Agreement. DEALER and CONOCOPHILLIPS agree that the following events, by way of example, but not in limitation are reasonable and of material significance to the franchise relationship and are lawful grounds for termination of this Agreement:

(1)     Default in the payment of any installment of rent or any other sum due CONOCOPHILLIPS from DEALER when due;

(2)     DEALER's failure to comply with any of the maintenance responsibilities and standards as set forth in this Agreement;

(3)     DEALER's failure to comply with any applicable law, ordinance, regulation, judicial or administrative order, or other legal requirement of any governmental authorities pertaining to this Agreement and/or DEALER's operation of the Station products;

(4)     DEALER's attempts to sell, assign, give, grant, devise, or otherwise dispose of DEALER's interest in this Agreement or the Station without the prior written consent of CONOCOPHILLIPS;

(5)     DEALER's unauthorized loading, unloading, storage, transportation, and/or sale of petroleum products;

(6)     DEALER's making or furnishing of any false or misleading statement, or failure to disclose information to CONOCOPHILLIPS, its agents or employees, concerning any material fact for the purpose of inducing CONOCOPHILLIPS to make any payment, deliver product, extend or continue to extend credit, or issue any credit memorandum to DEALER or any other party acting in cooperation with DEALER;

(7)     Any attachment, garnishment, execution or other legal process or proceeding is levied or brought, by anyone other than CONOCOPHILLIPS, against or involving the Agreement or the Station, or if any other financial impairment exists as to the Station, and such is not removed, cured, bonded, or satisfied within forty-five (45) days from such date of levy, execution, or other commencement of proceedings;

76 kb_fuelsupplyagrmt

24

Revised 10/11/2006
000032

25



(8)    The Station is vacant, unattended or not operated for the retail sale of motor fuels for seven (7) consecutive days or such lesser period of time which under the facts and circumstances constitutes an unreasonable period of time; and

(9)    DEALER's failure to comply with the use, operation and image standards and trademark requirements as set forth herein.

(c)    Nonrenewal or termination of this Agreement under this Section or any other Section shall not discharge DEALER from any liability of DEALER to CONOCOPHILLIPS occurring or accruing up to the effective date of any such nonrenewal or termination including, but not limited to, outstanding debt, insurance coverage and indemnity.

## 30.    TERMINATION BY DEALER

DEALER may terminate this Agreement at any time by providing ninety (90) days advance written notice to CONOCOPHILLIPS, delivered to CONOCOPHILLIPS by certified mail. Upon receipt of such notice by CONOCOPHILLIPS, it may not be withdrawn by DEALER without CONOCOPHILLIPS' written approval, except that DEALER may withdraw any such notice of termination given to CONOCOPHILLIPS without CONOCOPHILLIPS' prior written approval if DEALER's withdrawal of such notice is made within seven (7) calendar days after DEALER's notice of termination was first delivered to CONOCOPHILLIPS.

## 31.    MUTUAL TERMINATION

DEALER and CONOCOPHILLIPS may agree in writing to terminate this Agreement or nonrenew the franchise relationship by mutual termination.    The effective date of such mutual termination or nonrenewal shall be the date agreed to by both DEALER and CONOCOPHILLIPS.

## 32.    SURRENDER OF STATION

At the expiration, nonrenewal or earlier termination of this Agreement, DEALER shall yield immediate and peaceable possession of the Station to CONOCOPHILLIPS and shall, at such time, return the keys to all locks; it being the intention of the parties that the Station shall be surrendered to CONOCOPHILLIPS in as good condition as when received, except for reasonable wear and tear.

## 33.    REPURCHASE OF INVENTORY

Upon the termination or nonrenewal of this Agreement, unless State law provides to the contrary, CONOCOPHILLIPS shall not be obligated to purchase any of DEALER's inventory, tools, equipment or supplies; provide, however, that CONOCOPHILLIPS, at its option, may purchase any of such inventory, tools, equipment or supplies which are not obsolete and are in a current and saleable condition which DEALER purchased from CONOCOPHILLIPS, for the reasonable value thereof, but not to exceed the cost to DEALER.    CONOCOPHILLIPS may credit the amount thereof against any sums due CONOCOPHILLIPS by DEALER. With respect to personal property items owned by DEALER and not purchased by CONOCOPHILLIPS, and improvements, alterations, decorations or additions, structural or otherwise made by DEALER, DEALER agrees to remove same immediately from the Station and repair any and all damage to the Station caused or occasioned by such removal. Any such personal property not removed by DEALER may be removed from the Station and stored by CONOCOPHILLIPS at DEALER's expense. Any such personal property not removed by either party shall become the personal property of CONOCOPHILLIPS and no compensation will be due DEALER therefor.

## 34.    CONDEMNATION

If the whole of the Station, or such portion thereof as will make the Station unsuitable for the purposes herein agreed, are taken or condemned for any public purpose, or if CONOCOPHILLIPS agrees to execute a voluntary conveyance thereof in lieu of condemnation, this Agreement shall be terminated as of the date possession is taken by the condemning authority. The condemnation award paid to CONOCOPHILLIPS, or the payment received by CONOCOPHILLIPS in exchange for its

000033



voluntary conveyance in lieu of condemnation shall belong solely to CONOCOPHILLIPS, and DEALER shall not, by virtue of this Agreement, be entitled to any part thereof; provided, however, that nothing in this Agreement shall preclude DEALER from prosecuting any claim directly against the condemning authority for loss of business, or depreciation to, damage to, cost of, removal of, or value of, stock, inventory and other personal property of DEALER; and further provided, however, that no such claim shall diminish or otherwise adversely affect CONOCOPHILLIPS' award or proceeds from the condemning authority.

## 35.    BANKRUPTCY

If DEALER files a petition in bankruptcy or for reorganization, or be adjudicated as bankrupt, or make an assignment for the benefit of creditors; or a receiver or trustee of the property of DEALER is appointed in any proceeding brought by or against DEALER, and if such receiver or trustee is not discharged within sixty (60) days after such appointment, or if this Agreement or the Station is attached or executed upon or by operation of law devolves upon or passes to any person or persons other than DEALER, and within or for sixty (60) days thereafter such attachment has not been released or such execution has not been satisfied, or such person or persons remain in possession, CONOCOPHILLIPS may terminate this Agreement.

## 36.    INDEPENDENT CONTRACTOR

DEALER is, and shall remain at all times, an independent contractor hereunder. It is agreed that none of the provisions of this Agreement reserves, or shall be construed as reserving to CONOCOPHILLIPS any right to exercise control over the business or operations of DEALER upon the Station or to direct, in any respect, the manner in which such business and operations shall be conducted (including the price at which products and merchandise are to be sold), it being understood and agreed that the entire control and direction of such activities shall be and at all times remain with DEALER. DEALER shall have no authority to employ any persons as employees, or agents, for or on behalf of CONOCOPHILLIPS for any purpose, and neither DEALER, nor any other persons performing any duties or engaging in any work at the request of DEALER shall be deemed to be the employees or agents of CONOCOPHILLIPS. DEALER shall not erect or permit any sign, insignia, or other advertising device, upon or near the Station which would in any way indicate or imply that CONOCOPHILLIPS is the owner or operator of the business being conducted thereon by DEALER.

## 37.    NOTICE

(a)   Any demands, requests or notices required or permitted to be given hereunder to DEALER shall be deemed properly given and served when deposited, postage prepaid, certified, in the United States mail, addressed to DEALER at the Station or, in lieu of such mailing, personally served upon DEALER.

(b)   Any notices hereunder required or permitted to be given under this Agreement to CONOCOPHILLIPS by DEALER shall be deemed properly given and served when deposited, postage prepaid, Certified, in the United States mail, addressed to CONOCOPHILLIPS at: **ConocoPhillips Company, P.O. Box 2197, Houston, TX 77252-2197; Attn: US Marketing Contract Administration Department TR-1064B.**

## 38.    FORCE MAJUERE

The obligation of the parties to deliver and receive CONOCOPHILLIPS motor fuel under this Agreement shall be suspended and excused if CONOCOPHILLIPS is prevented from or delayed in producing, manufacturing, transporting or delivering in its normal manner, CONOCOPHILLIPS motor fuel or the materials from which CONOCOPHILLIPS motor fuel is manufactured, or DEALER is prevented from receiving or selling CONOCOPHILLIPS motor fuel at the Station, because of Acts of God, earthquake, fire, flood, or the elements, malicious mischief, riots, strikes, lockouts, boycotts, picketing, labor disputes or disturbances, war, compliance with any directive, order or regulation or any governmental authority or representative thereof acting under claim or color of authority; loss or

000034



shortage of any CONOCOPHILLIPS motor fuel or of any part of CONOCOPHILLIPS' own or customary transportation or delivery facilities, or for any reason beyond CONOCOPHILLIPS' or DEALER's reasonable control, whether or not similar to the foregoing.    Whenever such causes in CONOCOPHILLIPS judgment require restriction of deliveries, CONOCOPHILLIPS reserves the right in its discretion to restrict deliveries without liability, whether or not delivering to others.

**39.    REVIEW OF AGREEMENT**
DEALER's signature below shall operate as an acknowledgement that DEALER has received a copy of this Agreement and all of its exhibits and addendums which were given to DEALER at least ten (10) business days prior to the date DEALER signed this Agreement.

**40.    SECTION TITLES**
The section titles contained in this Agreement are for convenience only and shall be without substantive meaning or content of any kind whatsoever.

**41.    WAIVER**
Waiver by CONOCOPHILLIPS or DEALER of a default or breach of any provision, obligation, term or condition under this Agreement shall not be construed as a continuing waiver, or a waiver of a default or breach of any other provision, obligation, term or condition or of any subsequent default or breach of the same provision, obligation, term or condition.

**42.    WARRANTY**
CONOCOPHILLIPS warrants the title to all products sold hereunder and that such products meet the description herein.    NO OTHER WARRANTIES EXPRESSED OR IMPLIED ARE MADE BY CONOCOPHILLIPS, INCLUDING FITNESS FOR A PARTICULAR PURPOSE; SUCH WARRANTIES ARE EXPRESSLY EXCLUDED FROM THIS AGREEMENT.

**43.    CONFIDENTIALITY**
DEALER acknowledges that the systems, methods, procedures and information provided by CONOCOPHILLIPS to its dealers are confidential and are the valuable property of CONOCOPHILLIPS, and, therefore, DEALER shall keep and use such information in a secure and confidential manner and shall not disclose it to third parties or use it, or allow others to use it, other than for the purposes of and as authorized by this Agreement.    DEALER shall only disclose such information to DEALER's employees, accountants, attorneys and business counselors, who have a need to know such information for the purposes of fulfilling their job responsibilities, or in case of the accountants, attorneys and business counselors, for the purposes of fulfilling their engagement by DEALER.

**44.    SEVERABILITY**
Should any of the provisions contained in this Agreement be now, or hereafter become, illegal or unenforceable as to DEALER by State or Federal laws or otherwise, such provisions shall be void during the period of conflict, and the remaining provisions shall continue to be of full force and effect.    If subsequent to the date of this Agreement valid State or Federal laws or regulations governing the relationship between DEALER and CONOCOPHILLIPS take effect, this Agreement shall be considered to incorporate any mandatory requirements of such laws or regulations so long as they shall be effective, and any provisions of this Agreement in conflict therewith shall during such period be void.

**45.    SECURITY INTEREST**
(a)    In addition to any Security Reserve that may be required from DEALER, in order to secure payment of all DEALER's present and future indebtedness owed by DEALER to CONOCOPHILLIPS at any time during the Term of this Agreement or upon the nonrenewal, termination or expiration of this Agreement, DEALER hereby grants to CONOCOPHILLIPS a priority security interest and/or a purchase money security interest in the following:

76 kb_fuelsupplyagrmt

27

Revised 10/11/2006

000035



(1)     All of DEALER's inventory of petroleum products and other products purchased from CONOCOPHILLIPS, regardless of when purchased;

(2)     All chattel paper, general tangibles and accounts receivable owing to DEALER regardless of when or how incurred including, but not limited to, credit card receipts;

(3)     All DEALER's equipment purchased, regardless or when purchased; and

(4)     All proceeds of DEALER's inventory, chattel paper, accounts receivable and equipment.

(b)     DEALER agrees to sign all financing statements and renewals as necessary to provide a public record of this security interest. In the event of insolvency of DEALER, assignment for benefit of creditors, the institution of bankruptcy, insolvency, reorganization, receivership, debt adjustment, or liquidation proceedings, by or against DEALER, or failure of DEALER to perform any of the obligations of payment in accordance with the terms of payment established by CONOCOPHILLIPS from time to time, CONOCOPHILLIPS shall have the option without notice or demand upon DEALER to declare all of DEALER's indebtedness to CONOCOPHILLIPS immediately due and payable.   Thereafter, CONOCOPHILLIPS may proceed to enforce payment and may exercise any and all rights available to CONOCOPHILLIPS. In addition, CONOCOPHILLIPS reserves the right to require a security deposit, letter of credit, and/or personal guaranty in accordance with CONOCOPHILLIPS' dealer security policy in effect from time to time.

## 46.   EXHIBITS
Exhibits A-I, A-II, B, C, D, E and F and Addendum 1 and 2 referenced herein are hereby incorporated by this reference and made a part hereof.

## 47.   CONTRACTING ENTITY
(a)     The individual, partnership and/or corporation first set forth above as DEALER is the only entity that CONOCOPHILLIPS recognizes as the party contracting hereunder as DEALER. Any name DEALER uses as a "d.b.a." or fictitious firm name shall not be recognized by CONOCOPHILLIPS as the DEALER.

(b)     DEALER agrees that all Business Documents (as defined below) required under this Agreement or in conjunction with the operation of the Station shall be prepared bearing the name that is identical to the identity of DEALER in this Agreement. DEALER understands and acknowledges that Business Documents include, but are not limited to, business licenses, permits, business checking accounts, security agreements, financing statements, insurance polices, proofs of insurance, and utilities as further described in the Operating Expenses Section of this Agreement ("Business Documents").

(c)     In the event CONOCOPHILLIPS becomes aware of Business Documents containing names other than DEALER's upon written notice from CONOCOPHILLIPS, DEALER agrees that DEALER shall promptly, at DEALER's expense, correct the name on the Business Document(s) to be identical to the identify of DEALER herein. DEALER understands that any other party, other than the named DEALER, asserting that they are a party hereof will be dismissed as invalid. Any and all assignments, sublets or transfers shall be pursuant only to the Assignment, Subletting and Transfers Section set forth herein.

## 48.   ATTORNEY FEES
(a)     In the event an action is brought to enforce or interpret this Agreement, the prevailing party shall be entitled to reimbursement of all costs including, but not limited to, reasonable attorney fees and court costs incurred.

000036

29



(b)      DEALER agrees to pay all attorney fees, costs of suit and expenses incurred by CONOCOPHILLIPS in connection with the collection of any indebtedness owed or any liability of DEALER to CONOCOPHILLIPS.

## 49.   ENTIRETY

(a)      This Agreement cancels and supersedes, as of the commencement date hereof, all prior written and or oral, expressed or implied, agreements between CONOCOPHILLIPS and DEALER in regards to the following:

(1)      DEALER's and CONOCOPHILLIPS' rights, duties and obligations in respect of DEALER's occupancy, use and operation of the Station;

(2)      The sale and delivery of CONOCOPHILLIPS motor fuel at the Station and sets forth all the terms and conditions as to CONOCOPHILLIPS' sale to DEALER, and DEALER's purchase from CONOCOPHILLIPS, of CONOCOPHILLIPS motor fuels for sale at the Station; and

(3)      Any and all of the relationship which exists between CONOCOPHILLIPS and DEALER.

(b)      The terms and conditions can only be changed by a document signed both by CONOCOPHILLIPS and DEALER.   Neither CONOCOPHILLIPS nor DEALER is obligated by any inducement, statement, representation, promise or agreement made by either of them that is not included in this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by an authorized representative and effective as of the Contract Date first referenced above.

ACCEPTED AND AGREED TO                    ACCEPTED AND AGREED TO

THIS  6  DAY OF  8 ____ , 20 07 .            THIS  6  DAY OF  July , 20 07

CONOCOPHILLIPS COMPANY:                    DEALER: HOUTAN PETROLEUM INC

By _____                By _____
   Ross Davidson                             Ed Bozorghadad
   Manager, West Coast and Retail             President

000037



## EXHIBIT A-I

## # 0012 / 255661

### DESCRIPTIONS OF REAL PROPERTY

The land referred to herein is situated in the State of California, City of Mountain View,, described as follows:

PARCEL ONE

A portion of that 40.980 acre tract of land, which tract is shown upon that certain Map entitled, Record of Survey, Lands of Victor H. Owen, Jr. et al, Ptn. Sec. 27, T. 6 S., R. 1 W., M.D.B. & M., Santa Clara County, Calif. which Map was filed for record in the Office of the Recorder of the County of Santa Clara on August 13, 1959 in Book 110 of Maps, at Page 41, more particularly described as follows:

Beginning at a point on the Southeasterly line of Grant Road as said road is shown on the above mentioned map, at the most Westerly corner of that parcel of land, entitled, Exhibit "A", granted to the City of Mountain View, recorded December 24, 1965 in Book 7223 of Official Records at Page 626, in the Office of the County Recorder of the County of Santa Clara, State of California; thence from said point of beginning along said Southeasterly line of Grant Road North 31 deg. 59' East 64.19 feet; thence South 61 deg. 34' 10" East 26.60 feet to the true point of beginning; thence from said true point of beginning South 61 deg. 34' 10" East 143.40 feet; thence North 31 deg. 59' East 169.98 feet to a point 10 feet Southwesterly at right angles from the Southwesterly line of El Camino Real as shown on the above mentioned map; thence along a line parallel with the Southwesterly line of El Camino Real North 61 deg. 34' 10" West 109.68 feet; thence Southwesterly and Southerly along an arc of a curve to the left, tangent to the preceding course with a radius of 40 feet, through a central angle of 88 deg. 07' 47" for an arc distance of 61.53 feet; thence South 30 deg. 18' 03" West 131.03 feet to the True Point of Beginning together with non-exclusive easements for ingress and egress over and across the following described parcels of land:

PARCEL TWO

Commencing at a point on the centerline of Grant Road distant South 31 deg. 59' 00" West 230.10 feet from the intersection of the centerlines of Grant Road and El Camino Real; thence leaving said centerline of Grant Road South 61 deg. 34' 10" East 56.66 feet to the southernmost corner of that certain street easement described in that certain deed recorded in the Office of the Santa Clara County Recorder in Book 7223 of Official Records at page 624, said Southernmost corner being the True Point of Beginning of the lands hereinafter described; thence from said True Point of Beginning South 61 deg. 34' 10" East 45.38 feet; thence North 89 deg. 58' 37" West 52.52 feet to a point on the Southeast line of Grant Road; thence along said Southeast line North 30 deg. 18' 03" East 25.00 feet to the True Point of Beginning.

## PARCEL THREE

Commencing at a point on the centerline of El Camino Real distant South 61 deg. 34' 10" East 200.06 feet from the intersection of the centerlines of Grant Road and El Camino Real; thence leaving said centerline of El Camino Real South 31 deg. 59' 00" West 60.12 feet to a point distant 60.00 feet, measured at right angles, from said centerline of El Camino Real, said point being the True Point of Beginning of the lands hereinafter described; thence from said True Point of Beginning South 31 deg. 59' 00" West 34.62 feet; thence North 66 deg. 35' 02" East 43.94 feet to the Southwesterly line of said El Camino Real; thence along said Southwesterly line North 61 deg. 34' 10" West 25.00 feet to the True Point of Beginning.

APN:  197-42-003                                    ARB: 195-38-021

COMMONLY KNOWN AS:    101 EAST EL CAMINO REAL
                      MOUNTAIN VIEW, CA

255661
000039

EXHIBIT A-II
SITE # 0012/255661

**Type of Facility** (Check all that apply)
- ☐ 300
- ☐ 300R Short
- ☐ 300R Long
- ☐ 140
- ☐ Other
- ☑ Service Bays    `3`   # Bays Open     [ ] # Bays Closed
- ☐ Snack Shop    [ ]   Sq. Ft. Selling Space
- ☐ C-Store    [ ]   External Bldg Sq. Ft.
- ☐ Kiosk
- ☐ Car Wash    ☐ Rollover    ☐ Full Tunnel
- ☐ Single Island Canopy    ☑ Double Island Canopy
- ☑ CRIND    `6` # CRINDs
- ☐ E-CRIND    [ ] # E-CRINDs
- [ ] Dispenser Type    `6` # Dispensers Gas
  (Electronic or Mechanical)    [ ] # Dispensers Diesel

**EPOS**
- ☐ Dial up
- ☐ VSAT
- ☑ G-Site
- ☐ Ruby
- ☐ Additional Consoles

**Tanks**

| | Size | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | #1 | #2 | #3 | #4 | #5 | #6 | #7 | #8 |
| ☑ 87 Octane | 12,000 | | | | | | | |
| ☐ 89 Octane | | | | | | | | |
| ☑ 92 Octane | 12,000 | | | | | | | |
| ☐ Diesel | | | | | | | | |

- ☑ Monitoring Equipment    Veederoot Type (Veederoot, Ronan, other specify)

**Service Bay Stations**
- ☐ Tire Cabinets    Qty [ ]    ☑ Floor Safe w/keys    Qty `1`
- ☑ Hoists    Qty `3`    ☐ Wall Safe w/keys    Qty [ ]
- ☑ Air Compressors    Qty `1`    ☑ Utility Lockers    Qty `2`
- ☐ Overhead Reels    Qty [ ]    ☐ Display Counters    Qty [ ]
- ☐ Work Benches    Qty [ ]    ☐ Fire Extinguishers    Qty [ ]
- ☐ Utility Cabinets    Qty [ ]    ☐

Facility Walk-through inspection:

_____     July 6 2007

Dealer           Date

_____     _____

Manager, West Coast and Retail     Date

000040

**EXHIBIT B**

**SITE #255661**

**RENTAL SCHEDULE**

**Rental Period Effective**

September 1, 2007

**Monthly Rent Amount**

$3,497

000041



### EXHIBIT C

### 0012 / 255661

## MAINTENANCE PERFORMANCE RESPONSIBILITIES

**DEFINITIONS:**

*Clean:* To rid of dirt, impurities, grease, markings, or other extraneous matter from the surface by ordinary and routine cleaning, washing, wiping, or sweeping

*Repair & Maintain:* To keep in a properly functioning and operating state to extend the useful life of the facility or equipment by performing needed services as determined by inspection of wear and tear.

*Replace:* To install something new in place of the worn or deteriorated item which has been identified as having no foreseeable useful life or prospect for economical repair.

**Note:** **Where DEALER is responsible to perform the maintenance of equipment or facility (or any part of the Station), DEALER will also be liable for any associated fines or penalties if the equipment or facility is found to be in regulatory violation.**

| Area of Responsibility | Clean | Repair & Maintain | Replace |
|---|---|---|---|
| SITE IMPROVEMENTS | | | |
| RAMPS AND APPROACHES - including all ramps, curbs, culverts, headwalls, parking or safety curbs, sidewalks, highway beam areas or parkways | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| I. PRODUCT DISPENSING SYSTEM (Tanks, lines, dispensers, leak detection systems) | | | |
| 1. Underground and above ground tanks; underground lines (fuel and waste oil) | | | |
| A. Concrete Pad | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| B. Product I.D. Tags | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| C. Vents, Vent Pipes, P/V Valves | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| D. Padlocks for Fill Caps | DEALER | DEALER | DEALER |
| E. Underground Product Tanks and Piping | CONOCO PHILLIPS | CONOCO PHILLIPS | CONOCO PHILLIPS |
| F. Submerged Turbine & Leak Detector/Monitoring System. Maintenance must be accomplished by CONOCOPHILLIPS/Authorized designee). | CONOCO PHILLIPS | CONOCO PHILLIPS | CONOCO PHILLIPS |
| 1. Repair & replacement due to normal use. | | CONOCO PHILLIPS | CONOCO PHILLIPS |
| 2. Failure of turbine due to history of product runout | | DEALER | DEALER |
| 3. Repairs due to tampering/deactivation of leak-detector/monitoring system, including costs of any associated fines | | DEALER | DEALER |
| 4. Mandated periodic regulatory-required monitoring system calibration | | CONOCO PHILLIPS | |
| G. Vacuum or Vapor Recovery Equipment (excluding hoses and nozzles) | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| H. Fill lids and fill caps | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| I. Fill cap gaskets, including associated fines for regulatory violations | | | DEALER |
| J. Water pumpout from tanks (except when due to failure of gasket) | | CONOCO PHILLIPS | CONOCO PHILLIPS |
| | | | |

000042

| | | | |
|---|---|---|---|
| K. Waste Oil Tank | | CONOCO PHILLIPS | CONOCO PHILLIPS |
| 1. Pump Out as Required, including oil in sump area | DEALER | DEALER | |
| 2. Waste Oil Spill Containment Box | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| 3. Above ground waste oil tank, pump and lines | DEALER | DEALER | CONOCO PHILLIPS |
| L. Mandated periodic vapor recovery source testing | | CONOCO PHILLIPS | |
| **2. Dispensers** | | | |
| A. Initial hoses, swivels, nozzles in newly mandated vapor recovery areas | | | CONOCO PHILLIPS |
| B. Hoses, swivels, breakways, nozzles, filters, and vapor valves | DEALER | DEALER | DEALER |
| C. Calibrate Pumps as Required by governmental authority | | DEALER | |
| D. Glass, including plexiglass or plastic dial face panels | DEALER | DEALER | DEALER |
| E. Hose retractor, spring, pulley, retractor cable, and hose clamp, whip hoses, panel skirt key and locks | DEALER | DEALER | DEALER |
| F. Internal mechanical and electrical failures | | CONOCO PHILLIPS | CONOCO PHILLIPS |
| **3. Consoles, terminals, and VSATs** | | | |
| A. Dispenser consoles (except where misuse occurs) | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| B. Printers (Non-POS: both external and console with built-in printer) ex-warranty period | DEALER | DEALER | DEALER |
| C. POS Terminals and POS ECR (Electronic Cash Register) consoles (subject to maint. Agreements | | | |
| 1. POS Terminal and POS ECR - | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| 2. Cash Drawer, including locks and keys | DEALER | DEALER | DEALER |
| 3. VSAT (Very Small Aperture Terminals) - | | CONOCO PHILLIPS | CONOCO PHILLIPS |
| D. Wood and Plastics: Cashier Counters with Formica | DEALER | DEALER | DEALER |
| 4. Intercom systems (excluding internally-mounted dispenser type, e.g. Advantage Dispenser) initial installations, all types by CONOCOPHILLIPS) | DEALER | DEALER | CONOCO PHILLIPS |
| **II. ELECTRICAL, LIGHTING, AND SIGNAGE** | | | |
| **1. Electrical and Lighting** | | | |
| A. Bulbs, tubes & starters, sockets, tips, ends, & metal halides per CONOCOPHILLIPS standard | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| B. Electrical/light fixtures, ballast, lens covers (Note: ballast failure due to DEALER's tube/bulb misapplication will be charged to DEALER) | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| C. Electrical wiring/conduits requiring excavation | | CONOCO PHILLIPS | CONOCO PHILLIPS |
| D. Complete replacement of electrical power box panel (ex-CONOCOPHILLIPS funded capital projects) | | | CONOCO PHILLIPS |
| E. Other above ground electrical repairs/upgrades to power box panel (fuses, circuit breakers, etc.) | | CONOCO PHILLIPS | CONOCO PHILLIPS |
| F. Convenience outlets - new additions/upgrades by DEALER (non CONOCOPHILLIPS Capital project-related) | | | DEALER |
| G. All electrical to Car Wash (Stub Only) Note: C/W equipment vendor installs c/w electrical wiring and related hookups) | DEALER | DEALER | CONOCO PHILLIPS |
| H. Interior Car Wash Lighting | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| I. Illuminated Car Wash Signage with 12" Tube | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| J. Exterior Car Wash Lighting | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| K. Interior Outlet at Paypoint/Kiosk | DEALER | DEALER | CONOCO PHILLIPS |

76 kb_fuelsupplyagrmt                    Revised 10/11/2006

000043

| | | | |
|---|---|---|---|
| L. Paypoint Equipment, including console and equipment | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| M. C-Store/CARWASH Light Tube | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| **2. Signage** | | | |
| A. Internally illuminated signs (higher than thirty five feet) | | | |
| 1. Sign & Pole | CONOCO PHILLIPS | CONOCO PHILLIPS | CONOCO PHILLIPS |
| 2. Relamping | CONOCO PHILLIPS | CONOCO PHILLIPS | CONOCO PHILLIPS |
| B. Internally illuminated signs (thirty five feet or lower) | | | |
| 1. Sign & Pole | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| 2. Relamping | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| C. Miscellaneous Yard Signs | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| 1. Directional Signs | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| 2. Metal price signs, pole or permanent ground mounted | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| 3. Merchandising Signs | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| 4. Signage (Interior & Exterior Signs and Decals) | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| D. Price sign numerals (DEALER responsible for lost/stolen numerals.) | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| E. Pump Toppers | DEALER | DEALER | DEALER |
| F. Operating Hours | DEALER | DEALER | DEALER |
| G. Non-illuminated service, product, or menu sign, ground, window, or wall mounted | DEALER | DEALER | DEALER |
| H. Canopy Clearance Signs | DEALER | | CONOCO PHILLIPS |
| I. DEALER Name Signs | DEALER | DEALER | DEALER |
| J. Illuminated Fix Signage (Building or ground mounted) | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| K. Interior Graphics Package - Convenience/Snack Shop | DEALER | DEALER | DEALER |
| L. Non-regulatory agency required decals (ex. DEALER merchandising/promotions | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| **III. FACILITY STRUCTURES AND CANOPIES** | | | |
| **1. Plumbing, sewer and water systems** | | | |
| A. Municipal supply system to building | | | |
| 1. Initial tap fee and underground inbound water lines to building | | CONOCO PHILLIPS | CONOCO PHILLIPS |
| 2. Above ground plumbing costs & all materials, repairs & valves | | DEALER | DEALER |
| 3. Backflow device repair & inspection requirements | | DEALER | |
| 4. Backflow device replacement | | | CONOCO PHILLIPS |
| B. Water System from Local Wells | | | |
| 1. Operating Costs and All materials | | DEALER | DEALER |
| 2. Lubrication of Motors, Controls, etc. | | DEALER | CONOCO PHILLIPS |
| C. Rodding of toilet and sump drain lines to main sewer line (waste outbound) | DEALER | DEALER | |
| D. Floor Drain, Clarifier and Sumps (including yard sumps and clarifiers) | DEALER | DEALER | CONOCO PHILLIPS |
| E. Sump Pump & Pit (including lawful disposal) | DEALER | DEALER | CONOCO PHILLIPS |
| 1. Closure of Sump (Only where required by local regulatory agencies) | DEALER | | CONOCO PHILLIPS |

76 kb_fuelsupplyagrmt

Revised 10/11/2006

000044

| | | | |
|---|---|---|---|
| F. Lab-testing on sump drainage | | DEALER | |
| | | | |
| G. Hard Pipe Supply Line to Overhead Air and Water lines | | CONOCO PHILLIPS | CONOCO PHILLIPS |
| H. Convenience store(s) floor drains, clean-outs, vent pipes, sinks (19" x 16" & dual compartment), janitor sink (mop sink) | DEALER | | DEALER |
| **NOTE: DEALER agrees to be responsible for maintenance and repair of all CONVENIENCE STORE Fixtures and equipment either owned by CONOCOPHILLIPS or by the DEALER, and further agrees to maintain in operable condition any leased equipment used in the operation of the CONVENIENCE STORE. Refer to the Convenience Store Service Station Lease Addendum for complete details.** | | | |
| I. Full Service Car Wash. Refer to CARWASH Lease Addendum for complete details. DEALER agrees to be responsible for maintenance and repair of all CARWASH equipment either owned by CONOCOPHILLIPS or by the DEALER. DEALER Further agrees to maintain in operable condition any leased equipment used in the operation of the CARWASH. | | | |
| 1. Car wash drainage (4" PVC), includes R/R's | DEALER | DEALER | DEALER |
| 2. Sink with hardware | DEALER | DEALER | DEALER |
| 3. Exhaust fan for equipment room (CARWASH) | DEALER | DEALER | DEALER |
| 4. Window sprinkler lines and heads | DEALER | DEALER | DEALER |
| 5. Reclaim tanks | DEALER | DEALER | DEALER |
| NOTE: (CONOCOPHILLIPS is responsible for bringing in water and electrical to restroom. DEALER responsible for all items above unless as specified elsewhere.) | | | |
| J. Repairs/maintenance to piping requiring excavation | | CONOCO PHILLIPS | CONOCO PHILLIPS |
| K. Yard drain, manholes, drainage, ditches or canals | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| L. Waterheaters | | | |
| 1. Agency mandated (C-Stores, etc.), initial install by CONOCOPHILLIPS | DEALER | DEALER | DEALER |
| 2. Optional installs (DEALER provides for initial install) | DEALER | DEALER | DEALER |
| M. Refrigeration | | | |
| 1. Chest Freezer, Reach in Cooler | DEALER | DEALER | DEALER |
| 2. Ice Maker/Ice Dispenser | DEALER | DEALER | DEALER |
| 3. Walk - in cooler/condenser | DEALER | DEALER | DEALER |
| N. Store Equipment (C-Store/ Snack) | | | |
| All interior equipment (except CONOCOPHILLIPS G-Site equipment) | | | |
| O. Store Accessories - Coffee makers, Juice, soda dispensers, ovens, hoods, ansul systems, grease interceptors, counters, shelves, etc. | DEALER | DEALER | DEALER |
| **2. Ceilings, walls, and columns** | | | |
| A. Structural repairs to load bearing walls & columns due to settlement or corrosion | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| B. All wall and partition surfaces and non-structural repairs, including 5/8" gypsum board and vinyl base | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| C. Routine cleaning of surfaces | DEALER | | |
| D. Drywall, metal Suspended lay-in ceilings, including tile | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| E. Moisture and Thermal Protection: Insulated Standing Metal Roof (C-Store) | DEALER | DEALER | CONOCO PHILLIPS |
| F. Wall Insulation (R-11) - (C-Store) | DEALER | DEALER | DEALER |
| G. Perforated Steel Sheet Soffit; Metal Panels (18 Ga, semi Circle); Perforated Metal | | | |
| Panels,; Flat Metallic Panels (18 Ga.); Acrylic Panel, Bullnose, CARWASH | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |

36

76 kb_fuelsupplyagrmt                                         Revised 10/11/2006

000045

| | | | |
|---|---|---|---|
| **3. Doors, windows, and glass** | | | |
| A. Walk through doors and related hardware (Knobs, Pushbars, Closures, Kick-Plates) | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| B. Lock Cores and Keys (initial and replacement) | DEALER | DEALER | DEALER |
| C. Overhead doors (including roll-up door 12' x 14'; CARWASH, including locks) | DEALER | | |
| 1. Complete replacement door and related hardware | | | CONOCO PHILLIPS |
| 2. All other repairs to door and related hardware (including glass, rollers, hardware, etc. | DEALER | DEALER | DEALER |
| 3. CARWASH interior Doors w/hardware | DEALER | DEALER | DEALER |
| D. All windows and glass, including C-Store Front Glass and tower and Clerestory Glass (where applicable) | DEALER | DEALER | DEALER |
| E. Bullet resistant glass at cashier | DEALER | DEALER | DEALER |
| **4. Flooring** | | | |
| A. Flooring required to replace load bearing beams, columns, and walls due to settlement or corrosion | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| B. All other maintenance and repair of floors (incl. asphalt and vinyl tile and ceramic or porcelain tile) | DEALER | DEALER | |
| **5. Pump islands, canopies, island kiosks** | | | |
| A. Structural repairs to canopy due to settlement or corrosion | | CONOCO PHILLIPS | CONOCO PHILLIPS |
| B. Islands | | | |
| 1. Pump island Forms | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| 2. Island Merchandiser, oil display racks, canopy pole sign | DEALER | DEALER | DEALER |
| 3. Cash box and replacement of lock cores & keys | DEALER | DEALER | DEALER |
| C. Structural repairs to island kiosks | | CONOCO PHILLIPS | CONOCO PHILLIPS |
| **6. Painting & washing** | | | |
| A. Complete planned paint job - Exterior (Washing Included) | CONOCO PHILLIPS | CONOCO PHILLIPS | CONOCO PHILLIPS |
| B. Complete planned paint job — Interior | CONOCO PHILLIPS | CONOCO PHILLIPS | CONOCO PHILLIPS |
| C. Touch ups — Interior | | DEALER | |
| D. Touch ups — Exterior | | DEALER | |
| E. Paint Product Fill Areas | | DEALER | |
| F. Graffiti removal | DEALER | | |
| G. Routine Cleaning and Washing of all Station equipment and surfaces, including vinyl fabric fascias for buildings, canopies and awning systems, e.g. | DEALER | | |
| **7. Sales room, security booth, office interiors** | | | |
| A. Shelving | DEALER | DEALER | DEALER |
| B. Counters, including with Formica | DEALER | DEALER | DEALER |
| C. Desks | DEALER | DEALER | DEALER |
| D. Chairs, Settees | DEALER | DEALER | DEALER |
| E. Safe (Floor safe, original construction) | | | |
| 1. Lock Cores and Keys | DEALER | DEALER | DEALER |
| 2. Original construction floor safe (including safe lids) | DEALER | DEALER | CONOCO PHILLIPS |
| 3. Alterations to original safe installations | DEALER | DEALER | DEALER |
| 4. Electronic safes | DEALER | DEALER | DEALER |
| **8. Public or employee restrooms** | | | |
| A. Sinks, toilet fixtures, urinals | DEALER | DEALER | DEALER |
| B. Faucets, flush valves, toilet seats, plumbing from walls | DEALER | DEALER | DEALER |
| C. Routine Washing of Surfaces | DEALER | DEALER | DEALER |

37

Revised 10/11/2006

000046

39



| | | | |
|---|---|---|---|
| D. Mirrors, Soap, and Paper Product Dispensers, Coat Hooks, Grab Bars, Waste Receptacles | DEALER | DEALER | DEALER |
| E. Exhaust Fans (INCLUDING 110c.f.m.) | DEALER | DEALER | CONOCO PHILLIPS |
| F. Partitions | DEALER | | |
| G. Handicap Restroom Accessories (including grab bars, mirrors, coat hooks, product dispensers, waste receptacles, toilets) | DEALER | DEALER | DEALER |
| **9. Yard Paving, concrete, ramps and approaches** | | | |
| A. Asphalt Seal Coating | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| B. Asphalt — Potholes | | CONOCO PHILLIPS | CONOCO PHILLIPS |
| C. Asphalt - Repaving/Skincoat | | | CONOCO PHILLIPS |
| D. Concrete — Patching | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| E. Concrete — Replacement | | | CONOCO PHILLIPS |
| F. Building Curb (CARWASH) | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| G. Interior Building Slab (CARWASH) | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| H. Planter Curbs (CARWASH) | DEALER | DEALER | CONOCO PHILLIPS |
| I. Kiosk Floor (CARWASH) | DEALER | DEALER | CONOCO PHILLIPS |
| J. Concrete Slabs @ entrance & exit (CARWASH) | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| K. Parking stall striping replacements (CONOCOPHILLIPS provides striping on complete paving jobs only) | | | DEALER |
| L. Fencing | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| M. Retaining Walls | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| N. Ramps, culverts, headwalls, sidewalks, highway beam areas | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| O. Drive sweepers or snow plowing equipment | DEALER | DEALER | DEALER |
| P. Yard Drains, Drainage Ditches and Canals | DEALER | DEALER | CONOCO PHILLIPS |
| Q. Parking bumpers (CONOCOPHILLIPS provides initial install only) | DEALER | DEALER | DEALER |
| **10. Gutters & Downspouts** | | | |
| A. Cleaning of waste and accumulations, including pigeon waste | DEALER | | |
| B. Repair of gutters/downspouts | | CONOCO PHILLIPS | CONOCO PHILLIPS |
| C. CARWASH Roof, Canopy, and Kiosk Gutters and Downspouts | DEALER | DEALER | CONOCO PHILLIPS |
| D. Anti-bird protection devices (e.g. netting, bird wire) | | | DEALER |
| **11. Roofing - All Types** | | | |
| A. Complete Roof replacement | | | CONOCO PHILLIPS |
| B. Leak problems and roof sections | | CONOCO PHILLIPS | CONOCO PHILLIPS |
| **12. Grass area & landscaping (CONOCOPHILLIPS to provide initial installation of irrigation systems, planters, plants, and shrubbery)** | | | DEALER |
| A. Maintenance, repair, replacement of planters, shrubbery, plants and irrigation systems (including control valves, sprinkler heads & equipment) | DEALER | DEALER | DEALER |
| B. Common Area Maintenance (Governed by site specific agreements) | DEALER | DEALER | DEALER |
| **13. Service Bays** | | | |
| A. Shelving, Tire Racks, Work Benches, Cabinets | DEALER | DEALER | DEALER |

76 kb_fuelsupplyagrmt                                            Revised 10/11/2006

000047

40



| | | | |
|---|---|---|---|
| **14.  Refuse - trash, garbage** | | | |
| A.  Disposal of waste | DEALER | DEALER | |
| B.  Enclosure maintenance, including trash enclosure hinges and closures | DEALER | DEALER | |
| C.  Complete replacement of enclosure | | | CONOCO PHILLIPS |
| **15.  Tire merchandiser and storage (Owned by CONOCOPHILLIPS)** | DEALER | DEALER | CONOCO PHILLIPS |
| **16.  Tire racks, portable** | DEALER | DEALER | DEALER |
| **17.  Optional DEALER revenue (Note:  Prior CONOCOPHILLIPS written approval from Region Sales Manager and specific insurance coverage indemnification required)** | | | |
| A.  Equipment (vending machines, pay phones, ice machine, propane, etc.) | DEALER | DEALER | DEALER |
| B.  Any Station alterations to accommodate optional DEALER revenue sources (e.g. bumper poles, slabs, electrical upgrades, etc.) | DEALER | DEALER | DEALER |
| **IV.  STATION EQUIPMENT** | | | |
| **1.  Heating, air conditioning (HVAC)** CONOCOPHILLIPS is responsible for complete unit replacement only.  DEALER is responsible for all component parts and service.  New installations, maintenance/ repair, replacement of "Swamp Coolers or Heat Pumps are not covered by CONOCOPHILLIPS.** | | | |
| A.  Filters - Air & Oil | DEALER | DEALER | DEALER |
| B.  Ducts | DEALER | DEALER | CONOCO PHILLIPS |
| C.  Registers & Grills | DEALER | DEALER | DEALER |
| D.  Heating Oil Tanks | DEALER | CONOCO PHILLIPS | CONOCO PHILLIPS |
| E.  Exhaust Fans, Heat Exchanger | DEALER | DEALER | CONOCO PHILLIPS |
| F.  Oil Burner Nozzles | DEALER | DEALER | DEALER |
| G.  Motors | | | |
| 1.  Motor and attached components | DEALER | DEALER | DEALER |
| 2.  Pulleys and Belts | DEALER | DEALER | DEALER |
| H.  Compressors and Condensers | DEALER | DEALER | DEALER |
| I.  Cost of Annual Maintenance | DEALER | DEALER | DEALER |
| J.  Air-Conditioners (CONOCOPHILLIPS replaces HVAC-related air conditioners only) | DEALER | DEALER | CONOCO PHILLIPS |
| K.  Swamp Coolers | DEALER | DEALER | DEALER |
| L.  Heat Pump and Pad | DEALER | DEALER | DEALER |
| M.  Balancing Heat Pump | DEALER | DEALER | CONOCO PHILLIPS |
| N.  Balancing Diffusers | DEALER | DEALER | CONOCO PHILLIPS |
| O.  Furnaces/Heater (non-HVAC System-related) | DEALER | DEALER | DEALER |
| **2.  Fire Extinguishers** | | | |
| A.  Recharging Fire Extinguishers | | DEALER | DEALER |
| B.  Fire extinguishers | | DEALER | DEALER |
| **3.  Air Compressor** | DEALER | DEALER | CONOCO PHILLIPS |
| A.  Maintenance, draining, oil change, belt adjustment and replacement & cost of annual maintenance (CONOCOPHILLIPS furnishes belt guards on new installations only) | DEALER | DEALER | DEALER |
| B.  Compressor belts, pulleys, gauges, valves, and motor | DEALER | DEALER | DEALER |
| C.  Complete Replacement of Compressor | | | CONOCO PHILLIPS |

39

000048

41



| | | CONOCO PHILLIPS | CONOCO PHILLIPS |
|---|---|---|---|
| **4. Hoist/Lifts** | | | |
| A. Control valves | | CONOCO PHILLIPS | CONOCO PHILLIPS |
| B. Seal replacement, and other non-excavation repairs | | DEALER | DEALER |
| C. Adding and complete replacement of oil as required | | DEALER | DEALER |
| D. Repairs requiring excavation | | | CONOCO PHILLIPS |
| E. Complete replacement of hoist/lift (Note: CONOCOPHILLIPS reserves right to replace with above ground hoist) | | | CONOCO PHILLIPS |
| **5. Overhead Air, Water, and Lube equipment** | | | |
| A. Connecting Lines and Reels (including hose replacement and head) | DEALER | DEALER | DEALER |
| B. Overhead Chassis Lube Pump | DEALER | DEALER | DEALER |
| C. Hoses, gauges, nozzles (including ball chucks, springs) | DEALER | DEALER | DEALER |
| **6. Remote or Underground Water & Air equipment (all types, including, above ground above ground/ coin operated & below ground/ island mounted)** | | | |
| A. Air & water hoses, including connecting supply hose and nozzles, bibs, chucks, reels, pigtails, and spring equipment provider | DEALER | DEALER | DEALER |
| **7. Drive Alarm & Hose** | DEALER | DEALER | DEALER |
| **8. Security Systems** | | | |
| A. Alarms | DEALER | DEALER | DEALER |
| B. Cameras | DEALER | DEALER | DEALER |
| C. Safes (CONOCOPHILLIPS provides initial, new installations) | DEALER | DEALER | DEALER |
| **9. Telephones and Lines** | DEALER | DEALER | DEALER |
| **10. ATM's** | DEALER | DEALER | DEALER |
| **11. Vacuum Towers** | | | |
| A. Coin operated | DEALER | DEALER | DEALER |
| B. Manifold system (no tokens or coins) | DEALER | DEALER | DEALER |
| **12. DEALER automated business system (information System for business management)** | DEALER | DEALER | DEALER |
| **V. EXPENDABLE ITEMS** | | | |
| A. Computer, Printer, and related hardware, except when superseded by separate maintenance contract | DEALER | DEALER | DEALER |
| B. Software | | | DEALER |
| 1. Restroom operating supplies (paper, soap, cleaning materials) | DEALER | DEALER | DEALER |
| 2. Replacement of paper, ribbons, forms and other use items for printers, POS, DABS, card reader dispensers and leak monitoring systems | | | DEALER |
| 3. Buckets, wiper display cabinets, etc. | DEALER | DEALER | DEALER |
| **VI. Repairs and replacement caused by accidental damage** | | DEALER | DEALER |
| The Cleaning Maintenance-Repair, and Replacement obligations imposed upon CONOCOPHILLIPS and DEALER relate only to such buildings, improvements, fixtures, equipment and machinery listed and which are located on the Station as of the effective date of the attached Lease, and such buildings, improvements, fixtures, equipment and machinery which are added during the Lease term. CONOCOPHILLIPS does not represent that all of the buildings, improvements, fixtures, equipment and machinery listed in this Exhibit "C" are located on the Station. The terms of Exhibit "C" will not require or obligate CONOCOPHILLIPS to build, construct or place upon the Station any of the buildings, improvements, fixtures, equipment and machinery listed. (revised 3/1/99) | | | |
| | | | |

**40**

000049

42



## EXHIBIT D

### 0012 / 255661

### HOURS OF OPERATION

For the months of January Through December — **24 Hours Daily**



|  | FROM | TO |
|---|---|---|
| Sunday | | |
| Monday | | |
| Tuesday | | |
| Wednesday | | |
| Thursday | | |
| Friday | | |
| Saturday | | |

76 kb_fuelsupplyagrmt

Revised 10/11/2006

000050



**EXHIBIT E**

**QUARTERLY / ANNUAL MINIMUM VOLUME**

**AS OF DATE:  September 1, 2007**

**Lease 255661**



76 kb_fuelsupplyagrmt

Revised 10/11/2006

000051



## EXHIBIT F

### 0012 / 255661

### PETROLEUM MARKETING PRACTICES ACT (PMPA)

AN ACT To provide for the protection of franchised distributors and retailers of motor fuel and to encourage conservation of automotive gasoline and competitor in the marketing of such gasoline by requiring that information regarding the octane rating of automotive gasoline be disclosed to consumers.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That this Act may be cited as the "Petroleum Marketing Practices Act".*

#### TABLE OF CONTENTS

#### TITLE I-FRANCHISE PROTECTION

Sec. 2801. Definitions.
Sec. 2802. Franchise relationship; termination and nonrenewal.
Sec. 2803. Trial franchises and interim franchises; nonrenewal.
Sec. 2804. Notification of termination or nonrenewal.
Sec. 2805. Enforcement.
Sec. 2806. Relationship of this title to State law.

#### TITLE 1-FRANCHISE PROTECTION

DEFINITIONS

Sec. 2801. Definitions

As used in this subchapter:

(1)   (A) The term **"franchise"** means any contract-

    (i) between a refiner and a distributor,

    (ii) between a refiner and a retailer,

    (iii) between a distributor and another distributor, or

    (iv) between a distributor and a retailer,

under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

    (B) The term **"franchise"** includes-

    (i) any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy;

    (ii) any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed-

    (I) under a trademark owned or controlled by a refiner; or

    (II) under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner; and

000052



(iii) the unexpired portion of any franchise, as defined by the preceding provisions of this paragraph, which is transferred or assigned as authorized by the provisions of such franchise or by any applicable provision of State law which permits such transfer or assignment without regard to any provision of the franchise.

(2) The term **"franchise relationship"** means the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

(3) The term **"franchisor"** means a refiner or distributor (as the case may be) who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

(4) The term **"franchisee"** means a retailer or distributor (as the case may be) who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

(5) The term **"refiner"** means any person engaged in the refining of crude oil to produce motor fuel, and includes any affiliate of such person.

(6) The term **"distributor"** means any person, including any affiliate of such person, who-

(A) purchases motor fuel for sale, consignment, or distribution to another; or

(B) receives motor fuel on consignment for consignment or distribution to his own motor fuel accounts or to accounts of his supplier, but shall not include a person who is an employee of, or merely serves as a common carrier providing transportation service for, such supplier.

(7) The term **"retailer"** means any person who purchases motor fuel for sale to the general public for ultimate consumption.

(8) The term **"marketing premises"** means, in the case of any franchise, premises which, under such franchise, are to be employed by the franchisee in connection with the sale, consignment, or distribution of motor fuel.

(9) The term **"leased marketing premises"** means marketing premises owned, leased, or in any way controlled by a franchisor and which the franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment or distribution of motor fuel.

(10) The term **"contract"** means any oral or written agreement. For supply purposes, delivery levels during the same month of the previous year shall be prima facie evidence of an agreement to deliver such levels.

(11) The term **"trademark"** means any trademark, trade name, service mark, or other identifying symbol or name.

(12) The term **"motor fuel"** means gasoline and diesel fuel of a type distributed for use as a fuel in self-propelled vehicles designed primarily for use on public streets, roads, and highways.

(13) The term **"failure"** does not include-

(A) any failure which is only technical or unimportant to the franchise relationship;

(B) any failure for a cause beyond the reasonable control of the franchisee; or

(C) any failure based on a provision of the franchise which is illegal or unenforceable under the law of any State (or subdivision thereof).

(14) The term **"fail to renew"** and **"nonrenewal"** mean, with respect to any franchise relationship, a failure to reinstate, continue, or extend the franchise relationship-

(A) at the conclusion of the term, or on the expiration date, stated in the relevant franchise;

(B) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date; or

(C) following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978, and has not been renewed after such date.

(15) The term **"affiliate"** means any person who (other than by means of a franchise) controls, is controlled by, or is under common control with, any other person.

(16) The term **"relevant geographic market area"** includes a State or a standard metropolitan statistical area as periodically established by the Office of Management and Budget.

44

000053



(17) The term **"termination"** includes cancellation.

(18) The term **"commerce"** means any trade, traffic, transportation, exchange, or other commerce-

 (A) between any State and any place outside of such State; or

 (B) which affects any trade, transportation, exchange, or other commerce described in subparagraph (A).

(19) The term **"State"** means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, American Samoa, Guam, and any other commonwealth, territory, or possession of the United States.

## FRANCHISE RELATIONSHIP; TERMINATION AND NONRENEWAL

Sec. 2802. Franchise relationship

(a) General prohibition against termination or nonrenewal

Except as provided in subsection (b) of this section and section 2803 of this title, no franchisor engaged in the sale, consignment, or distribution of motor fuel in commerce may-

 (1) terminate any franchise (entered into or renewed on or after June 19, 1978) prior to the conclusion of the term, or the expiration date, stated in the franchise; or

 (2) fail to renew any franchise relationship (without regard to the date on which the relevant franchise was entered into or renewed).

(b) Precondition and grounds for termination or nonrenewal

 (i) Any franchisor may terminate any franchise (entered into or renewed on or after June 19, 1978) or may fail to renew any franchise relationship, if-

  (A) the notification requirements of section 2804 of this title are met; and

  (B) such termination is based upon a ground described in paragraph (2) or such nonrenewal is based upon a ground described in paragraph (2) or (3).

 (2) For purposes of this subsection, the following are grounds for termination of a franchise or nonrenewal of a franchise relationship:

  (A) A failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship, if the franchisor first acquired actual or constructive knowledge of such failure-

   (i) not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 2804(a) of this title; or

   (ii) not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given pursuant to section 2804(b)(1) of this title.

  (B) A failure by the franchisee to exert good faith efforts to carry out the provisions of the franchise, if-

   (i) the franchisee was apprised by the franchisor in writing of such failure and was afforded a reasonable opportunity to exert good faith efforts to carry out such provisions; and

   (ii) such failure thereafter continued within the period which began not more than 180 days before the date notification of termination or nonrenewal was given pursuant to section 2804 of this title.

  (C) The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable, if such event occurs during the period the franchise is in effect and the franchisor first acquired actual or constructive knowledge of such occurrence-

   (i) not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 2804(a) in this title; or

   (ii) not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given pursuant to section 2804(b)(1) in this title.

000054



(D) An agreement, in writing, between the franchisor and the franchisee to terminate the franchise or not to renew the franchise relationship, if-

(i) such agreement is entered into not more than 180 days prior to the date of such termination or, in the case of nonrenewal, not more than 180 days prior to the conclusion of the term, or the expiration date, stated in the franchise;

(ii) the franchisee is promptly provided with a copy of such agreement, together with the summary statement described in section 2804(d) of this title; and

(iii) within 7 days after the date on which the franchisee is provided a copy of such agreement, the franchisee has not posted by certified mail a written notice to the franchisor repudiating such agreement

(E) In the case of any franchise entered into prior to June 19, 1978, and in the case of any franchise entered into or renewed on or after such date (the term of which is 3 years or longer, or with respect to which the franchisee was offered a term of 3 years or longer), a determination made by the franchisor in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the marketing premises are located, if-

(i) such determination-

(I) was made after the date such franchise was entered into or renewed, and

(II) was based upon the occurrence of changes in relevant facts and circumstances after such date;

(ii) the termination or nonrenewal is not for the purpose of converting the premises, which are the subject of the franchise, to operation by employees or agents of the franchisor for such franchisor's own account; and

(iii) in the case of leased marketing premises-

(I) the franchisor, during the 180-day period after notification was given pursuant to section 2804 in this title, either made a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises, or, if applicable, offered the franchisee a right of first refusal of at least 45 days duration of an offer, made by another, to purchase such franchisor's interest in such premises; or

(II) in the case of the sale, transfer, or assignment to another person of the franchisor's interest in such premises in connection with the sale, transfer, or assignment to such other person of the franchisor' interest in one or more other marketing premises, if such other person offers, in good faith, a franchise to the franchisee on terms and conditions which are not discriminatory to the franchisee as compared to franchises then currently being offered by such other person or franchises then in effect and with respect to which such other person is the franchisor.

(3) For purposes of this subsection, the following are grounds for nonrenewal of a franchise relationship:

(A) The failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise, if-

(i) such charges or additions are the result of determinations made by the franchisor in good faith and in the normal course of business; and

(ii) such failure is not the result of the franchisor's insistence upon such changes or additions for the purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for the benefit of the franchisor or otherwise preventing the renewal of the franchise relationship.

(B) The receipt of numerous bona fide customer complaints by the franchisor concerning the franchisee's operation of the marketing premises, if-

(i) the franchisee was promptly apprised of the existence and nature of such complaints following receipt of such complaints by the franchisor; and

(ii) if such complaints related to the condition of such premises or to the conduct of any employee of such franchisee, the franchisee did not promptly take action to cure or correct the basis of such complaints.

(C) A failure by the franchisee to operate the marketing premises in a clean, safe, and healthful manner, if the franchisee failed to do so on two or more previous occasions and the franchisor notified the franchisee of such failures.

(D) In the case of any franchise entered into prior to June 19, 1978 (the unexpired term of which, on such date, is 3 years or longer) and, in the case of any franchise entered into or renewed on or after such date (the term of which was 3 years

000055



or longer, or with respect to which the franchisee was offered a term of 3 years or longer), a determination made by the franchisor in good faith and in the normal course of business, if-

(i) such determination is-

(I) to convert the leased marketing premises to a use other than the sale or distribution of motor fuel,

(II) to materially alter, add to, or replace such premises,

(III) to sell such premises, or

(IV) that renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or reasonable additions to the provisions of the franchise which may be acceptable to the franchisee;

(ii) with respect to a determination referred to in subclause (II) or (IV), such determination is not made for the purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for such franchisor's own account; and

(iii) in the case of leased marketing premises such franchisor, during the 90-day period after notification was given pursuant to section 2804 of this section, either-

(I) made a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises; or

(II) if applicable, offered the franchisee a right of first refusal of at least 45-days duration of an offer, made by another, to purchase such franchisor's interest in such premises.

(c)  Definition

As used in subsection (b)(2)(C) of this section, the term "an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable" includes events such as-

(1) fraud or criminal misconduct by the franchisee relevant to the operation of the marketing premises;

(2) declaration of bankruptcy or judicial determination of insolvency of the franchisee;

(3) continuing severe physical or mental disability of the franchisee of at least 3 months duration which renders the franchisee unable to provide for the continued proper operation of the marketing premises;

(4) loss of the franchisor's right to grant possession of the leased marketing premises through expiration of an underlying lease, if-

(A) the franchisee was notified in writing, prior to the commencement of the term of the then existing franchise-

(i) of the duration of the underlying lease; and

(ii) of the fact that such underlying lease might expire and not be renewed during the term of such franchise (in the case of termination) or at the end of such term (in the case of nonrenewal);

(B) during the 90-day period after notification was given pursuant to section 2804 of this title, the franchisor offers to assign to the franchise any option to extend the underlying lease or option to purchase the marketing premises that is held by the franchisor, except that the franchisor may condition the assignment upon receipt by the franchisor of-

(i) an unconditional release executed by both the landowner and the franchisee releasing the franchisor from any and all liability accruing after the date of the assignment for-

(I) financial obligations under the option (or the resulting extended lease or purchase agreement);

(II) environmental contamination to (or originating from) the marketing premises; or

(III) the operation or condition of the marketing premises; and

(ii) an instrument executed by both the landowner and the franchisee that ensures the franchisor and the contractors of the franchisor reasonable access to the marketing premises for the purpose of testing for and remediating any environmental contamination that may be present at the premises; or

47

000056

49



(C) in a situation in which the franchisee acquires possession of the leased marketing premises effective immediately after the loss of the right of the franchisor to grant possession (through an assignment pursuant to subparagraph (B) or by obtaining a new lease or purchasing the marketing premises from the landowner), the franchisor (if requested in writing by the franchisee not later than 30 days after notification was given pursuant to section 2804 of this title), during the 90-day period after notification was given pursuant to section 2804 of this title-

(i) made a bona fide offer to sell, transfer, or assign to the franchisee the interest of the franchisor in any improvements or equipment located on the premises; or

(ii) if applicable, offered the franchisee a right of first refusal (for at least 45 days) of an offer, made by another person, to purchase the interest of the franchisor in the improvements and equipment.

(5) condemnation or other taking, in whole or in part, of the marketing premises pursuant to the power of eminent domain;

(6) loss of the franchisor's right to grant the right to use the trademark which is the subject of the franchise, unless such loss was due to trademark abuse, violation of Federal or State law, or other fault or negligence of the franchisor, which such abuse, violation, or other fault or negligence is related to action taken in bad faith by the franchisor;

(7) destruction (other than by the franchisor) of all or a substantial part of the marketing premises;

(8) failure by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled;

(9) failure by the franchisee to operate the marketing premises for-

(A) 7 consecutive days, or

(B) such lesser period which under the facts and circumstances constitutes an unreasonable period of time;

(10) willful adulteration, mislabeling or misbranding of motor fuels or other trademark violations by the franchisee;

(11) knowing failure of the franchisee to comply with Federal, State or local laws or regulations relevant to the operation of the marketing premises; and

(12) conviction of the franchisee of any felony involving moral turpitude.

(d)    Compensation, etc., for franchisee upon condemnation or destruction of marketing premises

In the case of any termination of a franchise (entered into or renewed on or after June 19, 1978), or in the case of any nonrenewal of a franchise relationship (without regard to the date on which such franchise relationship was entered into or renewed)-

(1) if such termination or nonrenewal is based upon an event described in subsection (c)(5) of this section, the franchisor shall fairly apportion between the franchisor and the franchisee compensation, if any, received by the franchisor based upon any loss of business opportunity or good will; and

(2) if such termination or nonrenewal is based upon an event described in subsection (c)(7) of this section and the leased marketing premises are subsequently rebuilt or replaced by the franchisor and operated under a franchise, the franchisor shall, within a reasonable period of time, grant to the franchisee a right of first refusal of the franchise under which such premises are to be operated.

## TRIAL FRANCHISES AND INTERIM FRANCHISES; NONRENEWAL

Section 2803. Trial and interim franchises

(a)    Nonapplicability of statutory nonrenewal provisions

The provisions of section 2802 of this title shall not apply to the nonrenewal of any franchise relationship-

(1) under a trial franchise; or

(2) under an interim franchise.

(b)    Definitions

For purposes of this section-

000057



(1) The term "trial franchise" means any franchise-

    (A) which is entered into on or after June 19, 1978;

    (B) the franchisee of which has not previously been a party to a franchise with the franchisor;

    (C) the initial term of which is for a period of not more than 1 year; and

    (D) which is in writing and states clearly and conspicuously-

        (i) that the franchise is a trial franchise;

        (ii) the duration of the initial term of the franchise;

        (iii) that the franchisor may fail to renew the franchise relationship at the conclusion of the initial term stated in the franchise by notifying the franchisee, in accordance with the provisions of section 2804 of this title, of the franchisor's intention not to renew the franchise relationship; and

        (iv) that the provisions of section 2802 of this title, limiting the right of a franchisor to fail to renew a franchise relationship, are not applicable to such trial franchise.

(2) The term "trial franchise" does not include any unexpired period of any term of any franchise (other than a trial franchise, as defined by paragraph (1)) which was transferred or assigned by a franchisee to the extent authorized by the provisions of the franchise or any applicable provision of State law which permits such transfer or assignment, without regard to which provision of the franchise.

(3) The term "interim franchise" means any franchise-

    (A) which is entered into on or after the date of June 19, 1978;

    (B) the term of which, when combined with the terms of all prior interim franchises between the franchisor and the franchisee, does not exceed 3 years;

    (C) the effective date of which occurs immediately after the expiration of a prior franchise, applicable to the marketing premises, which was not renewed if such nonrenewal-

        (i) was based upon a determination described in section 2802(b)(2)(E) of this title, and

        (ii) the requirements of section 2802(b)(2)(E) of this title were satisfied; and

    (D) which is in writing and states clearly and conspicuously-

        (i) that the franchise is an interim franchise;

        (ii) the duration of the franchise; and

        (iii) that the franchisor may fail to renew the franchise at the conclusion of the term stated in the franchise based upon a determination made by the franchisor in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the marketing premises are located if the requirements of section 2802(b)(2)(E) (ii) and (iii) of this title are satisfied.

(c)   Nonrenewal upon meeting statutory notification requirements

If the notification requirements of section 2804 of this title are met, any franchisor may fail to renew any franchise relationship-

    (1) under any trial franchise, at the conclusion of the initial term of such trial franchise; and

    (2) under any interim franchise, at the conclusion of the term of such interim franchise, if-
        (A) such nonrenewal is based upon a determination described in section 2802(b)(2)(E) of this title; and

        (B) the requirements of section 2802((b)(2)(E) (ii) and (iii) of this title are satisfied.

NOTIFICATION OF TERMINATION OR NONRENEWAL

Sec. 2804. Notification of termination or nonrenewal of franchise relationship

(a)   General requirements applicable to franchisor

49

Revised 10/11/2006

000058



Prior to termination of any franchise or nonrenewal of any franchise relationship, the franchisor shall furnish notification of such termination or such nonrenewal to the franchisee who is a party to such franchise or such franchise relationship-

(1) in the manner described in subsection (c) of this section; and

(2) except as provided in subsection (b) of this section, not less than 90 days prior to the date on which such termination or nonrenewal takes effect.

(b)    Additional requirements applicable to franchisor

(1) In circumstances in which it would not be reasonable for the franchisor to furnish notification, not less than 90 days prior to the date on which termination or nonrenewal takes effect, as required by subsection (a)(2) of this section-

(A) such franchisor shall furnish notification to the franchisee affected thereby on the earliest date on which furnishing of such notification is reasonably practicable; and

(B) in the case of leased marketing premises, such franchisor -

(i) may not establish a new franchise relationship with respect to such premises before the expiration of the 30 day period which begins-

(I) on the date notification was posted or personally delivered, or

(II) if later, on the date on which such termination or nonrenewal takes effect; and

(ii) may, if permitted to do so by the franchise agreement, repossess such premises and, in circumstances under which it would be reasonable to do so, operate such premises through employees or agents.

(2) In the case of any termination of any franchise or any nonrenewal of any franchise relationship pursuant to the provisions of section 2802(b)(2)(E) of this title or section 2803(c)(2) of this title, the franchisor shall-

(A) furnish notification to the franchisee not less than 180 days prior to the date on which such termination or nonrenewal takes effect; and

(B) promptly provide a copy to such notification, together with a plan describing the schedule and conditions under which the franchisor will withdraw from the marketing of motor fuel through retail outlets in the relevant geographic area, to the Governor of each State which contains a portion of such area.

(c)    Manner and form of notification

Notification under this section-

(1) shall be in writing;

(2) shall be posted by certified mail or personally delivered to the franchisee; and

(3) shall contain-

(A) a statement of intention to terminate the franchise or not to renew the franchise relationship, together with the reasons therefor,

(B) the date on which such termination or nonrenewal takes effect; and

(C) the summary statement prepared under subsection (d) of this section.

(d)    Preparation, publication, etc., of statutory summaries

(l) Not later than 30 days after June 19, 1978, the Secretary of Energy shall prepare and publish in the Federal Register a simple and concise summary of the provisions of this subchapter, including a statement of the respective responsibilities of, and the remedies and relief available to, any franchisor and franchisee under this subchapter.

(2) In the case of summaries required to be furnished under the provisions of section 2802(b)(2)(D) of this title or subsection (c)(3)(C) of this section before the date of publication of such summary in the Federal Register, such summary may be furnished not later than 5 days after it is so published rather than at the time required under such provisions.

76 kb_fuelsupplyagrmt

Revised 10/11/2006

000059



## ENFORCEMENT

Sec. 2805. Enforcement provisions

(a)  Maintenance of civil action by franchisee against franchisor; jurisdiction and venue; time for commencement of action

If a franchisor fails to comply with the requirements of section 2802 or 2803 of this title, the franchise may maintain a civil action against such franchisor. Such action may be brought, without regard to the amount in controversy, in the district court of the United States in any judicial district in which the principal place of business of such franchisor is located or in which such franchisee is doing business, except that no such action may be maintained unless commenced within 1 year after the later of-

   (1) the date of termination of the franchise or nonrenewal of the franchise relationship; or

   (2) the date the franchisor fails to comply with the requirements of section 2802 or 2803 of this title.

(b)  Equitable relief by court; bond requirements; grounds for nonexercise of court's equitable powers

   (1) In any action under subsection (a) of this section, the court shall grant such equitable relief as the court determines is necessary to remedy the effects of any failure to comply with the requirements of section 2802 or 2803 of this title, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief.

   (2) Except as provided in paragraph (3), in any action under subsection (a) of this section, the court shall grant a preliminary injunction if-

      (A) the franchisee shows-

         (i) the franchise of which he is a party has been terminated or the franchise relationship to which he is a party has not been renewed, and

         (ii) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and

      (B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

   (3) Nothing in this subsection prevents any court from requiring the franchisee in any action under subsection (a) of this section to post a bond, in an amount established by the court, prior to the issuance or continuation of any equitable relief.

   (4) In any action under subsection (a) of this section, the court need not exercise its equity powers to compel continuation or renewal of the franchise relationship if such action was commenced-

      (A) more than 90 days after the date on which notification pursuant to section 2804(a) of this title was posted or personally delivered to the franchisee;

      (B) more than 180 days after the date on which notification pursuant to section 2804(b)(2) of this title was posted or personally delivered to the franchisee; or

      (C) more than 30 days after the date on which the termination of such franchise or the nonrenewal of such franchise relationship takes effect if less than 90 days notification was provided pursuant to section 2804(b)(1) of this title.

(c)  Burden of proof; burden of going forward with evidence

In any action under subsection (a) of this section, the franchisee shall have the burden of proving the termination of the franchise or the nonrenewal of the franchise relationship. The franchisor shall bear the burden of going forward with evidence to establish as an affirmative defense that such termination or nonrenewal was permitted under section 2802(b) or 2803 of this title, and, if applicable, that such franchisor complied with the requirements of section 2802(d) of this title.

(d)  Actual and exemplary damages and attorney and expert witness fees to franchisee; determination by court of right to exemplary damages and amount; attorney and expert witness fees to franchisor for frivolous actions

(1) If the franchisee prevails in any action under subsection (a) of this section, such franchisee shall be entitled-

      (A) consistent with the Federal Rules of Civil Procedure, to actual damages;

Revised 10/11/2006

000060



(B) in the case of any such action which is based upon conduct of the franchisor which was in willful disregard of the requirements of section 2802 or 2803 of this title, or the rights of the franchisee thereunder, to exemplary damages, where appropriate; and

(C) to reasonable attorney and expert witness fees to be paid by the franchisor, unless the court determines that only nominal damages are to be awarded to such franchisee, in which case the court, in its discretion, need not direct that such fees be paid by the franchisor.

(2) The question of whether to award exemplary damages and the amount of any such award shall be determined by the court and not by a jury.

(3) In any action under subsection (a) of this section, the court may, in its discretion direct that reasonable attorney and expert witness fees be paid by the franchisee if the court finds that such action is frivolous.

(e)   Discretionary power of court to compel continuation or renewal of franchise relationship; grounds for noncompulsion; right of franchisee to actual damages and attorney and expert witness fees unaffected

(1) In any action under subsection (a) of this section with respect to a failure of a franchisor to renew a franchise relationship in compliance with the requirements of section 2802 of this title, the court may not compel a continuation or renewal of the franchise relationship if the franchisor demonstrates to the satisfaction of the court that-

(A) the basis for such nonrenewal is a determination made by the franchisor in good faith and in the normal course of business-

(i) to convert the leased marketing premises to a use other than the sale or distribution of motor fuel,

(ii) to materially alter, add to, or replace such premises,

(iii) to sell such premises,

(iv) to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the marketing premises are located, or

(v) that renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or reasonable additions to the provisions of the franchise which may be acceptable to the franchisee; and

(B) the requirements of section 2804 of this title have been complied with.

(2) The provisions of paragraph (1) shall not affect any right of any franchisee to recover actual damages and reasonable attorney and expert witness fees under subsection (d) of this section if such nonrenewal is prohibited by section 2802 of this title.

(f)   Release or waiver of rights

(1)   No franchisor shall require, as a condition of entering into or renewing the franchise relationship, a franchisee to release or waive-

(A) any right that the franchisee has under this subchapter or other Federal law; or

(B) any right that the franchisee may have under any valid and applicable State law.

(2) No provision of any franchise shall be valid or enforceable if the provision specifies that the interpretation or enforcement of the franchise shall be governed by the law of any State other than the State in which the franchisee has the principal place of business of the franchisee.

## RELATIONSHIP OF THIS TITLE TO STATE LAW

Sec. 2806. Relationship of statutory provisions to State and local laws

(a)   Termination or nonrenewal of franchise

(1) To the extent that any provision of this subchapter applies to the termination (or the furnishing of notification with respect thereto) of any franchise, or to the nonrenewal (or the furnishing of notification with respect thereto) of any franchise relationship, no State or any political subdivision thereof may adopt, enforce, or continue in effect any provision of any law or regulation (including any remedy or penalty applicable to any violation thereof) with respect to termination (or the furnishing to notification with respect thereto) of any such franchise or to the nonrenewal (or the furnishing of notification with respect

000061

54



thereto) of any such franchise relationship unless such provision of such law or regulation is the same as the applicable provision of this subchapter.

(2) No State or political subdivision of a State may adopt, enforce, or continue in effect any provision of law (including a regulation) that requires a payment for the goodwill of a franchisee on the termination of a franchise of nonrenewal of a franchise relationship authorized by this subchapter.

**(b)    Transfer or assignment of franchise**

(1) Nothing in this subchapter authorizes any transfer or assignment of any franchise or prohibits any transfer or assignment of any franchise as authorized by the provisions of such franchise or by any applicable provision of State law which permits such transfer or assignment without regard to any provision of the franchise.

(2) Nothing in this subchapter shall prohibit any State from specifying the terms and conditions under which any franchise or franchise relationship may be transferred to the designated successor of a franchisee upon the death of the franchisee.

76 kb_fuelsupplyagrmt

Revised 10/11/2006

000062



## ADDENDUM 1

### 0012 / 255661

### UNDERLYING LEASE

There is a possibility that the term of the underlying lease to the Station might expire and not be renewed upon the underlying lease's expiration date. DEALER hereby acknowledges CONOCOPHILLIPS' disclosure to DEALER that this Agreement and the Station herein are subject to all the terms and conditions of an underlying lease held by CONOCOPHILLIPS in the property and premises, which underlying lease expires on **October 31, 2007** and that such underlying lease may expire and may not be renewed during the Term of this Agreement. Thereby, the DEALER is hereby on notice that this Agreement is hereby terminated on the date the underlying lease expires or on a prior date in the event CONOCOPHILLIPS' lessor terminates the underlying lease or the underlying lease otherwise requires early termination.

CONOCOPHILLIPS is under no obligation to seek an extension or renewal, or exercise any renewal options it may have, of such underlying lease, but may do so at its discretion.

If no dates are filled in above, then CONOCOPHILLIPS does not have possession of the Station, property and premises, under or through an underlying lease.



000063

HOUTAN PETROLEUM INC Site # 255661

# Important!
# Environmental Compliance Documents
# Must be Maintained on Site

Please find enclosed copies of the Underground Storage Tank documents for your facility, required by Federal Underground Storage Tank Regulations. These are very important documents and NOT maintaining copies on site could result in a lease default. All facilities are required to maintain these documents.

In addition, for stations with electronic monitoring systems, you are required to check your monitoring system daily to ensure that it is operating correctly. If your system is not operating correctly or is in alarm, call your Maintenance Service Provider immediately.

Please retain one copy of this Monitoring Plan at your site so that it is accessible to all employees and agency personnel upon request. If desired, you may keep an additional copy with your lease.

If you have questions, please contact your HSE Specialist:

**HSE Specialist: Julie Lee, Phone (510) 245-5218, Fax (510) 245-5179**

**Note: When accepting, you are certifying that the information is accurate. If there are any discrepancies, please make corrections and initial and fax a copy to your HSE Specialist.**

Date Printed:    3/12/2007

000064

| Unit: | Cost Center 255661 | ACQ#: | 5661 |
|---|---|---|---|
| Operator Name: | HOUTAN PETROLEUM, INC. | | |
| Address: | 101 E EL CAMINO REAL | | |
| | MOUNTAIN VIEW, CA 94040 | | |

## UNDERGROUND STORAGE TANKS (UST) OWNER/OPERATOR AGREEMENT

California Underground Storage Tank Regulations (CCR, Title 23, Division 3, Chapter 16, Article 2, Section 2620 (b)), require ConocoPhillips (the tank owner) to execute a written agreement with their Dealers, (the tank operators), requiring them to monitor the underground storage tanks (USTs) containing hazardous substances.

### PART I: OWNER CERTIFICATION

ConocoPhillips Company, as owner of the USTs at the above site, certifies that:

1.      It is not the tank operator of the USTs at said site.

2.      It has applied for the UST permit, and a valid UST permit is on-site or will be delivered to the tank operator when received from the local implementing agency.

3.      It will notify the local implementing agency of any operator change within thirty (30) days of any such change.

4.      Both ConocoPhillips and the operator have signed this Agreement.

### PART II: OPERATOR CERTIFICATION

The law requires the tank operator of USTs containing motor vehicle fuel to comply with the following standards:

1.      A valid UST permit shall be maintained on site.

2.      A UST Monitoring Program, approved by the local implementing agency, must be implemented.

3.      A Spill Response Plan, approved by the local implementing agency, must be implemented.

4.      The requirements stipulated in the UST Monitoring Program and Spill Response Plan (attached), must be complied with. This shall include, if necessary, the submittal of an annual written statement to the local implementing agency, verifying under penalty of perjury that all monthly monitoring reports were summarized, and that all data contained within the monitoring reports are within allowable variations. Alternatively, a listing of the times, dates and corresponding monitoring report data that exceeded the allowable variations must be provided.

5.      The monitoring and maintenance records must be maintained. This includes inventory readings and reconciliation records, sampling and testing results, all of which must be maintained on-site for at least 3 years, or in an approved off-site location. Said records must be made available upon request, within 36 hours, to the local implementing agency or the State Water Board.

6.      Records must be kept in sufficient detail to enable the local implementing agency, at any time, to determine that the tank operator has undertaken all monitoring activities required by the UST Permit to Operate and/or the UST Monitoring Program.

7.      ConocoPhillips must be notified of the detection of any unauthorized releases by the fastest means available (no later than 8 hours) or within the time frame mandated by the local implementing agency. The operator must adhere to the procedures contained in the Spill Response Plan. ConocoPhillips will notify the appropriate agency(s) and submit a written report as may be required by the agency(s).

8.      Daily inventory measurements must be performed by a trained facility operator or designated facility personnel for each day the facility is in operation.

9.      ConocoPhillips must be notified of any malfunctioning of the UST monitoring system. The monitoring equipment shall be operated and maintained in accordance with the regulation per Title 023, Division 3, Chapter 16, Article 4, Section 2641 (j) of the California Code of Regulation.

CostCenter# 255661, HOUTAN PETROLEUM, INC., 101 E EL CAMINO REAL, MOUNTAIN VIEW, CA 94040

Date Printed:     3/12/2007

000065

| Unit: | Cost Center 255661 | ACQ#: | 5661 |
| --- | --- | --- | --- |
| Operator Name: | HOUTAN PETROLEUM, INC. | | |
| Address: | 101 E EL CAMINO REAL | | |
| | MOUNTAIN VIEW, CA 94040 | | |

10.  Review and comply with all applicable Federal, State and local regulations.

Furthermore, ConocoPhillips policy under the Lease Agreement requires the Dealer to comply with the following procedures:

1.  Daily gauging, recording and inventory reconciliation of each motor vehicle fuel is required. These readings must be within the allowable variances established by the UST permit or lease agreement whichever is more stringent. If not, please follow procedure #6 below.

2.  Daily measurement and recording of any water layer in each UST is required.

3.  Daily meter readings and recording of UST input and withdrawals of motor vehicle fuels is required.

4.  Monitor and maintain any Aboveground Storage Tank(s) according to the California State Aboveground Petroleum Storage Act Guidelines and/or the Uniform Fire Codes.

5.  The inventory reconciliation records must be reviewed monthly.

6.  The steps described herein will be implemented by the tank operator if inventory reconciliation indicates a loss of product (book volume to physical volume) greater than the allowable variance for each tank:

    a.  Review the inventory reconciliation records within two hours to determine if an error exists which would explain the loss

    b.  Take a new inventory reconciliation within 8 hours after the initial inventory reconciliation which triggered the evaluation.

    c.  If loss is still indicated, the operator shall notify ConocoPhillips by the fastest possible means, but always within 8 hours of the completion of the daily reconciliation which verified the loss.

    d.  A complete review of all inventory records from the last time a non-loss condition existed shall be performed. This analysis shall be completed within 24 hours after determination that suspected loss is not due to error by the two-hour review described in 6 (a) above.

7.  A current ConocoPhillips Certificate of Financial Responsibility Statement shall be maintained on-site for review by governmental authorities.

8.  A current Underground Storage Tank Owner/Operator Agreement shall be maintained on-site for review by governmental authorities.

9.  All unauthorized releases must be recorded. Such records shall be maintained on-site at all times and be available for review by governmental authorities

The Dealer Lease Agreement requires the Dealer to pay for all necessary permit fees, renewal fees and any surcharges. It is customary for ConocoPhillips to remit the appropriate fees and invoice the Dealer's account. However, Dealers are responsible for final payment of all fees.

The local UST regulatory agency may have more stringent monitoring procedures in place. The tank operator must take the necessary steps to ensure familiarity with the procedures and follow those regulatory guidelines as required.

ConocoPhillips

_____
ConocoPhillips Representative Signature

ACCEPTED AND AGREED TO THIS ____6____ DAY OF ____8____ , 20 _07_

Lessee Name:    HOUTAN PETROLEUM, INC.

_____          July 6 2007
Signature                                         Date Signed

CostCenter# 255661, HOUTAN PETROLEUM, INC., 101 E EL CAMINO REAL, MOUNTAIN VIEW, CA 94040

Date Printed:    3/12/2007

000066

# Underground Storage Tank Monitoring Program

**1. Owner/Operator/Site Number:** HOUTAN PETROLEUM INC    Site # 255661  RE# 30948

**2. Site Address and Phone Number:** 101 E EL CAMINO REAL  MOUNTAIN VIEW, CA  94040    ph. (650) 967-1776

**3. Method and equipment to be used for performing the monitoring (USTs only):**

| TANK DATA: | Tank 01 Unleaded | Tank 02 Premium Unleaded | Tank 03 Waste Oil |
|---|---|---|---|
| Product | | | |
| Capacity (gallons) | 12032 | 12032 | 550 |
| Wall Type | Double | Double | Double |
| Material | Steel, Fiberglass cladded on outside | Steel, Fiberglass cladded on outside | Steel, Fiberglass cladded on outside |
| Install Date | 1/1/1988 | 1/1/1988 | 1/1/1988 |
| Overfill | Flapper Valve (at 95%) | Flapper Valve | Yes |
| Spill Containment | Yes | Yes | Yes |
| Monitoring Method** | Interstitial (Dry) | Interstitial (Dry) | Interstitial (Dry) |

| PIPING DATA: | Pipe 01 | Pipe 02 | |
|---|---|---|---|
| Wall Type | Double | Double | |
| Material | Fiberglass | Fiberglass | |
| Install Date | 1/1/1994 | 1/1/1994 | |
| Monitoring Method** | Interstitial | Interstitial | |
| Sump Containment | Yes | Yes | |
| Disp. Containment** | Yes | Yes | |
| Monitor Probe Location** | Turbine Sump | Turbine Sump | |
| Mechanical Leak Detector (manuf/model) | Vaporless LD2000 | Vaporless LD2000 | |
| Electronic Leak Detector Present | No | No | |

** If applicable, leak sensor and under-dispenser shut off mechanism model numbers are included in the Monitoring System Certification.

**ELECTRONIC MONITOR:**
Make: Veeder Root
Model: TLS-350

**ADDITIONAL ELECTRONIC MONITOR**
**(for Waste Oil Tank):**
Make:  None
Model:

**ALARMS AND SHUT DOWN MECHANISMS (if present):**
Piping equipped with audible/visual alarm, failsafe, and positive shutoff.

Date Printed:  3/12/2007

255661 / 30948  HOUTAN PETROLEUM, INC., 101 E EL CAMINO REAL, MOUNTAIN VIEW, CA  94040

000067

# Underground Storage Tank Monitoring Program

**1. Owner/Operator/Site Number:** HOUTAN PETROLEUM INC     Site # 255661   RE# 30948

**2. Site Address and Phone Number:** 101 EL CAMINO REAL, MOUNTAIN VIEW, CA 94040   ph. (650) 967-1776

## 4. Frequency of Monitoring Method and location Where Monitoring will be Performed:

**Tanks:** Tank(s) 01 02 03 are monitored continuously using an electronic probe in the interstitial space of the tank.

**Piping:** Pipe(s) 01 02 are monitored continuously by a liquid-detecting probe located in the turbine sump.

**Dispenser:** Dispenser pans are equipped with continuous mechanical monitoring/mechanical shut-off device.

## 5. Name(s) and title(s) of the person(s) responsible for performing the monitoring and/or maintaining the equipment:

**Operator Name and Number:** HOUTAN PETROLEUM, INC. - (650) 967-1776

**Maintenance:** ServOne - 1-866-215-0965

## 6. Reporting Format:

The monitor will be certified annually and a report generated and provided to the operator. The operator is to report all audible or visual alarm conditions that may indicate a potential release to the ConocoPhillips Field Representative, as well as the responsible party for maintenance listed under #5. In the event of a test failure, the specific piece(s) of equipment are taken out of service and proper reporting procedures followed. The operator is to report all suspected and confirmed releases to the ConocoPhillips Field Representative, as well as the responsible party for maintenance listed under #5.

## 7. State the Preventative Maintenance Schedule for the Monitoring Equipment:

The electronic monitoring system is certified annually to be functioning per manufacturer instructions by a properly trained and certified third-party contractor. Repairs are made by the responsible party listed under #5 upon notification by the station operator. The station operator is responsible for maintaining copies of testing results and repair records on site and available for agency inspectors. The 3rd-party testing requirements and frequencies for the tank system are summarized below.

### Contractor UST System Testing Requirements/Frequency

Contractor testing of the primary tank is not required.

Mechanical leak detector(s) tested annually.

The tank secondary containment is tested per manufacturer's specifications every 3 years in accordance with CCR Title 23 Section 2637.

Contractor testing of the primary piping is not required.

Fuel spill buckets require annual testing.

Secondary containment testing for piping, turbine sumps and dispenser pans is conducted every 3 years per manufacturer's specification under CCR Title 23.

## 8. Describe the Training Needed for the Operation of Both the Tank System and the Monitoring Equipment:

The operator has been trained to check the tank system and/or monitor daily for proper operation. Training topics include performing daily/monthly inventory reconciliation, inspection of the monitoring system to ensure it is operating properly and not in alarm, periodic inspection of under-dispenser for leaks, inspection of fill and vapor spill buckets, inspection of hoses, nozzles, and other ancillary tank system equipment. If the tank system and/or monitor is not functioning correctly, the operator has been instructed to repair the equipment (if appropriate) or contact the responsible party for maintenance listed under item #5 for repairs.

## 9. Summary of Site Operator Requirements:

For pipes monitored electronically, the site operator is to call the specified maintenance company to report monitoring alarms and maintain a record of all monitoring alarms and repairs. For double wall tanks monitored by interstitial probes, the monitoring equipment must be continuously operational with probes in place. Report all non-inventory monitoring alarms to the specified maintenance company and keep a record of alarms and repair work performed. All sites are responsible for maintaining daily and monthly inventory reconciliation records and notifying the ConocoPhillips Field Representative and the Regional Environmental Compliance Specialist for inventory variances greater than the regulatory limit.

255661 / 30948   HOUTAN PETROLEUM, INC., 101 E EL CAMINO REAL, MOUNTAIN VIEW, CA 94040     Date Printed: 3/12/2007

HOUTAN PETROLEUM INC Site # 255661

# Spill Response Plan

## For Minor Releases:

If the release is less than 5 gallons and service station personnel can contain the release immediately (and the release does not go off-site, enter any waterway, or contact bare soils), do the following:

1. Turn off the source of the spill (i.e. turn off dispensers, pump, etc.)
2. Contain with absorbent material, making sure that the release does not leave the site or enter any drains.
3. Clean up release material with absorbent material.
4. Place used absorbent material into an approved container for such materials.
5. For proper disposal of used absorbent material, the dealer or designated employee will contact a licensed waste hauler to dispose of the material in accordance with all applicable federal, state, and local regulations.

## For Major Releases:

If the release is greater than 5 gallons, threatens to leave the site, enter any waterway, or contact bare soils, or there is an injury to a person, do the following:

1. Turn off the source of the spill (i.e. turn off dispensers, pump, etc.)
2. Evacuate customers, asking them to leave by foot.
3. Call the Fire Department:  911
4. All employees evacuate the premises.
5. Employees are to meet at a designated emergency assembly area.
6. Station dealer or manager to account for employees and any known customers at meeting place.
7. Dealer or manager should remain in the vicinity to provide information to the fire department, etc.
8. Notify the following personnel:

    Regional HSE Specialist
    SolvOne at 1-866-215-0965

9. Attempt to contain the spill with absorbent material, attempting to prevent the release from leaving the site or entering any drains.

10. In California, call the Office of Emergency Services at 1-800-852-7550.
11. In the case of an unauthorized release from the primary containment, ConocoPhillips Company will respond within 8 hours to address necessary repairs to the primary containment and cleanup of the secondary containment.  Exceptions to this will be reported to the  agency as required under California Health and Safety Code Section 25295.

ConocoPhillips# 255661 / 5661 -  HOUTAN PETROLEUM, INC.  101 E EL CAMINO REAL MOUNTAIN VIEW CA 94040
Phone# (650) 967-1776

Date Printed:   3/12/2007

000069

## OFFICER CERTIFICATION
### #0012/255661

The undersigned does hereby confirm to be an officer of _Host -- A.T. ; N C_
a _Ca    Corp_____ corporation ("Corporation"). The
undersigned certifies that as an officer of the Corporation he/she is duly authorized to
execute any and all documents and/or other instruments on behalf of the Corporation.
The execution of the foregoing Agreement and any ancillary documents related to the
Agreement, by the undersigned are and shall be binding upon the Corporation.

Signature: _____

Print Name: _Ed  Bozorghadan_

Corporate Title: _Pres lut_

Date: _July 6  2007_

000070

# SNACK SHOP ADDENDUM
## TO UNION 76 DEALER STATION LEASE and MOTOR FUEL SUPPLY AGREEMENT

### # 0012/255661

### Table of Contents

| Subject | Section |
|---|---|
| Station | 1 |
| Term | 2 |
| Records and Audit | 3 |
| Services and Use | 4 |
| Permits | 5 |
| Equipment & Fixtures | 6 |
| Merchandising | 7 |
| Staffing | 8 |
| Training | 9 |
| Security | 10 |
| Maintenance and Repair | 11 |
| Signs | 12 |
| Compliance With Regulations | 13 |
| Agreement | 14 |
| Termination | 15 |

**Exhibits**

| | |
|---|---|
| Exhibit I | Approved/Non-approved Products |
| Exhibit II | Equipment and Fixtures |

## SNACK SHOP ADDENDUM TO AGREEMENT

This snack shop addendum ("Addendum") is an Addendum to the Union 76 DEALER Station Lease and Motor Fuel Supply Agreement for unit #255661 ("Agreement") between ConocoPhillips Company, successor to Tosco Corporation by merger ("CONOCOPHILLIPS") and the individual(s) named below ("DEALER").

### HOUTAN PETROLEUM INC

### *RECITALS*

**A.**    CONOCOPHILLIPS and DEALER do hereby enter into this Addendum to the Agreement in reflect their desire to operate a first class snack shop for the sale of food, beverages, other grocery items and related goods and services of similar types.

NOW, THEREFORE, in consideration of the mutual promises contained herein, CONOCOPHILLIPS and DEALER agree as follows:

**1.    STATION**
The snack shop is located at the DEALER's service station premises located at **101 E EL CAMINO REAL, MOUNTAIN VIEW, CA 94040** ("Station").  DEALER agrees to operate the snack shop during those same business hours of operation of the Station as more specifically set forth in the Agreement's **Exhibit D.**

**2.    TERM**
This Addendum shall coincide and run concurrently with the Term set forth in the Agreement and will terminate concurrently with any termination or non-renewal of the Agreement without the need for a separate notification.  The Term of the Agreement is from **September 1, 2007** through **August 31, 2010.**

**3.    RECORDS AND AUDIT**
In addition to the terms set forth in the Agreement, DEALER shall make the sales records, business and occupation tax reports (except income tax reports, unless other sufficient records are not available to conclude the audit), general ledgers and such other information that reflects gross revenue, and all sales of merchandise and services, at or from the Station available to, and shall provide working space for, CONOCOPHILLIPS' auditors on a date that is mutually agreeable to DEALER and CONOCOPHILLIPS, which date shall not be more than ten (10) days following DEALER's receipt of notice from CONOCOPHILLIPS that an audit is to be conducted.

DEALER shall retain the records, tax reports, general ledgers and other information set forth above for a period of forty-eight (48) months following the end of each calendar year of the Term of the Agreement.

DEALER shall, if requested by CONOCOPHILLIPS, obtain and submit to CONOCOPHILLIPS on or before the 30th day following the end of any calendar year in which such request is made, including the last year, an audit certified by a certified public accountant, signed by DEALER, detailing the amount of gross sales from the snack shop.

2

DEALER grants CONOCOPHILLIPS the irrevocable right to inspect the records of all suppliers, distributors, and other third parties supplying food products, supplies, equipment and materials to the DEALER and hereby irrevocably authorizes such parties to release such records to CONOCOPHILLIPS.

**4.    SERVICES AND USES**

DEALER shall offer products and services at the snack shop of food, beverages, grocery items, and other related goods as set forth in **Exhibit I** attached hereto and by this referenced made a part of this Addendum.

DEALER agrees to maintain a complete and competent inventory of all items as detailed in **Exhibit I**, and otherwise approved by CONOCOPHILLIPS, which are normally offered for sale from a first class snack shop service station. Products not specifically listed in **Exhibit I** may not be sold without the DEALER first obtaining the prior written consent of CONOCOPHILLIPS.

**5.    PERMITS**

DEALER will obtain and maintain at all times, at DEALER's sole cost and expense, all business licenses, health permits and alcoholic beverage control licenses required to operate the snack shop.

**6.    EQUIPMENT & FIXTURES**

DEALER agrees to purchase or lease equipment and fixtures necessary to operate the snack shop. Any equipment and fixtures to be operated at the snack shop is subject to CONOCOPHILLIPS' prior written approval, said approval shall not be unreasonably withheld, as to format, location and size.

The type of equipment and fixtures which shall be required at the commencement of the Term to run a first class snack shop operation is set forth in **Exhibit II** attached hereto and by this reference made a part of this Addendum.

DEALER shall remove all equipment and fixtures owned by DEALER within five (5) days of any termination or nonrenewal of this Addendum and/or this Agreement. DEALER further agrees to repair any and all damages caused by such removal within fifteen (15) days of the removal of any such equipment and fixtures. In the event DEALER fails to make such repairs, as CONOCOPHILLIPS reasonably determines is required, CONOCOPHILLIPS may elect to make all necessary repairs and charge the cost of repairs to DEALER's account.

**7.    MERCHANDISING**

DEALER agrees to maintain a sufficient supply of approved products and merchandise at all times to meet consumer demand for such products and merchandise. DEALER agrees to maintain the interior and exterior of the snack shop and all fixtures, furnishings, signs and equipment in the highest degree of cleanliness, orderliness, sanitation and repair.

**8.    STAFFING**

The snack shop must be staffed by at least one (1) individual continuously during all hours of operation. All personnel must demonstrate a literacy and fluency in the English language sufficient, in the good faith opinion of CONOCOPHILLIPS, to satisfactorily communicate with other employees, customers and suppliers.

3

## 9.    TRAINING

DEALER agrees that DEALER and DEALER's employees shall promptly attend training on snack shop operations including, but not limited to, security and safety procedures and merchandising as CONOCOPHILLIPS shall from time to time reasonably require or as may be reasonably required for DEALER to safely and responsibly conduct the operations contemplated herein.

## 10.    SECURITY

DEALER agrees that DEALER has sole responsibility for the selection, cost and operation of any and all security devices and equipment DEALER deems necessary for the operation of the snack shop.

## 11.    MAINTENANCE AND REPAIRS

DEALER shall be solely responsible for maintenance and repair of any and all snack shop equipment either owned by CONOCOPHILLIPS or the DEALER.  DEALER further agrees to maintain in operable condition any leased equipment used in the operation of the snack shop.  In the event DEALER fails to perform or provide adequate maintenance and/or repairs, as CONOCOPHILLIPS reasonably determines is required, CONOCOPHILLIPS and/or its selected contractor shall be permitted to access the Station and snack shop to perform maintenance and/or make all necessary repairs and charge the cost of maintenance and repairs to DEALER's account.  In the event that any equipment item is no longer repairable, upon CONOCOPHILLIPS' request DEALER agrees to be responsible for replacement of the item in order to continue operation of the snack shop in a first class manner.

## 12.    SIGNS

Subject to laws, ordinances and regulation and subject to CONOCOPHILLIPS' prior written approval, which shall not be unreasonably withheld, as to format, location and size; DEALER may install the usual and customary signs advertising the products and prices available at the snack shop. It is agreed that approval by CONOCOPHILLIPS is required for all signs whether free-standing, affixed to the station building or other structure or otherwise.

## 13.    COMPLIANCE WITH REGULATIONS

DEALER agrees to comply promptly with all applicable laws, rules, regulations, ordinances and orders of public authorities, including but not limited to, Government Agencies, Board of Fire Underwriters and other similar organizations.  The term "Government Agencies" shall include without limitation, all government and regulatory units, however designated, which establish and administer health, safety, sanitation, environmental, or other guidelines affecting operations of the snack shop.

## 14.    AGREEMENT

This Addendum is part of the Agreement and all terms and conditions of said Agreement apply with equal force and effect to this Addendum including, but not limited to, all insurance requirements, indemnification and other obligations thereunder.  If, however, there is a conflict between the terms and conditions of this Addendum and the Agreement, the terms and conditions of this Addendum, to the extent they refer more fully with the operation of a snack shop selling food, grocery items, beverages and related goods and services than the Agreement, will prevail.

4

## 15. TERMINATION

CONOCOPHILLIPS may terminate this Addendum by providing DEALER with ninety (90) days prior written notice of termination for DEALER's failure to comply with, or failure to make a good faith effort to carry out, any one or all of the terms and conditions of this Addendum and/or the Agreement.

This Addendum shall automatically terminate, without notice, upon termination or nonrenewal of the Agreement between CONOCOPHILLIPS and DEALER.

ACCEPTED AND AGREED TO

THIS _6_ DAY OF _8_ , 20_07_.

CONOCOPHILLIPS COMPANY:

By_____
Ross Davidson
Manager, West Coast and Retail

ACCEPTED AND AGREED TO

THIS _6_ DAY OF _July_ , 20_07_.

DEALER: HOUTAN PETROLEUM INC

By_____
Ed Bozorghadad
President

Snack Shop Addendum to DL&MF Agreement

5

Revised 7/12/2006 kb

## EXHIBIT I

### # 0012/255661

### SNACK SHOP APPROVED/NON-APPROVED PRODUCTS

Items which may be sold at the snack shop are:

| | |
|---|---|
| Bakery Products | Gum |
| Beer and Wine | Ice |
| Bottle Water | Ice Cream |
| Candy | Juices |
| Cereal | Microwaveable Foods |
| Coffee | Milk |
| Condiments | Sandwiches |
| Dairy Products | Soft Drinks |
| Frozen Foods | Snacks |
| | |
| Automotive Accessories | Lube Oil |
| Batteries | Newspapers and Magazines |
| Film | Paper Products |
| Flowers | Tobacco Products |
| Health and Beauty Aids | Toiletries |
| Lottery Tickets | |

Items not to be sold, leased, rented or otherwise distributed from the snack shop are:

Hard Liquor
Head Shop Items - Drug Paraphernalia
Indecent Miscellaneous Items
Sexually Explicit Books, Magazines or Video Tapes
Video Games

CONOCOPHILLIPS reserves the right to inspect the inventory of said snack shop. Any class or type items not listed in Exhibit I which the DEALER desires to add to inventory must have prior written consent from CONOCOPHILLIPS.

Snack Shop Addendum to DL&MF Agreement

Revised 7/12/2006 kb

000076

## EXHIBIT II

### # 0012/255661

### EQUIPMENT & FIXTURES

In the interest of uniformity for the operation of a first class snack shop, the following equipment and fixtures list has been developed. This list represents the equipment and fixtures the DEALER is required to buy or lease. The equipment and fixtures which the DEALER is required to have includes, but is not limited to, the following:

Sales Counter

Reach-in Coolers (minimum one two-door cooler)

Display Shelving/Gondolas (minimum four linear feet)

Tobacco Merchandiser

Interior and Exterior Graphics

**7**

Revised 7/12/2006 kb

000077

70

Dealer Name: HOUTAN PETROLEUM INC
Site #: 0012/255661
Effective Date: September 1, 2007
Expiration Date: August 31, 2010

## 76 BRANDED TEMPERATURE ADJUSTMENT AGREEMENT

Dear Dealer:

You have elected to purchase various motor fuels from CONOCOPHILLIPS for the above subject service station, pursuant to a UNION 76 AGREEMENT ("Agreement").

By this Agreement you acknowledge that CONOCOPHILLIPS has advised you that single deliveries made to your service station may be on a 60 degrees Fahrenheit temperature corrected basis, unless you elect to accept delivery on a gross gallonage basis.

You understand and agree that the election made herein shall be effective for a period of one (1) year from the date of this letter and then on a year to year basis thereafter unless canceled by written notice given thirty (30) calendar days prior to the expiration of any one (1) year period.

You hereby elect to accept single deliveries on the following basis (choose one):

_____**X**_____    Temperature Corrected

_____    Gross Gallonage

ACCEPTED AND AGREED TO

THIS __6__ DAY OF ____8____, 20 _07_.

CONOCOPHILLIPS COMPANY:

By _____
Ross Davidson
Manager, West Coast and Retail

ACCEPTED AND AGREED TO

THIS __6__ DAY OF __July__, 20 _67_

DEALER: HOUTAN PETROLEUM INC

By _____
Ed Bozorghadad
President

tempadj.doc (Rev. 3/4/04 dlb)

000078

Dealer Name: HOUTAN PETROLEUM INC
Site #: 0012/255661
Effective Date: September 1, 2007
Expiration Date: August 31, 2010

## CONOCOPHILLIPS FEDERAL TIRE REGISTRATION REQUIREMENTS - DEALER

Dear Dealer:

Federal regulations (49 CRF 574.8) require that you record the serial number of each new tire you
sell to a tire customer, and your name and address, on a registration form. This form must be
given to the purchaser who may use the form to report his/her name and address to the new tire
manufacturer or brand name owner of the tire.

Under the law CONOCOPHILLIPS is providing you with Tire Registration forms which meet the
Federal requirements. CONOCOPHILLIPS expects each dealer to provide the necessary
information and form to each tire purchaser.

The civil penalty for your failure to give the purchaser the required form with the proper information
on it is up to $1,000 for each violation.

Your signature in the space provided below signifies you understand your obligation under the law
to record the tire serial number and your name and address on a registration form for each tire
sale you make to a tire purchaser and to give this form to such purchaser, and your obligation to
pay any civil penalty assessed for any violation thereof.

ACCEPTED AND AGREED TO                    ACCEPTED AND AGREED TO

THIS  6  DAY OF     8     , 20 07.        THIS  3rd DAY OF     6     , 20 07.

CONOCOPHILLIPS COMPANY:                   DEALER: HOUTAN PETROLEUM INC

By _____               By _____
   Ross Davidson                             Ed Bozorghadad
   Manager, West Coast and Retail            President

FORM 3-4P14 (REV. 3/4/04 - dlb) PRINTED IN U.S.A.

000079

# CERTIFICATE OF EXEMPTION RETAIL SALES TAX (Destination)

SELLER: CONOCOPHILLIPS CO., P. O. BOX 1267, PONCA CITY, OKLAHOMA 74602- 1267    FAX #918-662-5600

CONCERNING STATE SALES TAX, THE BILLING INSTRUCTIONS FOR PURCHASED PRODUCT SHOULD BE AS FOLLOWS:

A. ___ I AM NOT EXEMPT THE SALES TAX ON MY PURCHASE.
B. ___ I AM EXEMPT SALES TAX ON THE FOLLOWING PETROLEUM PRODUCTS FOR THE REASON(S) BELOW:

_____

_____

PURCHASER'S DESCRIPTION OF BUSINESS ACTIVITY _____

_____

## REASONS FOR QUALIFYING FOR EXEMPTION OF SALES TAX

B1. ___ PURCHASE FOR RESALE.
B2. ___ I AM A WHOLESALER.
B3. ___ PRODUCT(S) PURCHASED WILL BECOME AN INGREDIENT OR COMPONENT PART OF ARTICLES MANUFACTURED OR COMPOUNDED FOR SALE.
B4. ___ EXEMPT INDUSTRY (CHECK ONE) ___ FARMING ___ MINING ___ MANUFACTURING ___OTHER
B5. ___ I AM A COMMON CARRIER. MY I.C.C. OR CERTIFICATE OF CONVENIENCE NUMBER IS _____

B6. ___ OTHER REASON OF SALES TAX EXEMPTION - EXPLAIN IN DETAIL:

*B7. ___ I AM LICENSED TO PAY DIRECTLY STATE FUEL TAX ON SALES OF MOTOR FUEL OR SPECIAL FUEL.

MY SPECIAL FUELS LICENSE NUMBER IS _____

MY MOTOR FUELS LICENSE NUMBER IS _____
MY VALID SALES TAX LICENSE OR PERMIT NUMBER(S) IS:
ORIGIN STATE _California_    NO. _SRGH 97136405_

STATE _____ NO. _____

STATE _____ NO. _____

DEST / HOME STATE _____ NO. _____

"I UNDERSTAND THAT I AM SOLELY RESPONSIBLE FOR PURCHASING WITHIN THE ABOVE CATEGORIES AND ACKNOWLEDGE THAT MISUSE OF THE RESALE PRIVILEGE CLAIMED BY USE OF THE CERTIFICATE MAY SUBJECT ME TO PENALTIES AND INTEREST IMPOSED BY THE VARIOUS STATES AS WELL AS THE TAX."

THIS CERTIFICATE SHALL BE CONSIDERED AS PART OF EACH ORDER UNLESS WRITTEN NOTICE IS GIVEN TO THE CONTRARY, AND IT SHALL REMAIN IN EFFECT UNTIL REVOKED IN WRITING OR EXPIRED BY STATE STATUTE. THE UNDERSIGNED PURCHASER FURTHER AGREES THAT SHOULD THE SALE TO HIM BE LATER HELD SUBJECT TO THE TAX, HE ASSUMES FULL LIABILITY.

*THIS EXEMPTION IS NOT VALID FOR THE STATES OF:
CALIFORNIA  GEORGIA  ILLINOIS  INDIANA  MICHIGAN  NEW YORK

PLEASE NOTE THAT VALID LOUISIANA REGISTRATION NUMBERS INCLUDE THE LETTER 'W' IN THEM.
¶IF OKLAHOMA, PLEASE ENCLOSE A COPY OF YOUR OKLAHOMA SALES TAX PERMIT.

NAME CO: __HOUTAN PETROLEUM INC__ Site #256687
FEIN # ___77-0448388___                    Address: __101 E EL CAMINO REAL__

Signature: _____                    __MOUNTAIN VIEW CA 94040__

__Ed Bozorghadad__                    Phone #. __650-967-1776__  Fax #: __650-967-2692__
Printed or typed name with authorization to bind

Title: __President__                    Date: __July 6 2007__

IF YOU HAVE ENTERED A TAX NUMBER ABOVE, THE DEALER MUST FAX THIS FORM TO CONOCOPHILLIPS #918-662-5600 PRIOR TO THE EFFECTIVE DATE OF THE MOTOR FUEL SUPPLY AGREEMENT.

000080