1  GLYNN & FINLEY, LLP
   CLEMENT L. GLYNN, Bar No. 57117
2  ADAM FRIEDENBERG, Bar No. 205778
   One Walnut Creek Center
3  100 Pringle Avenue, Suite 500
   Walnut Creek, CA 94596
4  Telephone: (925) 210-2800
   Facsimile: (925) 945-1975
5  Email: cglynn@glynnfinley.com
          afriedenberg@glynnfinley.com
6
   Attorneys for Defendant and Counter-Plaintiff
7  ConocoPhillips Company

8

9              UNITED STATES DISTRICT COURT

10           NORTHERN DISTRICT OF CALIFORNIA

11  HOUTAN PETROLEUM, INC.          )  Case No. 3:07-cv-5627 SC
                                    )
12              Plaintiff,          )  **CONOCOPHILLIPS COMPANY'S**
                                    )  **OPPOSITION TO PLAINTIFF'S IN**
13      vs.                         )  **LIMINE MOTION NO. 1 TO EXCLUDE**
                                    )  **THE TESTIMONY OF JEFF M. KEY**
14  CONOCOPHILLIPS COMPANY, a Texas )
    corporation and DOES 1 through 10, )  **Pretrial Conference:  August 15, 2008**
15  Inclusive                       )  **Time:                 10:00 a.m.**
                                    )  **Courtroom:             1**
16              Defendants.         )  **Before:                Hon. Samuel Conti**
                                    )
17  ───────────────────────────────    **Trial Date:           August 18, 2008**

18

19        Defendant and Counter-Plaintiff ConocoPhillips Company ("ConocoPhillips") submits

20  this opposition to Plaintiff's motion in limine to exclude the expert testimony of Jeff M. Key

21  ("Key") at trial.

22  **I.      INTRODUCTION**

23        Plaintiff claims that ConocoPhillips failed to timely disclose Key as an expert witness and

24  that this has caused some "prejudice."  But Plaintiff points to no discovery deadline imposed by

25  the Rules or Court order with which ConocoPhillips has not complied.  At the July 25 trial

26  setting conference, counsel for ConocoPhillips advised the Court that some investigation and

27  discovery remained.  The Court instructed the parties to complete such preparation "in August."

28  Four business days later, ConocoPhillips disclosed Mr. Key, and agreed to make him available

- 1 -

1    for deposition at Plaintiff's convenience.[1]  (Exhibit A, July 31, 2008 ConocoPhillips'

2    Supplemental Expert Disclosure of Jeff M. Key)  Plaintiff ignored ConocoPhillips' offer,

3    expressing a preference for needless motion practice over legitimate case preparation.

4          In reality, Plaintiff has known of most of ConocoPhillips' witnesses for months, but has

5    chosen not to take a single deposition or serve any discovery in this case.  That is because

6    Plaintiff's entire focus has been on delaying ConocoPhillips' recovery of its property, which

7    Plaintiff meanwhile uses every single day to make a profit.  That Plaintiff may regret this

8    decision not to take discovery provides no basis for evidentiary exclusion.  There is no legitimate

9    basis for Plaintiff's request that the Court exclude ConocoPhillips' primary expert witness.

10   Plaintiff's motion is intended only to harass ConocoPhillips as it prepares for trial, and should be

11   denied.

12   **II.    ARGUMENT**

13         Plaintiff argues that the Court must exclude Key's testimony at trial, because

14   ConocoPhillips did not disclose him within the time prescribed by Rule 26.  The argument is

15   unreasonable.  Rule 26 requires that parties make expert disclosures 90 days prior to trial.  Here,

16   however, the Court did not set the August 18 trial date until July 25.  Compliance with the 90-

17   day disclosure deadline was therefore impossible.  Indeed, the Court recognized this in its July 25

18   order, which explicitly declined to set any expert or other discovery deadlines.  (Docket No. 108,

19   p. 1, § 2.)  Moreover, the Court stated at the July 25 hearing that the parties could complete

20   necessary discovery "in August," prior to trial.  ConocoPhillips' voluntary disclosure permitted

21   Plaintiff time to depose Key, but Plaintiff chose not to do so.

22         Plaintiff argues that exclusion is justified because ConocoPhillips represented in February

23   that it had disclosed all witnesses and documents.  In January 2008, just more than two months

24   after the case had been filed and before it was even at issue, the Court set trial for the following

25   month.  ConocoPhillips did not disclose or identify Key, because it had not yet retained Key.[2]

---

26   [1] Shortly thereafter, ConocoPhillips provided a Rule 26 expert report, again absent any Court
     order requiring that it do so.  (Exhibit B, August 8, 2008 Email Correspondence to Plaintiff's
27   Counsel and Attached Report.)

28   [2] ConocoPhillips did, at that time, disclose Peter Morrison an expert witness.  Mr. Morrison,
     prepared the appraisal on which ConocoPhillips relied in making its bona fide offer to Plaintiff.

1  The Court's subsequent vacation of the trial date afforded both parties time to conduct necessary

2  preparation and expert retention.  ConocoPhillips later retained Key, and planned to disclose him

3  once the trial date was set, and pretrial deadlines established.  The Court set trial on very short

4  notice, and ConocoPhillips promptly disclosed Key--even though it was under **no** obligation to

5  do so.

6          Plaintiff acknowledges that a factor in the timing of Key's report was **Plaintiff's** refusal

7  to make the property available for inspection promptly upon ConocoPhillips' July 22 request.

8  (Docket No. 120 at 5:7-10.)  Notwithstanding Plaintiff's admission, Plaintiff nevertheless argues

9  that ConocoPhillips should have disclosed Key's identity in advance of the completed Rule 26

10 report. But this is precisely what occurred -- ConocoPhillips disclosed Key's identity almost

11 immediately after the trial setting, and shortly thereafter provided his expert report to Plaintiff.

12 Plaintiff's arguments are frivolous.

13          Finally, Plaintiff's assertion that it has somehow been harmed by ConocoPhillips'

14 disclosure is spurious.  ConocoPhillips promptly offered to make Key available for deposition at

15 Plaintiff's convenience.  Plaintiff refused, and indeed has never deposed a single witness or

16 served a single written discovery request during the life of this case.  Given Plaintiff's choice not

17 to take **any** discovery, it cannot credibly claim that ConocoPhillips has somehow prevented such

18 discovery.[3]  As will be clear at trial, plaintiff has used the litigation process to prevent

19 ConocoPhillips from recovering its property.  The Court denied injunctive relief to plaintiff who

20 then resorted to self help.  It is for this reason that ConocoPhillips is pursuing not only recovery

21 of its property, but also recovery of the profits by which plaintiff has been unjustly enriched.

22 ///

23 ///

24

---

25 Mr. Morrison will testify regarding that appraisal, but ConocoPhillips intends to limit his
   testimony to that appraisal report.  Mr. Key will provide traditional expert opinion testimony
26 regarding the property value, Houtan's redevelopment plans and will testify in rebuttal to
   Plaintiff's expert.

27 [3] Plaintiff cites various cases holding parties may not use witnesses they failed to identify in
   *interrogatory* responses, apparently to suggest to the Court that ConocoPhillips has refused to
28 identify witnesses about whom Plaintiff has inquired.  Plaintiff, however, has not served any
   interrogatories, and ConocoPhillips has not refused to identify its witnesses.

CONOCOPHILLIPS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE TRIAL WITNESSES

1

2    **III.    CONCLUSION**

3           Parties must have flexibility to conduct necessary investigation and preparation, and to

4    use at trial the witnesses and evidence such efforts reveal.  Here, where the trial scheduling was

5    atypical, ConocoPhillips' recent, and voluntary, disclosure is justified.  Moreover, the disclosure

6    is also harmless given Plaintiff's decision not to take any discovery in the case.  No cause exists

7    for exclusion of ConocoPhillips' witnesses, particularly its expert witnesses, a sanction that,

8    given the nature of the action, would be the equivalent of entering ConocoPhillips' default.

9           Dated:  August 13, 2008

10                                                    GLYNN & FINLEY, LLP
                                                      CLEMENT L. GLYNN
11                                                    ADAM FRIEDENBERG

12

13                                          By
                                               Attorneys for Defendant and Counter-
14                                             Plaintiff ConocoPhillips Company

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONOCOPHILLIPS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE TRIAL WITNESSES

# EXHIBIT A

GLYNN & FINLEY, LLP
ONE WALNUT CREEK CENTER
SUITE 500
100 PRINGLE AVENUE
WALNUT CREEK, CALIFORNIA 94596
TELEPHONE: (925) 210-2800

FACSIMILE: (925) 945-1975

WRITER'S DIRECT DIAL NUMBER
(925) 210-2809
e-mail:  afriedenberg@glynnfinley.com

July 31, 2008

ConocoPhillips/Houtan Petroleum

**VIA FACSIMILE AND FEDEX**

Gennady Lebedev, Esq.
Bleau Fox
3575 Cahuenga Boulevard West, Suite 580
Los Angeles, CA 90068-1336

Dear Gennady:

Enclosed is our supplemental expert disclosure of Jeff M. Key.  As noted in the enclosed disclosure, Mr. Key has been unable to complete his expert witness report because you have refused to work with us to coordinate the site inspection we noticed many months ago.  To review, on March 28, 2007, we noticed the inspection to take place on April 30, 2008.  The parties thereafter agreed to defer the inspection pending summary judgment.  On July 22, after we received Judge Conti's order on ConocoPhillips Company's summary judgment motion, I advised you that it would be necessary to reschedule the inspection.  I then raised the issue again multiple times thereafter, both in writing and in person at the trial setting conference last week (at which you agreed to work with us to coordinate the inspection).  You refused to provide timely dates for the inspection, instead waiting until yesterday evening to advise that you would not permit the inspection prior to August 7 or 8 (just 10 days prior to trial).

Your gamesmanship has obviously interfered with and prejudiced our ability to prepare the case for trial.  Nevertheless, we will provide Mr. Key's expert witness report as soon as possible.  Should you choose to depose him, we will of course work with you in good faith to schedule a deposition.

Very truly yours,

Adam Friedenberg

Enc.

GLYNN & FINLEY, LLP
CLEMENT L. GLYNN, Bar No. 57117
ADAM D. FRIEDENBERG, Bar No. 205778
JONATHAN A. ELDREDGE, Bar No. 238559
One Walnut Creek Center
100 Pringle Avenue, Suite 500
Walnut Creek, CA 94596
Telephone: (925) 210-2800
Facsimile: (925) 945-1975
Email: cglynn@glynnfinley.com
        afriedenberg@glynnfinley.com
        jeldredge@glynnfinley.com

Attorneys for Defendant and Counter-Plaintiff
ConocoPhillips Company

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| HOUTAN PETROLEUM, INC. | Case No. 3:07-cv-5627 |
| Plaintiff, | **DEFENDANT AND COUNTER-PLAINTIFF CONOCOPHILLIPS COMPANY'S SUPPLEMENTAL EXPERT WITNESS DISCLOSURE** |
| vs. | |
| CONOCOPHILLIPS COMPANY, a Texas corporation and DOES 1 through 10, Inclusive | **Before:**      **Hon. Samuel Conti**<br>**Trial Date:**   **August 18, 2008** |
| Defendants. | |

Pursuant to Federal Rule of Civil Procedure 26, Defendant and Counter-Plaintiff

ConocoPhillips Company ("ConocoPhillips") hereby discloses Jeff M. Key, MAI, P.E., as an

expert witness it expects to use at trial to present evidence. Mr. Key's qualifications, and

publications he has authored, are set forth in the Curriculum Vitae attached hereto as **Exhibit A**.

Mr. Key's compensation for this matter is $375 per hour.

Mr. Key has testified as an expert at trial or deposition in the following matters in the last

four years: *Todd C. Danley & Kathleen L. Danley v. W. Michael Scott*, Case No. 06CC02850,

Orange County Superior Court (deposition and trial).

/ / /

1    Mr. Key will offer opinions regarding ConocoPhillips' bona fide offer to sell its

2    equipment and improvements to Plaintiff and the fair market value of those equipment and

3    improvements.  Mr. Key may also offer opinions in response or rebuttal to experts and expert

4    opinions on which Plaintiff relies.  ConocoPhillips has properly noticed, and attempted to

5    schedule with Plaintiff, an inspection of the subject property so that Mr. Key may prepare a

6    detailed appraisal and expert witness report, but Plaintiff has refused to cooperate to schedule

7    such an inspection at a mutually convenient time.  Accordingly, Mr. Key has not been able to

8    complete a report reflecting the opinions he may offer at trial pursuant to Federal Rule of Civil

9    Procedure 26.  Mr. Key will prepare such a report as expeditiously as possible given these

10   circumstances, and ConocoPhillips will thereafter promptly provide Plaintiff with a copy of that

11   report, and make Mr. Key available for deposition at a mutually convenient time and place.

12        This disclosure is made based on information currently known to ConocoPhillips.

13   Discovery and investigation are ongoing, and ConocoPhillips reserves the right to offer at trial

14   such further and additional opinions and/or expert witnesses as may become necessary.  This

15   disclosure is supplemental to the previous disclosures made by ConocoPhillips in this action, and

16   ConocoPhillips expects to use at trial expert and percipient witnesses identified in those previous

17   disclosures.

18

19

20        Dated:  July 31, 2008

21                                      GLYNN & FINLEY, LLP
                                        CLEMENT L. GLYNN
22                                      ADAM FRIEDENBERG
                                        JONATHAN A. ELDREDGE
23                                      One Walnut Creek Center
                                        100 Pringle Avenue, Suite 500
24                                      Walnut Creek, CA  94596

25

26                                      By _____
                                        Attorneys for Defendant and
27                                      Counter-Plaintiff ConocoPhillips
                                        Company

28

- 2 -

# EXHIBIT A



## HERRON
C O M P A N I E S
2929 Edinger Avenue
Tustin, CA 92780

**QUALIFICATIONS OF THE APPRAISER**
**JEFFREY M. KEY, MAI, P. E.**

### EDUCATION

**Master of Engineering, Civil Engineering, 1980--**University of California, Berkeley, California. Major in Structural Engineering and Structural Mechanics; Minors in Business Management and Construction Engineering. Teaching Assistant for Department of Civil Engineering during 1978-1979 Academic Year.

**Bachelor of Science, Engineering, 1978--**California State University, Fullerton, California. Emphasis in Civil Engineering.

### FORMAL TRAINING

**Appraisal Institute:**

Basic Valuation Procedures
Standards of Professional Practice
Real Estate Appraisal Principles
Various Seminars and Classes

Capitalization Theory and Techniques
Case Studies in Real Estate Valuation
Report Writing & Valuation Analysis

### PROFESSIONAL DATA

Certified General Appraiser, State of California, AG015297 (3/31/09)
Member, Appraisal Institute
Registered Professional Civil Engineer, State of California
Registered Professional Civil Engineer, State of Alaska
Member American Society of Civil Engineers (ASCE)
Member ASCE Committee on Construction Equipment and Techniques

### PROFESSIONAL EXPERIENCE

**Vice President, Real Estate Appraiser,** S. S. Herron & Associates, Inc., Tustin, CA. Supervise appraisers, including training, review, and administration. Prepare full narrative reports on a variety of properties including office, retail, industrial and residential properties-- February 1985 to present

## PROFESSIONAL EXPERIENCE (continued)

**Design Engineer,** SF/Braun, Orange, CA.  Analysis, design, procurement and construction related to industrial projects; cost estimating and technical support of procurement operations for Arctic construction; preparation of technical reports and proposals--July 1980 to February 1985

**Part-Time Lecturer,** Department of Mechanical Engineering, California State University, Fullerton, CA.  Instructor for Engineering Unified Laboratory--1981 to 1984

## TYPES OF PROPERTIES APPRAISED

Office Land and Improved Office Buildings and Condominiums
Commercial Land and Commercial Shopping Centers
Industrial Land and Industrial Buildings
Motel Properties
Apartment Complexes
Residential and Commercial Land Subdivision
Golf Course and Driving Range Properties
Medical Office Buildings
Congregate Care, Board and Care Facilities
Car Wash and Gas Station Properties
Truck Stops and Going Concern Operations

## PUBLICATIONS

Key, Jeffrey M., "Computer Simulation of a Solar Energy System," *Sunworld*, Vol. #4, 1979.

Key, Jeffrey M. and Gerwick, Ben C. Jr., "Construction of Fixed, Deep-Water Bridges," proceedings of ASCE Specialty Conference on Construction Equipment and Techniques for the Eighties, at Purdue University, March 28-31, 1982.

Bryce, Peter W. and Key, Jeffrey M., "Modified Reel Method for Subsea Arctic Pipelines," proceedings of ASCE Specialty Conference on Pipelines in Adverse Environments, at San Diego, California, November 14-16, 1983.

Key, Jeffrey M., "Arctic Pipeline Hardware," proceedings of ASCE Specialty Conference on Civil Engineering in the Arctic, at San Francisco, California, April 1985.

Key, Jeffrey M., "Earthmoving and Heavy Equipment," *Journal of Construction Engineering and Management*, American Society of Civil Engineers, Volume 113, No. 4, December 1987.

Herron, Steven Schmidt, and Key, Jeffrey M., "How to Get Your Carwash Appraised," *Professional Carwashing & Detailing*, Vol. 18, No. 11, November 1994.

Herron, Steven Schmidt, and Key, Jeffrey M., "How Much Does Traffic Count?," *Professional Carwashing & Detailing*, Vol. 19, No. 7, July 1995.

Herron, Steven Schmidt, and Key, Jeffrey M., "Location: The $3 Million Gamble," Professional *Carwashing & Detailing*, Vol. 22, No. 6, June 1998.

# STATE OF CALIFORNIA

Business, Transportation & Housing Agency

## OFFICE OF REAL ESTATE APPRAISERS

# REAL ESTATE APPRAISER LICENSE

OREA APPRAISER IDENTIFICATION NUMBER    AG015297

### JEFFREY M. KEY

has successfully met the requirements for a license as a general real estate appraiser in the State of California and is, therefore, entitled to use the title "Certified General Real Estate Appraiser".

This license has been issued in accordance with the provisions of the Real Estate Appraisers' Licensing and Certification Law.

OFFICE OF REAL ESTATE APPRAISERS

Anthony T. Majewski

Date Issued:   April 1, 2007
Date Expires:  March 31, 2009

I certify under penalty of perjury that this is a true and correct copy of my original license or certificate.

3/8/07
Date



Signature

Audit No.   89293

THIS DOCUMENT CONTAINS A TRUE WATERMARK. HOLD UP TO LIGHT TO SEE SAFE AND VERIFY FIRST

# EXHIBIT B

**From:**      Adam Friedenberg
**Sent:**      Friday, August 08, 2008 1:10 PM
**To:**        glebedev@bleaufox.com
**Subject:**   Houtan



101 E.
) Real, Mount;

         Gennady, Jeff Key's expert witness report is attached.   Please let us know if
you intend to depose Key as we obviously have limited time and will need to schedule a
deposition soon.

Adam



## HERRON
C O M P A N I E S

2929 Edinger Avenue
Tustin, CA 92780

A Summary Appraisal Report Of

A Gas Station Facility
Located In
Mountain View, California

Prepared For

ConocoPhillips
c/o Mr. Adam Friedenberg
Glynn & Finley, LLP
100 Pringle Avenue, #500
Walnut Creek, CA 94596

Prepared By

Jeffrey M. Key, MAI, And
Lonnie M. Kantomer, SCREA
Retrospective Date Of Appraisal: October 22, 2007
Date Of Report: August 5, 2008
File #: N08-0201

Office 949-733-0070   Customer Service 800-556-1222   Fax 949-733-0073   www.herronco.com
• California   • Colorado   • Texas   • Tennessee   • Michigan   • Washington



# HERRON
C O M P A N I E S

2929 Edinger Avenue
Tustin, CA 92780

**August 5, 2008**

**ConocoPhillips**
c/o Mr. Adam Friedenberg
Glynn & Finley, LLP
100 Pringle Avenue, #500
Walnut Creek, CA 94596

**Regarding:**   A narrative Summary Appraisal Report of a gas station facility located at 101 E. El Camino Real in Mountain View, California

**To Whom It May Concern:**

We have conducted the required investigation, gathered the necessary data, and made certain analyses that have enabled us to form an opinion of the market value on the above-referenced property. The physical inspection and analyses that form the basis of this report were conducted by Lonnie M. Kantomer, SCREA, under the supervision of Jeffrey M. Key, MAI. The appraised value considers the real property along with business value, which are items typically included in the sale of a gas station property.

The subject property is a gas station facility with 1,632 SF of building improvements on a 24,394-SF site. It was reportedly constructed in 1967, is in average condition, and is at stabilized operations. The primary problem to be solved in this appraisal is identification of retrospective Market Value As Is of the leasehold improvements.

This report is based on extraordinary assumption(s) explained in detail later in this report. The following analyses, opinions, and conclusions were developed and this report has been prepared in compliance with Federal Regulation 12 CFR, Parts 34, 225, 323, 545, etc., which also requires compliance with the Uniform Standards of Professional Appraisal Practice (USPAP), as mandated by the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA). It is also subject to very specific limiting conditions presented in Addendum "A" (please read). This letter is an integral part of an appraisal report and should not be considered out of that context.

Based on the investigation and analyses and on our experience as real estate appraisers, we have formed the opinion that, as of **October 22, 2007**, and subject to the premises,

---

Office 949-733-0070   Customer Service 800-556-1222   Fax 949-733-0073   www.herronco.com

• California   • Colorado   • Texas   • Tennessee   • Michigan   • Washington

**ConocoPhillips**                                                                    **Page 2**

assumptions, and limiting conditions set forth in this report, the contribution to total value by the building and site improvements, including petroleum fixtures is in the amount of:

    Retrospective Depreciated Value As Is—Real Estate Improvements:    $ 335,000

This appraisal has been prepared for the sole and exclusive use of our client, Glynn & Finley, LLP, and ConocoPhillips for the purpose of litigation. It is not intended to be used or relied upon by a buyer or seller for pricing, marketing, or any other decision-making purpose. No other entity is authorized to use or rely on this appraisal for any reason without the express written consent of Herron Companies.

We are dedicated to providing a report that meets with your complete satisfaction. If you have any problems or concerns regarding this appraisal, or if you would like to discuss our analyses or conclusions, please call Rod Shain, Partner, at 1-800-556-1222, who will connect you with the appropriate person to address your questions.

                                              **Respectfully submitted,**

                                              **Jeffrey M. Key, MAI**
                                              SCREA, AG015297

                                              **Lonnie M. Kantomer**
                                              SCREA, AG005524

**GAS STATION FACILITY**–101 E. El Camino Real, Mountain View, CA

## TABLE OF CONTENTS

|  | Page |
|---|---|
| **INTRODUCTION** | 1 |
| Summary of Important Facts and Conclusions | 2 |
| Extraordinary Assumptions and Hypothetical Conditions | 3 |
| Other Notable Conclusions | 4 |
| Relevant Dates, Client, Intended Use, and Intended User | 8 |
| Property Rights Appraised | 8 |
| Definitions | 9 |
| Competency Provisions | 12 |
| **GENERAL PROPERTY INFORMATION** | 13 |
| Identification, Legal Description, Ownership History | 14 |
| Area & Neighborhood Description | 15 |
| Site Description | 18 |
| Improvements Description | 22 |
| Highest and Best Use | 25 |
| **VALUATION SECTION** | 31 |
| Appraisal Procedures | 32 |
| Scope of Appraisal | 32 |
| Land Valuation and Cost Approach | 34 |
| Sales Comparison Approach | 39 |
| **CONCLUSION** | 43 |
| Correlation & Final Estimate of Value | 44 |
| Certificate of Appraisal | 47 |
| Qualifications of the Appraiser | 48 |
| **ADDENDA SECTION** | 51 |
| A. Contingent and Limiting Conditions | |
| B. MPSI Data | |
| C. Radius Demographics Report | |

**GAS STATION FACILITY–101 E. El Camino Real, Mountain View, CA**

# INTRODUCTION

GAS STATION FACILITY–101 E. El Camino Real, Mountain View, CA

| Summary of Important Facts and Conclusions |
| --- |

**Property Facts**

| | |
| --- | --- |
| Property Type: | Gas station facility |
| Property Address: | 101 E. El Camino Real, Mountain View, CA |
| Assessor Parcel Number: | 197-42-003 |
| Current Owner: | Victor Owen & Judith Burns |
| Current Purchase Price: | N/A |
| Retrospective Date of Appraisal: | October 22, 2007 |
| Property Rights Appraised: | Fee Simple |

**Property Description**

Site:

| | |
| --- | --- |
| Net Site Area: | 24,394 SF (0.56 acre) |
| Zoning: | CRA--Commercial/Residential Arterial District |
| Flood Zone: | X |

Improvements:

| | |
| --- | --- |
| Gross Building Area: | 1,632 SF |
| Number of MPDs: | 6 double-sided MPDs (12 positions) |
| Underground Tanks: | 2 @ 12,000 gallons |
| Year Built: | 1967 |
| Effective Age: | 19 years |
| Canopy Area: | 2,024 SF over fueling islands |

**Highest and Best Use**

| | |
| --- | --- |
| As if Vacant: | Development of gas station & C-store |
| As Improved: | Convert existing service bays to a C-store |

**Fee Simple Value Conclusions**

| | |
| --- | --- |
| Real Estate Value As Is: | $ 2,551,000 |
| Contributory Business Enterprise Value: | $   291,000 |
| Retrospective Going Concern Value As Is*: | $ 3,060,000 |
| Retrospective Depreciated Value As Is—Real Estate Improvements*: (Contribution to total value) | $   335,000 |

*based on hypothetical condition(s) as explained later

| | |
| --- | --- |
| **Estimated Exposure and Marketing Time:** | **7-9 months** |

## PHOTOGRAPHS OF SUBJECT PROPERTY



The subject is located at 101 E. El Camino Real in Mountain View, California.



This is a rear view of the property.

File #: N08-0201



Looking west on El Camino Real, the subject is to the left.

GAS STATION FACILITY–101 E. El Camino Real, Mountain View, CA

## EXTRAORDINARY ASSUMPTIONS AND HYPOTHETICAL CONDITIONS

### Extraordinary Assumptions

- We were not given detailed historical income and expense information, which would be preferable in evaluating a property of this type. Instead, we were provided limited information on gasoline volumes sold and very brief reports of sales volumes from the operator by way of a deposition testimony. We have correlated this information, along with data acquired from MPSI, a major industry source of competitive performance information, to make certain estimates of revenue for the subject. We have reason to assume our estimates are very close to what would be found if we had access to complete historical records, but if the available information is found to be noticeably inaccurate, it could have an effect on our value conclusions.

- We were not provided access to the subject property prior to the completion of this report because of scheduling constraints on the part of the client. We did make a brief but fairly thorough exterior inspection and a partial inspection of the interior. All building measurements are from information provided by others; we did not measure the structure and were not provided blueprints. Similarly, information about tanks, dispensers, and other items was given to us by others, and we assume that information is accurate.

### Hypothetical Conditions

- The subject is currently operating under a ground lease; in this appraisal, we are estimating the value of the leasehold improvements, but our analysis is based on the ownership as fee simple. This is contrary to the current ownership and is considered a hypothetical condition.

GAS STATION FACILITY–101 E. El Camino Real, Mountain View, CA

**OTHER NOTABLE CONCLUSIONS**

- In our Highest & Best Use (H&BU) section, we consider that the subject should be converted from existing service bays to C-store space. A typical way to approach this proposed H&BU scenario would be to arrive at our proposed value, then deduct the cost of the renovations to arrive at an "as is" value. However, we have no costs or drawings for a renovation; thus, we have included an abbreviated version in the HB&U section of this report.

- **PREF.** A gas station facility such as the subject inevitably includes fixtures, primarily the fuel-storage tanks, fuel-monitoring system, fuel pumps, multiple-product dispensers (MPDs), and other various related items, all of which are necessary to meet the intended use of the facility. It may also include ancillary items such as built-in beverage coolers and other profit center items. *The Dictionary of Real Estate Appraisal*, Fourth Edition, published by the Appraisal Institute defines a fixture as "an article that was once personal property but has since been installed or attached to the land or building in a rather permanent manner so that it is <u>regarded in law as part of the real estate</u>." Thus, the gas station and related profit center fixtures are considered in much the same manner as the air-conditioning units installed on the roof of a commercial building.

  This is not to be confused with trade fixtures, which are defined as "articles placed in or attached to rented buildings by a tenant to help carry out the trade or business of the tenant." Trade fixtures are not real estate components but rather are the items installed by a bakery tenant in a retail center, for example. When the lease is over the bakery equipment is removed because the space could then be leased to any one of many other retail users. This is not true in a gas station where the facility has no other reasonable use. The permanent real estate fixtures are essential to the ongoing operations, as are the air-conditioning unit or a water heater. Consequently, we include the value of gas station and related profit center fixtures in the estimate of real estate value. We refer to them as permanent real estate fixtures (PREF). This is separate from and in addition to the FF&E, which are not real property.

- **Other Sources.** *Convenience Store News* (CSN) publishes an industry report that compiles specific performance indicators and productivity benchmarks established from previous years of operation of convenience stores and gas stations throughout the nation. The most recent industry reports from CSN include surveys of thousands of locations nationwide, representing widespread cooperation from the industry's primary retailers.

**GAS STATION FACILITY**–101 E. El Camino Real, Mountain View, CA

- **Remaining Economic Life.** The appraisal process typically involves estimates of effective age, total economic life, and remaining economic life. The latter is computed by subtracting effective age from the total economic life. In this case, the remaining economic life of the subject property is 6 years. Although these parameters are necessary to compute physical depreciation related to the existing improvements as part of the Cost Approach analysis, it can be misleading to attribute too much significance to them.

The remaining economic life does not suggest that there will be no value left at the end of that time period; it is not the expected remaining physical life. Instead, it refers to the probable effects of market conditions on the property. For example, structures reach the end of their economic life when the surrounding area increases in development density over many years, causing land value to exceed the value of the property as improved. In that instance, market forces entice the owner to demolish the structure and construct a "higher and better use" that represents a more profitable use of the site. An example would be an old retail center that is redeveloped with a mid-rise office complex.

Another scenario would be that several years down the road the owner invests in a substantial renovation of the facility, thereby reducing the effective age. As an example, assume the "statistical" economic life of a gas station is 30 years according to the Marshall Swift Valuation Service. If we estimate the current effective age to be 10 years in the Year 2008, the theoretical remaining economic life is 20 years (30 - 10), suggesting that its life will end in the Year 2028. Assume now that 10 years have passed; the facility has now operated for 10 years. At this future time (the Year 2018), the owner replaces worn out fixtures and renovates the building, reducing the effective age to perhaps 10 years again (this is one reason why we have deducted a replacement allowance in the Income Approach analysis). The remaining economic life is again 20 years. There has been no change in the remaining economic life, even though 10 years have elapsed (assuming it is renovated). To have originally assumed in the Year 2008 that the property would be worthless in the Year 2028 would be erroneous.

Another important point is that the building and site work represent a rather small part of the entire project value, with land and business enterprise value being other major components. In fact, the land value alone may sometimes make up 50% or more of the total value. The remaining economic life applies only to the items that depreciate. Thus, the influence of the estimate of remaining economic life is actually rather small relative to the overall value.

Furthermore, we note that land value will increase gradually over the next 10 to 20 years, and the loan balance will decrease at an ever-increasing rate. Even if land value has not

GAS STATION FACILITY–101 E. El Camino Real, Mountain View, CA

increased enough to justify demolition and redevelopment of the site, it may well grow enough to more than match the remaining principal balance on a 25-year amortizing loan. That is, the future loan balance will be paid down substantially when the time period equal to our estimate of remaining economic life has elapsed.

Finally, we note that the remaining *economic* life is not the same as the remaining *physical* life. A gas station that may be replaced by a mid-rise office complex in 20 years could very well have a potential physical life of 30 to 40 years. In fact, some concrete industrial and commercial buildings with a statistical economic life of 50 years are still quite profitable 70 years later.

For the above reasons, we suggest that the somewhat-artificial estimate of remaining economic life should not be applied in a manner that limits the amortization period of a mortgage on the subject. Such a limitation unreasonably penalizes the property and does not recognize other important factors that work to protect the future loan collateral. With proper future maintenance and reasonable renovations from time to time, the remaining physical life of the property could exceed 30 years.

- **Americans with Disabilities Act.** The Americans with Disabilities Act (ADA) became effective January 26, 1992, and is generally considered to have been fully implemented since that time. Although the subject may be subject to its requirements, we have not made a specific compliance survey and analysis to determine whether it is in conformity with the various detailed requirements of the ADA.

In the case of the subject property, we assume that it either conforms to the Americans with Disabilities Act or is not subject to its requirements. If the property is proposed, we assume that it will comply with all ADA requirements upon approval by the local building department. However, a detailed analysis of the requirements of the ADA could reveal that the property might not be in compliance with one or more of the requirements of the Act. If so, this fact could have a negative effect upon the value of the property.

**GAS STATION FACILITY–101 E. El Camino Real, Mountain View, CA**

**RELEVANT DATES, CLIENT, INTENDED USE, AND INTENDED USER**

<u>Date of Valuation</u>:  October 22, 2007

<u>Date of Report</u>:  August 5, 2008

<u>Client</u>:  Glynn & Finley, LLP

<u>Intended Use</u>:  This appraisal has been prepared for the sole and exclusive use of our client, Glynn & Finley, LLP, and ConocoPhillips for the purpose of litigation.  It is not intended to be used or relied upon by a buyer or seller for pricing, marketing, or any other decision-making purpose.

<u>Intended User</u>:  The intended user of this report is Glynn & Finley, LLP, and ConocoPhillips.  No other entity is authorized to use or rely on this appraisal for any reason without the express written consent of Herron Companies.

**PROPERTY RIGHTS APPRAISED**

We are appraising the **fee simple interest** in the subject property, with all rights that can be lawfully owned with the exception of the four powers that forever will remain with the sovereign, being taxation, escheat, eminent domain, and police power (zoning).  It is regarded as having a good and merchantable title, responsible ownership, and competent management.

GAS STATION FACILITY–101 E. El Camino Real, Mountain View, CA

## DEFINITIONS

**Business Enterprise Value (Informally, Business Value or BEV).**[1]  A term applied to the concept of the value contribution of the total intangible assets of a continuing business enterprise such as marketing and management skill, an assembled work force, working capital, trade names, franchises, patents, trademarks, contracts, leases, and operating agreements.

**Extraordinary Assumption.**[2]  An assumption, directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinions or conclusions. Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property; or about conditions external to the property such as market conditions or trends; or about the integrity of data used in an analysis.  An extraordinary assumption may be used in an assignment only if: (1) it is required to properly develop credible opinions and conclusions; (2) the appraiser has a reasonable basis for the extraordinary assumption; (3) use of the extraordinary assumption results in a credible analysis; and (4) the appraiser complies with the disclosure requirements set for in USPAP for extraordinary assumptions.

**Fee Simple Estate.**[3]  Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.

**Going-Concern Value.**[4]  (1) The market value of all the tangible and intangible assets of an established and operating business with an indefinite life, as if sold in aggregate; also called *value of the going concern.*  (2) Tangible and intangible elements of value in a business enterprise resulting from factors such as having a trained work force, an operational plant, and the necessary licenses, systems, and procedures in place.  (3) The value of an operating business enterprise.  Goodwill may be separately measured but is an integral component of going-concern value.

**Hypothetical Condition.**[5]  That which is contrary to what exists but is supposed for the purpose of analysis.  Hypothetical conditions assume conditions contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis.  A hypothetical condition may be used in an assignment only if: (1) use of the hypothetical condition is clearly required for legal purposes, for purposes of reasonable analysis, or for purposes of comparison; (2) use of the hypothetical condition results in a credible analysis; and (3) the appraiser complies with the disclosure requirements set forth in USPAP for hypothetical conditions.

---

[1] *The Dictionary of Real Estate Appraisal*, Fourth Edition, Appraisal Institute, 2002, pp. 37-38.
[2] Ibid., pp. 106-107.
[3] Ibid., p. 113.
[4] Ibid., p. 127.
[5] Ibid., p. 141.

GAS STATION FACILITY–101 E. El Camino Real, Mountain View, CA

**Insurable Value.**[6]  (1) The value of an asset or asset group that is acknowledged by an insurance policy; can be estimated by deducting costs of noninsurable items (e.g., land value) from market value.  (2) Value used by insurance companies as the basis for insurance.  Often considered to be replacement or reproduction cost plus allowances for debris removal or demolition less deterioration and noninsurable items.  Sometimes cash value or market value, but often entirely a cost concept.  (Marshall & Swift LP)

**Leased Fee Interest.**[7]  An ownership interest held by a landlord with the rights of use and occupancy conveyed by lease to others.  The rights of the lessor (the leased fee owner) and the lessee are specified by contract terms contained within the lease.

**Leasehold Interest.**[8]  The interest held by the lessee (the tenant or renter) through a lease transferring the rights of use and occupancy for a stated term under certain conditions.

**Market Value:**[9]  The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1.  buyer and seller are typically motivated;
2.  both parties are well informed or well advised and acting in what they consider their best interests;
3.  a reasonable time is allowed for exposure in the open market;
4.  payment is made in terms of cash in United States dollars or in terms of financial arrangements comparable thereto; and
5.  the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

**Prospective Value Opinion.**[10]  A forecast of the value expected at a specified future date. A prospective value opinion is most frequently sought in connection with real estate projects that are proposed, under construction, or under conversion to a new use, or those that have not achieved sellout or a stabilized level of long-term occupancy at the time the appraisal report is written.

---

[6] Ibid., p. 147.
[7] Ibid., p. 161.
[8] Ibid., p. 162.
[9] OCC (12 CFR, Part 34.42[g]); FDIC (12 CFR, Part 323); FRB (12 CFR, Part 225); OTS (12 CFR, Part 545). This definition is compatible with the definition of market value in *The Dictionary of Real Estate Appraisal*, Fourth Edition, Appraisal Institute, 2002, pp. 177-178, and the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of The Appraisal Foundation, 2008-2009 Edition.  It is also compatible with the definition of market value of the OTS, RTC, FDIC, NCUA, and the Board of Governors of the Federal Reserve System.
[10] *The Dictionary of Real Estate Appraisal*, Fourth Edition, Appraisal Institute, 2002, p. 224.

GAS STATION FACILITY—101 E. El Camino Real, Mountain View, CA

**Sandwich Lease.**[11]  A lease in which an intermediate, or sandwich, leaseholder is the lessee of one party and the lessor of another.  The owner of the sandwich lease is neither the fee owner nor the user of the property; he or she may be a leaseholder in a chain of leases, excluding the ultimate sublessee.

**Value As Is.**[12]  The value of specific ownership rights to an identified parcel of real estate as of the effective date of the appraisal; relates to what physically exists and is legally permissible and excludes all assumptions concerning hypothetical market conditions or possible rezoning.

**Retrospective Value Opinion.**[13]  An opinion of value that is likely to have applied as of a specified historic date.  A retrospective value opinion is most frequently sought in connection with appraisals for estate tax, condemnation, inheritance tax, and similar purposes.

---

[11] Ibid., p. 256.
[12] Ibid., p. 306.
[13] *The Dictionary of Real Estate Appraisal*, Fourth Edition, Appraisal Institute, 2002, p. 248.

**GAS STATION FACILITY–101 E. El Camino Real, Mountain View, CA**

## COMPETENCY PROVISIONS

With the passage of FIRREA in 1989, the regulatory agencies governing banks, savings and loan associations, credit unions, and other lending institutions mandated adherence to the provisions of Title XI, calling for appraisals performed in conjunction with federally regulated transactions to be made in conformance to the Uniform Standards of Professional Appraisal Practice (USPAP). Another provision of FIRREA is that lending institutions use only appraisers who are certified or licensed under the various states pertaining thereto. The "Competency Rule" requires specific educational courses, minimum hours of experience, and the passage of an examination in order to attain certification. To that end, the signatories on this appraisal report are currently certified under the state of California.

Having evaluated a large number of gas stations over the course of several years and having performed appraisals in most parts of the country, we hereby attest that we, the writers of this report, have attained a level of competency necessary to complete the assignment in a diligent manner, utilizing all of the commonly recognized analysis techniques considered normal for a prudent evaluation effort. This includes contacting local professionals for data and insight into specific real estate markets as necessary. Also, please refer to the appraiser qualifications in the Conclusion section of the report for further confirmation of adequate technical training.

**GAS STATION FACILITY–101 E. El Camino Real, Mountain View, CA**

## GENERAL PROPERTY INFORMATION

**GAS STATION FACILITY**–101 E. El Camino Real, Mountain View, CA

## IDENTIFICATION, LEGAL DESCRIPTION, OWNERSHIP HISTORY

### Identification

The subject property consists of a self-serve independent gas station with three service bays, and a snack shop located at the southeast corner of El Camino Real and Grant Road in the city of Mountain View, California. The building improvements total 1,632 SF, not including the two fueling-island canopies. The three service bays are accessed via the rear of the building with three hydraulic lifts. The snack shop has reach-in coolers for sodas and a variety of snack items. There are 6 double-sided multiple-product dispensers (MPDs) on the covered islands (12 fueling positions). The site area consists of one parcel totaling 24,394 SF (0.56 acre), which forms a level, rectangular, corner lot.

The operator of the business has leased the improvements from ConocoPhillips and the land from the fee owner stated below. Of interest is to estimate the value contribution associated with the site, building improvements, and permanent real estate fixtures (PREF) that are to be acquired from ConocoPhillips. We appraise the entire going concern as a fee simple estate, and then allocate value to the relevant components. However, the land value and business value are not of primary interest in this assignment.

### Legal Description

No legal description was provided for our review.

### Ownership History

Based on public records, fee simple title to the subject property is vested in Victor Owen and Judith Burns. The owners have reportedly held title to the property for over 10 years. The site is leased to the current operator, Coast Gasoline, under a ground lease extension that reportedly expires roughly 25 years after the appraisal date. We are aware of no sale transactions that have taken place within the past 3 years, although no warranty of title is implied.

GAS STATION FACILITY–101 E. El Camino Real, Mountain View, CA

## AREA & NEIGHBORHOOD DESCRIPTION

### Area Description, Population, and Demographics

The subject property is situated near the southern end of the San Francisco Bay Area in the city of Mountain View, California. It lies in northwest Santa Clara County, west of the Nimitz (880) Freeway and Luther E. Gibson (680) Freeway and southwest of the convergence of the 101 and 85 Freeways. Mountain View is approximately 40 miles south of San Francisco, 105 miles south of Sacramento, and 345 miles north of Los Angeles. All major points and attractions to the west in the Bay Area, including San Francisco, Oakland, the Pacific Ocean, the Santa Cruz beaches, and the Monterey Peninsula, are within a 1-hour drive.

Santa Clara County, as part of the "Silicon Valley," is the largest county in the San Francisco Bay Area, with 1,312 square miles of land area populated by over 1.7 million residents in 15 cities and unincorporated areas. The area is known as the Silicon Valley because it is considered the birthplace of the high-technology revolution. A significant portion of the land area consists of unincorporated ranch and forest land; however, 92% of the population lives in cities. Santa Clara County is the fifth-largest county in California. Today, the county is a major employment center for the region, providing more than a quarter of all jobs in the Bay Area.

Mountain View's major landmarks include the 800-acre Shoreline Park; Moffett Field, home to U.S. space camp, NASA, and aeronautic facilities; the San Antonio District, which includes the city's most significant shopping centers; the North Bayshore District, which contains the city's primary high-tech and entertainment venues; and the Stevens Creek Recreational Trail. Nearby towns and communities include Palo Alto, Los Altos, and Sunnyvale. Mountain View population and income trends are reflected in the following table that shows demographics from within a 2-mile trade area:

| | 2000 | 2007 | Projected 2012 |
|---|---|---|---|
| Population | 88,022 | 88,934 | 90,426 |
| Median Household Size | N/Av | 2.50 | N/Av |
| Median Household Income | N/Av | $86,450 | N/Av |
| Population Density (Residents/Sq. Mile) | 6,993 | 7,065 | 7,184 |
| *Source: Easy Analytic Software, Inc., July 2008* | | | |

**GAS STATION FACILITY–101 E. El Camino Real, Mountain View, CA**

**AREA & NEIGHBORHOOD DESCRIPTION** (Continued)

### Transportation and Services

| | |
|---|---|
| Freeway Access: | US 101, Interstate 280, State Route 85 |
| Major North/South Streets: | Shoreline Boulevard, Moffett Boulevard |
| Major East/West Streets: | El Camino Real, Central Expressway |
| Services: | All typical community services are located in the area |

### Employment

A total of 49,651 people are employed within a 2-mile radius, according to a demographics report included in Addendum "C." Of this total, 41,013 are reportedly in white collar jobs, 4,575 are in blue collar categories, and the remaining are in service occupations.

### Neighborhood Description and Trends

<u>Boundaries:</u>
| | |
|---|---|
| North: | Interstate 101 |
| South: | Interstate 280 |
| East: | Highway 85 |
| West: | Moffett Boulevard |

The subject is situated on the southeast corner of El Camino Real and Grant Road. Interior neighborhoods immediately to the north and southwest contain single-family residences of good condition and appeal; apartments are scattered throughout the area. There is a significant amount of residential development in Mountain View.

There are numerous commercial buildings within a few blocks of the subject; the subject is located at the corner of the Mountain View Center, which is a small neighborhood retail center with a Walgreens and a Smart & Final. The Grant Road Plaza is to the west; it is also a neighborhood center with a 99 Ranch Market, Radio Shack, Rite Aid, Blockbuster, In & Out Burger, and a Marshalls. Commercial properties along El Camino Real range in age from newer to over 30 years old. Along El Camino Real within ¼ mile is the Highway 85 and El Camino Real interchange. The current trend of moderate growth is expected to continue in the short term.

GAS STATION FACILITY–101 E. El Camino Real, Mountain View, CA

**AREA & NEIGHBORHOOD DESCRIPTION** (Continued)

### Area Competition, Supply, and Demand

Our field research included a review of the existing supply of gas stations in the immediate area. On El Camino Real, there are six major-brand stations within approximately 1½ miles of the subject; these include two Shells, two Chevrons, a ConocoPhillips 76, and a Valero station. Another Shell stations lies roughly ¼ mile to the south on Grant Road. All but one of the competitors has snack shops; the Shell located roughly 1½ miles east has a C-store only. Four of the six competitors have auto-service, and one has a large car wash.

The local population density is 7,065 residents per square mile (within a 2-mile radius), which is relatively high. There appears to be a reasonable balance between supply and demand of gas stations in this trade area. Later in the Income Approach section, we analyze the market in greater detail, resulting in a projection of sales volume for the subject.

### Conclusions

The subject is located in a mature community with a mixture of primarily residential and commercial uses. The neighborhood is not far from downtown San Jose and San Jose International Airport, as well as the San Francisco Bay Area freeway system. We find that there is a reasonable balance between supply and demand for gas station facilities in the market area. Our analysis of demographics data pertaining to the 2-mile trade area leads us to conclude that the subject should continue to be well supported by its location within this neighborhood.

# NEIGHBORHOOD MAP



GAS STATION FACILITY--101 E. El Camino Real, Mountain View, CA

## SITE DESCRIPTION

### Location and Physical Description

The 24,394-SF site consists of one parcel, is at street grade, and has a rectangular shape. This level, corner site has average visibility along both El Camino Real and Grant Road. There is about 143 feet of frontage along El Camino Real and 170 feet of frontage along Grant Road. The site can be located in the Santa Clara County Thomas Guide on page 811, Grid J7.

### Adjacent Uses

| | |
|---|---|
| North: | BMW Dealership |
| South: | Mountain View Center (Walgreens) |
| East: | Mountain View Center |
| West: | Chevron gas station |

### Offsite Improvements & Utilities

El Camino Real is an east/west artery with three lanes of traffic in each direction. The street is dedicated to 120 feet at the subject. There are two driveways to the subject accessible from eastbound traffic. The signalized intersection permits turns that increase accessibility to the site.

Grant Road is a north/south street with two lane of traffic in each direction and a dedicated width of 120 feet at the subject. There is one driveway to the subject from this street, with access from northbound traffic. All utilities are to the site.

### Zoning and Use

The subject property is zoned "CRA"--Commercial/Residential Arterial District, which provides for a broad range of commercial, office, and residential uses located along the city's major arterials. Gas stations are allowed with a conditional use permit (CUP); however, we were unable to ascertain the subject's CUP status. In our conversations with the city, they indicated that obtaining a CUP for a service station within this zoning district is typical, as long as all of the requirements are met.

GAS STATION FACILITY–101 E. El Camino Real, Mountain View, CA

### SITE DESCRIPTION (Continued)

The zoning requires 10 parking spaces on the subject site, and the site had 7 marked stalls with room for at least 3 additional spaces. Therefore, the improvements appear to be in conformance with the current zoning and parking requirements.

### Flood Hazard Information

According to FEMA Community Panel No. 060347-0003D, dated July 4, 2008, the property is located in Flood Zone "X," which is **NOT in a Federal Flood Hazard Area.**

### Title Report Disclaimer

Part of the appraisal process involves a careful consideration of ownership and other title matters. Easements, trust deeds, and other instruments may encumber the legal interest held by the owner of record. Consequently, it is very important that the appraiser be provided a copy of the most recent title insurance policy or preliminary title report.

In the course of performing this appraisal assignment, we attempted to obtain a title report or policy. Such documents were not available, either because a current title report has not been ordered or will not be completed soon enough to be included in this appraisal analysis. Rather than postpone or delay the assignment, we were instead directed by the client to proceed, recognizing that there may be matters of title that significantly affect the market value of the subject property. It is therefore possible that there are existing easements, liens, encroachments, or other items that would materially alter the conclusion of market value presented in this report.

### Toxic Hazards

During our inspection, we observed that two underground storage tanks (USTs) have been installed. There is also an underground waste oil tank. We noted that the property includes a Veeder Root monitoring system; we are aware of no existing leaks. The 1998 Federal UST regulations require that all gas stations utilize approved, double-walled tanks with monitoring systems or take other steps to ensure the integrity of the petroleum system. We cannot confirm the status of the tanks or other systems. We therefore assume that the system is in conformance and leak free. No information was provided about possible soil contamination prior to installation of the existing fueling system. Furthermore, although we saw no evidence of spilled toxic materials, there are petroleum products being stored and used on the premises. We are not experts in this field and can

GAS STATION FACILITY–101 E. El Camino Real, Mountain View, CA

**SITE DESCRIPTION** (Continued)

therefore render no opinions about such matters. Any costs to cure soil contamination passed on to a buyer would be a direct deduction from value and, perhaps, even create a handicap to any subsequent attempt at marketing.

**Tax Information**

| | |
|---|---|
| Assessor Parcel #: | 197-42-003 |
| Assessed Values: | $741,543 (total assessed value is in the land) |
| Tax Rate: | 1.11720% |
| Direct Assessments: | $712.74/year |

The tax rate is typical for the area. In California, the law limits increases in property taxes to 2%/year, except in the case of a sale. Any time a property is sold, a new assessment is triggered. The reassessed values most often correspond to a sale price when the property is transacted at arm's length. Therefore, any tax estimate included in later sections of this report would be computed upon market value as herein determined.

**Conclusions**

The gas station facility has been developed on a rectangular-shaped, level site located on the corner of a major arterial street and a moderate thoroughfare. The heavy street exposure is favorable to the subject development. All utilities are available at the site, and the property is of marginally adequate size to support the continued use as a gas station with auto service and snack shop. Although relatively small for a modern C-store (developers typically prefer sites from 30,000-SF or more to handle peak vehicle activity), it is large enough to support at least the expansion of the snack shop into a larger convenience store by converting some or all of the auto-service space to store area.

**GAS STATION FACILITY**–101 E. El Camino Real, Mountain View, CA

## PARCEL MAP



GAS STATION FACILITY–101 E. El Camino Real, Mountain View, CA

## IMPROVEMENTS DESCRIPTION

### Introduction

The building is 1,632 SF in size, a portion of which is for the three service bays. There is also a small snack shop and restroom.

There are two Class "S" canopies covering 6 gasoline islands with a total of 12 fueling positions. There are six double-sided MPDs, one on each island. Positioned under a concrete slab are two 12,000-gallon underground fuel tanks.

The completed facility reportedly opened for business in 1967. We estimate the effective age to be 18 to 20 years; we use 19 years; based on a total economic life of 25 years, the remaining economic life is estimated to be 25% or approximately 6 years. The site is 24,394 SF in size, for a land-to-building ratio of 14.95:1 and site coverage of roughly 6.7%. This is not uncommon for a smaller modern gas station. More specific details regarding the building and site improvements are presented below.

### Building Improvements

|  |  |
|---|---|
| Site Preparation: | Grading prior to construction, excavation for USTs |
| Foundation: | Steel-reinforced concrete spread and continuous footings |
| Frame: | Steel-frame; canopy is of steel-frame construction. |
| Floor Structure: | Reinforced-concrete slab-on-grade |
| Floor Cover: | Concrete and vinyl flooring |
| Ceilings: | Suspended acoustic-tile ceilings with recessed lighting |
| Interior Partitions: | Painted drywall over stud framing and metal dividers |
| Sprinklers: | None |
| Heating and Cooling: | Rear-mounted HVAC unit to provide air-conditioning and heating to the store |
| Electrical: | Conventional 120/240-VAC electrical service |
| Exterior Walls: | Metal panels |

**GAS STATION FACILITY–101 E. El Camino Real, Mountain View, CA**

**IMPROVEMENTS DESCRIPTION** (Continued)

Wall Ornamentation:   Standard service station design

Roof:   Decorative concrete tile and built-up composition

Special Features:   Three built-in hydraulic lifts and a compressor; given the highest and best use being to convert the service bays to retail space and/or related storage, these features are considered to have no value.

**Site Improvements**

Drive Approaches:   Two driveways along El Camino Real and one along Grant Road

Walks:   Concrete cast-in-place sidewalks around the store and along the streets

Paving:   Most of the site is asphalt-paved, with concrete beneath the canopy of the gasoline islands and over the fuel tanks.

Parking:   There are 7 marked spaces (with room for more) for vehicle parking and typical exterior lot lighting throughout the property.

Landscaping:   Various planters and landscaped areas with flowers, trees, and grass

**PREF and FF&E**

A list of the PREF is presented on the following page.

**Conclusions**

The gas station and auto-service facility with snack shop appear to be of average- to good-quality construction and typical of other independent stations in the county. The site is of marginally sufficient size and is efficiently designed, providing reasonable vehicular access and site circulation. Based on our site inspection, we conclude that the existing improvements are physically adequate for their continued use as a gas station with auto service and snack shop.

**GAS STATION FACILITY–101 E. El Camino Real, Mountain View, CA**

## SITE PLAN



GAS STATION FACILITY–101 E. El Camino Real, Mountain View, CA

## HIGHEST & BEST USE

### Definition

The highest and best use of a property is defined as:

> The use, from among reasonably probable and legal alternative uses, found to be physically possible, appropriately supported, financially feasible, that results in highest land value as of the effective date of the appraisal.

In other words, it is a simple determination of what should be done with a piece of land, given all the various constraints imposed upon that land, in order to maximize its return (aesthetically, economically, and functionally) to the owner of the site. Once a site has been developed, the issue becomes more a matter of determining what to do with the existing property. In some cases, the highest and best use analysis may indicate that demolition and new construction is appropriate. More often than not, however, it is a matter of selecting the most appropriate utilization of the existing improvements.

### Highest and Best Use Application

According to the above definition, four criteria must be employed in the analysis of highest and best use for a property. The use must (1) be physically possible, (2) be legally permissible, (3) be financially feasible, and must (4) result in the highest residual to the land component. We discuss these considerations in the commentary that follows.

Physically Possible Use--The subject site is relatively level and provides adequate access for a variety of commercial, industrial, or residential development alternatives. The obvious limitation is overall size--it is not suitable for a large regional mall or golf course, for example. Otherwise, the highest and best use is not significantly limited by the physical characteristics of the site.

Legally Permissible Use--This pertains primarily to the zoning in place for the subject property. It would be inconsistent to consider a development type that would require a change in zoning, especially after the considerable effort that invariably goes into the zoning process. Spot zoning changes are not likely to be politically encouraged. The subject is zoned "CRA," which permits a variety of commercial uses, as well as some residential uses. These include mostly uses related to their location on a major thoroughfare within the city. Gas stations are permitted with a conditional use permit.

GAS STATION FACILITY–101 E. El Camino Real, Mountain View, CA

**HIGHEST & BEST USE** (Continued)

Industrial uses are not likely to be permitted here, nor would they be particularly appropriate at this location.

Financially Feasible/Highest Residual Land Value--After considering the above physical, legal, and zoning limitations, the remaining potential use for the site, if vacant, is some type of commercial development. A primary test of financial feasibility is whether a completed project produces a value that exceeds the total development costs, including a minimal profit. Similarly, feasibility is indicated when the rental income exceeds operating costs and produces a net return sufficient to attract investment capital. With this in mind, a commercial development of some kind would appear appropriate for the subject site. The highest residual land values are often associated with uses such as service stations, car washes, or restaurants from which very significant operational cash flows can generate income in excess of what may be required to amortize and recapture fixed capital investment in only the real estate improvements (thus creating additional "business enterprise value"). The subject is relatively small to support a conventional, modern C-store of say 2,500 SF or more; we do find such stores at prime locations where the developer was unable to obtain a larger parcel. It is more of a challenge to meet city parking, landscaping, and setback requirements for a larger store on a site of this size, but it can be done.

Conclusion of Highest and Best Use as if Vacant--If the subject were vacant, it would likely be a prime target for new construction. It is a busy intersection , and it is too small for a larger retail center. Its access makes it a good site for a gas station, possible smaller C-store or smaller fast food restaurant. Retail uses are also possible alternatives.

Conclusion of Highest and Best Use as Improved--The question is what to do with the existing facility. The most obvious choices are to leave it "as is," to demolish the existing improvements and redevelop with something new, or to renovate and enhance the facility that is presently in place. The existing improvements are later shown to add considerably to the overall value, so one could argue that there is no urgent need to do anything.

However, the highest and best use conclusion must consider which options result in the most profitable outcome financially. Leaving the facility "as is" means that the auto-service bays are either rented out or provide no income to the operator. We have not fully analyzed the potential to rent out the bays, but this has been done in the past and has been stopped. We have seen other gas stations where the auto-service profit center has

**GAS STATION FACILITY**–101 E. El Camino Real, Mountain View, CA

**HIGHEST & BEST USE** (Continued)

been shut down. For one thing, a thriving auto-service and repair business needs enough space to spread out and offer ample parking to customers and employees. That is pretty tight on a site that is shared with hundreds of gas customers daily. Thus, although continued auto service use might be a viable option, our observations suggest this will not return the highest long-term profit.

Another option would be to demolish the building and construct something new. Usually, a prime corner will support a fast food restaurant, C-store development, or retail user such as Starbucks or Blockbuster Video, among others. The scope of this assignment did not permit the investigation into all of the legally permissible redevelopment options. Of interest to the client is whether the full demolition and reconstruction of a modern C-store is the best choice because that is the business in which the current operator and ground lessee is engaged.

With this in mind, the two options to be examined in more detail are the full redevelopment of the site into a new C-store facility or the renovation of the existing improvements. That choice affects the conclusion of effective age and remaining economic life. If the improvements can be used for renovation, their remaining life is greater than if it makes sense to immediately demolish them. Thus, their contribution to value hinges on this determination.

First, we look at the full demolition and reconstruction option. We use two methods to consider whether the highest and best use as improved is to demolish and reconstruct a new C-store development. First, we look at the local market and the subject property in particular. We have inspected the half-dozen closest competitors and find that virtually all are older gas stations that have had some level of renovation. None are newer C-stores. That suggests that competing operators are finding that the economics do not support a full redevelopment of the site.

The Chevron station across the street from the subject is reportedly planning a reconstruction, according to the onsite manager with whom we spoke. However, that site is around 29,000 SF is size, which is considerably larger than the subject. Also, Chevron owns the fee interest; it is not on a ground lease. The subject is operated under a ground lease that expires in 15 years, with two 5-year options. Thus, in 25 years the tenant loses possession of the property. Given that obtaining approvals (conditional use permit would be required, which could add several months to the approval process) and completing the design and bidding process could take 6 months to a year, with another 6 months of

GAS STATION FACILITY–101 E. El Camino Real, Mountain View, CA

**HIGHEST & BEST USE** (Continued)

actual construction and another couple of months to stabilize operations, the true remaining life of a new C-store would be on the order of 23-24 years

In our appraisal consulting with many lenders, it is common for the bank to require a 30-year remaining life to justify a fully amortized loan. It would be possible to obtain say a 20- or 23-year loan on the completed facility, but that increases the debt service (fewer years to pay off the loan) and increases the necessary revenue generated from the new property. It makes more sense for the Chevron facility to be reconstructed, with the larger site area and fee ownership. From a review of the local market, the continued use of the existing facility is suggested.

A second way of examining the redevelopment scenario is to estimate the amount by which the net income is likely to increase and compare that to the potential with the existing facility, renovated with an expanded store within the same building. The redevelopment scenario must generate enough net income to increase the value by the amount of the construction (and demolition) plus a suitable profit.

The economic analysis is summarized briefly on the following page. We have modified the table, presented in the Sales Comparison Approach, that projects revenue from the property. Later, we examine the performance of the property "as is." The present analysis estimates the likely performance of a new facility. As stated later, the property currently is selling around 300,000 gallons/month, according to testimony by the operator and from data acquired from MPSI, which further estimates store sales at around $24,000 monthly. The operator says that gas volume went up when he separated from ConocoPhillips (UNOCAL 76 brand of gas) and presumably was able to trim his prices to be what he thought was more competitive. Thus, our estimate of revenue uses a modest gas margin of $0.14/gallon, which is slightly higher than the estimated $0.13/gallon in its current configuration. The small site area is likely to prevent an increase in gasoline sales volume, but it is reasonable to assume the operator can achieve a small increase in the margin with the new facility. Thus, gross margin from gas sales goes up modestly with a new store, being limited by the site area (it is not likely that a larger number of dispensers will be supported, and the existing dispensers are able to handle a fairly high volume).

The new store should be able to generate much more revenue than the existing snack shop. It is uncertain as to how large a store could be supported on this small site but, based on data from MPSI, we estimate store sales at $90,000 monthly. That is at the high