1  GLYNN & FINLEY, LLP
   CLEMENT L. GLYNN, Bar No. 57117
2  ADAM FRIEDENBERG, Bar No. 205778
   One Walnut Creek Center
3  100 Pringle Avenue, Suite 500
   Walnut Creek, CA 94596
4  Telephone: (925) 210-2800
   Facsimile: (925) 945-1975
5  Email: cglynn@glynnfinley.com
          afriedenberg@glynnfinley.com
6
   Attorneys for Defendant and Counter-Plaintiff
7  ConocoPhillips Company

8

9                  UNITED STATES DISTRICT COURT

10              NORTHERN DISTRICT OF CALIFORNIA

11  HOUTAN PETROLEUM, INC.              )  **Case No. 3:07-cv-5627 SC**
                                        )
12                Plaintiff,            )  **CONOCOPHILLIPS COMPANY'S**
                                        )  **OPPOSITION TO PLAINTIFF'S IN**
13       vs.                            )  **LIMINE MOTION NO. 2 TO EXCLUDE**
                                        )  **ANY COMPUTATION OF DAMAGES**
14  CONOCOPHILLIPS COMPANY, a Texas     )  **BASED ON DISGORGEMENT OF**
    corporation and DOES 1 through 10,  )  **PROFITS OR PUNITIVE DAMAGES AND**
15  Inclusive                           )  **TO EXCLUDE CALCULATIONS OF**
                                        )  **DAMAGES IN EXCESS OF $4,000**
16                Defendants.           )  **MONTHLY RENT AT TRIAL**
                                        )
17  ────────────────────────────────── )
                                           **Pretrial Conference:   August 15, 2008**
18                                         **Time:                  10:00 a.m.**
                                           **Courtroom:             1**
19                                         **Before:                Hon. Samuel Conti**

20                                         **Trial Date:            August 18, 2008**

21

22       Defendant and Counter-Plaintiff ConocoPhillips Company ("ConocoPhillips") submits

23  this opposition to Houtan Petroleum, Inc.'s Motion in Limine No. 2.

24  I.    INTRODUCTION

25       Houtan moves to preclude any claim by ConocoPhillips for:  (1) disgorgement of profits

26  Houtan has received from its use, without legal right, of ConocoPhillips' equipment and

27  improvements; (2) punitive damages; and (3) compensatory damages in excess of $4,000

28  monthly rental value.  The motion must be denied for the following reasons:

- 1 -

1      *First,* ConocoPhillips did not fail to make any required disclosure, and in fact it is Houtan

2  that has actively prevented ConocoPhillips from discovering the profits that should be disgorged.

3      *Second,* no harm could have resulted from any alleged non-disclosure, as the information

4  at issue is within Houtan's exclusive control.

5      *Third,* disgorgement is an appropriate remedy for ConocoPhillips' claim for unjust

6  enrichment, and Houtan's improperly obtained profits are therefore relevant and recoverable.

7      *Fourth,* punitive damages may be awarded as a result of Houtan's willful conversion of

8  ConocoPhillips' property.

9      Accordingly, the Court must deny Houtan's Motion in Limine No. 2.

10  **II.     ARGUMENT**

11      **A.     ConocoPhillips Has Complied With Its Rule 26 Disclosure Obligations.**

12      This case was filed in November 2007. In January 2008, the Court set the matter

13  for trial in February 2008. Later in January, ConocoPhillips voluntarily provided Rule 26

14  initial disclosures pursuant to an agreement with Houtan. Houtan admits, as it must, that

15  ConocoPhillips properly disclosed the damages it seeks pursuant to its counterclaims.

16  That disclosure provided:

17
18
19
20           ConocoPhillips will seek compensatory damages reflecting Plaintiff's failure to pay rent for equipment and improvements owned by ConocoPhillips which Plaintiff has wrongfully retained. The appropriate market rent for this property is $4,000 per month. In addition, ConocoPhillips seeks punitive damages, disgorgement of amounts by which Plaintiff has been unjustly enriched and attorneys' fees.

(Exhibit A, ConocoPhillips Company's Initial Disclosures at p. 3.)

21

22         **1.     Houtan Has Improperly Interfered With ConocoPhillips' Legitimate Efforts To Obtain The Information Now At Issue.**

23      Of course, there is a very obvious reason why ConocoPhillips was unable to provide

24  greater specificity with respect to its claim for disgorgement of Houtan's unjustly obtained

25  profits: such information is solely within the knowledge and control of *Houtan*. Accordingly,

26  Conoco took the deposition of Ed Haddad, Houtan Petroleum's president and owner, both in his

27  individual capacity and pursuant to a 30(b)(6) notice to Houtan. At that deposition, counsel for

28  ConocoPhillips specifically asked Mr. Haddad: "What are Houtan Petroleum's annual

Case 3:07-cv-05627-SC    Document 133    Filed 08/13/2008    Page 3 of 13

1    revenues?" and "How about the entire station? What does the entire station gross?" (Exhibit B,

2    Deposition of Ed Haddad, January 30, 2008 at 23:13-15, 26:17-20.) After Houtan's counsel

3    advised Mr. Haddad not to answer the questions, Mr., Haddad refused to do so. (*Id.*)

4          Because the Court shortly thereafter took the case off its trial calendar, and

5    ConocoPhillips then moved for summary judgment, ConocoPhillips did not bring an immediate

6    motion to compel. On July 25, the Court re-set the matter for trial, to commence on August 18.

7    ConocoPhillips then served a (deposition and document production) subpoena on Russell S.

8    Braasch ("Braasch"), whom Plaintiff had previously disclosed as an expert witness on the subject

9    of Houtan's damages, in a second attempt to obtain legitimate discovery of Houtan's improperly

10   obtained profits since the franchise termination. Showing a casual disdain for a properly issued

11   subpoena, Braasch simply refused to appear for deposition or produce the subpoenaed

12   documents, after Plaintiff served objections the subpoena.[1]

13         Thus, to the extent ConocoPhillips has been unable to identify the total profits that must

14   be disgorged, such was solely the result of Houtan's frivolous interference with ConocoPhillips'

15   legitimate discovery efforts. We have subpoenaed Mr. Haddad for trial so that the proof can be

16   presented to the jury.

17            **2.       Houtan Did Not, and Could Not, Identify Any Harm.**

18         In support of its motion, Houtan cites *Colombini v. Members of the Board of Directors of*

19   *the Empire College School of Law,* 2001 U.S. Dist. LEXIS 13405, 25 (N. Cal. 2001), affrm'd by

20   *Colombini v. Members of the Bd. Of Dirs.*, 2003 U.S. App. LEXIS 6750 (9th Cir. Cal., April 7,

21   2003). *Colombini* is inapposite. There, the Court excluded evidence of the plaintiff's damages

22   _____

[1] The objections were procedurally improper. "Only the witness can prevent disclosure by
23   objection. The party to whom the subpoenaed records pertain *cannot* simply object. Rather, a
     protective order or motion to quash the subpoena is required." Schwarzer, Tashima &
24   Wagstaffe, *Rutter Group Prac. Guide: Fed. Civ. Pro. Before Trial* at § 11:2291. Further, the
     objections were all substantively meritless. First, Houtan objected on the ground that the
25   subpoena was untimely pursuant to Rule 34, but Rule 34(b) applies only to document requests to
     parties, not subpoenas to non-parties. Houtan's objections that the subpoena seeks information
26   that is irrelevant and "privileged, commercial information, trade secrets and invades Houtan's
     right to privacy" are spurious; the requested information is directly relevant to ConocoPhillips'
27   damages and disgorgement remedy and indeed was included within Braasch's previous expert
     witness report. Finally, Braasch was not an "unretained expert" as Plaintiff asserts, but a
28   disclosed expert whom Plaintiff subsequently determined not to call. He remains subject to
     deposition.

- 3 -

CONOCOPHILLIPS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE TRIAL WITNESSES

1    where the plaintiff had exclusive control of such information but failed to produce it in

2    discovery.  In the case at bar, however, Houtan, and not ConocoPhillips, has exclusive control of

3    the information necessary for a full accounting of its own profits.

4           **B.**    **ConocoPhillips' Counterclaims Permit The Various Remedies Sought By ConocoPhillips.**

5

6                **1.**    **ConocoPhillips' counterclaims are not dependent on a defense verdict on Houtan's claims.**

7           Houtan argues that ConocoPhillips is precluded from recovering on its counterclaims

8    unless ConocoPhillips first establishes that its offer to sell its improvements to Houtan was "bona

9    fide" under the PMPA.  ConocoPhillips expects to prevail on Houtan's claim.  In any event,

10    Houtan is wrong, and indeed cites no authority to support its assertion.  It is undisputed that:

11    1) Houtan's right to use the equipment existed under the franchise agreement; 2) the franchise

12    agreement terminated properly on October 31, 2007; 3) Houtan has paid no rent for, but has

13    continued to use and profit from, ConocoPhillips' valuable property; and 4) Houtan has

14    prevented ConocoPhillips from removing its property.  Houtan never made *any* offer to purchase

15    the property, but instead sought preliminary injunctive relief to stay in possession pending the

16    litigation.  The Court denied injunctive relief; Houtan nevertheless refused to enter an interim

17    rental agreement with ConocoPhillips, but kept possession of ConocoPhillips' property.  Houtan

18    had no legal right (under the PMPA or otherwise) to do so, and is therefore accountable to

19    ConocoPhillips for unpaid rent, other damages, and disgorgement of its unjustly obtained profits.

20                **2.**    **Disgorgement is available to ConocoPhillips.**

21           Houtan next argues that "[t]here is no law that can be cited by ConocoPhillips to support

22    a claim for disgorgement of profits under a theory of breach of contract." (Docket No. 121 at

23    4:10-11.)  We agree.  What Plaintiff fails to mention, however, is that ConocoPhillips seeks a

24    disgorgement remedy not on its counterclaim for breach of contract, but rather on its claim of

25    unjust enrichment, a claim for which disgorgement is plainly available. *See, e.g., County of San*

26    *Bernardino v. Walsh*, 158 Cal.App.4th 533, 542-43 (2007).

27    ///

28    ///

CONOCOPHILLIPS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE TRIAL WITNESSES

1    **3.    ConocoPhillips may recover punitive damages.**

2    Houtan moves nominally to preclude ConocoPhillips' claim for punitive damages. The

3    motion, however, provides no authority, or even any argument, to support the proposition. It

4    simply requests the relief in its caption, and says no more. Presumably, this is because the

5    request is utterly unsupportable. In reality, it is well-settled that punitive damages are

6    recoverable on a claim for the intentional tort of conversion. *See, e.g. Professional Seminar*

7    *Consultants, Inc. v. Sino American Technology Exchange*, 727 F.2d 1470 (9th Cir. 1984)

8    (awarding compensatory and punitive damages on a claim for the intentional tort of conversion

9    and libel).

10    **III.    CONCLUSION**

11    Based on the foregoing, the Court should deny Houtan's motion in limine to exclude

12    and/or limit computation of damages by ConocoPhillips at trial (MIL No. 2).

13    Dated: August 13, 2008

14    GLYNN & FINLEY, LLP
      CLEMENT L. GLYNN
15    ADAM FRIEDENBERG

16

17    By _____
      Attorneys for Defendant and Counter-
18    Plaintiff ConocoPhillips Company

19

20

21

22

23

24

25

26

27

28

- 5 -

# *EXHIBIT A*

1  GLYNN & FINLEY, LLP
   CLEMENT L. GLYNN, Bar No. 57117
2  ADAM FRIEDENBERG, Bar No. 205778
   One Walnut Creek Center
3  100 Pringle Avenue, Suite 500
   Walnut Creek, CA 94596
4  Telephone: (925) 210-2800
   Facsimile: (925) 945-1975
5  Email: cglynn@glynnfinley.com
           afriedenberg@glynnfinley.com
6
   Attorneys for Defendant and Counter-Plaintiff
7  ConocoPhillips Company

8

9              UNITED STATES DISTRICT COURT

10           NORTHERN DISTRICT OF CALIFORNIA

11  HOUTAN PETROLEUM, INC.            )  Case No. 3:07-cv-5627
                                      )
12               Plaintiff,           )  DEFENDANT AND COUNTER-
                                      )  PLAINTIFF CONOCOPHILLIPS
13       vs.                          )  COMPANY'S INITIAL DISCLOSURES
                                      )
14  CONOCOPHILLIPS COMPANY, a Texas   )  Trial Date:   February 11, 2008
    corporation and DOES 1 through 10,)  Time:         10:00 a.m.
15  Inclusive                         )  Courtroom:    1
                                      )  Before:       Hon. Samuel Conti
16               Defendants.          )
                                      )
17  ————————————————————————————————  )

18       These initial disclosures are made based on information currently known to

19  ConocoPhillips Company ("ConocoPhillips"). Discovery and investigation are ongoing, and

20  ConocoPhillips reserves the right to use at trial such further and additional witnesses, documents

21  and damages information as may become known in the course of ConocoPhillips' investigation

22  and discovery. Subject to the foregoing, ConocoPhillips makes the following initial disclosures

23  pursuant to Federal Rule of Civil Procedure 26 and the agreement of the parties.

24  I.    WITNESSES

25       Defendant and Counter-Plaintiff ConocoPhillips Company may use the following

26  witnesses to support its claims and defenses:

27       1.    Dan Pellegrino. Mr. Pellegrino is an employee of ConocoPhillips and may be

28  contacted through ConocoPhillips' counsel of record. He may have information regarding

- 1 -
CONOCOPHILLIPS' INITIAL DISCLOSURES

1    ConocoPhillips' discussions with Plaintiff, the parties' franchise relationship, the franchise

2    agreement that is at issue in this matter, and issues related to ConocoPhillips' counterclaims.

3        2.    Greg Vasquez. Mr. Vasquez is an employee of ConocoPhillips and may be

4    contacted through ConocoPhillips' counsel of record. He may have information regarding the

5    parties' franchise relationship, the franchise agreement that is at issue in this matter and the

6    termination of said agreement.

7        3.    David Nash. Mr. Nash is an employee of ConocoPhillips and may be contacted

8    through ConocoPhillips' counsel of record. He may have information regarding the parties'

9    franchise relationship, the franchise agreement that is at issue in this matter and the termination

10   of said agreement.

11       4.    Jay Rollins. Mr. Rollins is an employee of ConocoPhillips and may be contacted

12   through ConocoPhillips' counsel of record. He may have information regarding ConocoPhillips'

13   discussions with Plaintiff, the franchise agreement that is at issue in this matter, and issues

14   related to ConocoPhillips' counterclaims.

15       5.    Phillip Bonina. Mr. Bonina is an employee of ConocoPhillips and may be

16   contacted through ConocoPhillips' counsel of record. He may have information regarding the

17   franchise agreement that is at issue in this matter, the expiration of ConocoPhillips' underlying

18   property lease of the service station property at issue, ConocoPhillips' efforts to obtain an

19   extension and/or renewal of said underlying property lease, ConocoPhillips' bona fide offer to

20   sell its equipment and improvements at the subject station to Plaintiff, and issues related to

21   ConocoPhillips' counterclaims.

22       6.    Richard Mathews. Mr. Mathews may be contacted through ConocoPhillips'

23   counsel of record. He may have information regarding the franchise agreement that is at issue in

24   this matter, the expiration of ConocoPhillips' underlying property lease of the service station

25   property at issue, ConocoPhillips' efforts to obtain an extension and/or renewal of said

26   underlying property lease, ConocoPhillips' bona fide offer to sell its equipment and

27   improvements at the subject station to Plaintiff, and issues related to ConocoPhillips'

28   counterclaims.

CONOCOPHILLIPS' INITIAL DISCLOSURES

1       7.     John Vidovich, De Anza Properties, 920 West Fremont Avenue, Sunnyvale,

2  California. Mr. Vidovich may have information regarding ConocoPhillips' underlying property

3  lease of the service station property at issue, ConocoPhillips' efforts to obtain an extension

4  and/or renewal of said underlying property lease and Plaintiff's current lease agreement.

5       8.     Carla Wilkey, De Anza Properties, 920 West Fremont Avenue, Sunnyvale,

6  California. Ms. Wilkey may have information regarding ConocoPhillips' underlying property

7  lease of the service station property at issue, ConocoPhillips' efforts to obtain an extension

8  and/or renewal of said underlying property lease and Plaintiff's current lease agreement.

9  **II.    DOCUMENTS**

10       Pursuant to Rule 26(a)(1)(ii) and the agreement of the parties, ConocoPhillips produces

11  herewith all documents it may use to support its claims and defenses, with the exception of

12  documents which either party has already produced, exchanged or submitted as part of a

13  pleading, motion or other paper filed in this action.

14  **III.    DAMAGES**

15       ConocoPhillips will seek compensatory damages reflecting Plaintiff's failure to pay rent

16  for equipment and improvements owned by ConocoPhillips which Plaintiff has wrongfully

17  retained. The appropriate market rent for this property is $4,000 per month. In addition,

18  ConocoPhillips seeks punitive damages, disgorgement of amounts by which Plaintiff has been

19  unjustly enriched and attorneys' fees.

20

21      Dated: January 28, 2008

22                      GLYNN & FINLEY, LLP
                          CLEMENT L. GLYNN

23                      ADAM FRIEDENBERG
                          One Walnut Creek Center

24                      100 Pringle Avenue, Suite 500
                          Walnut Creek, CA 94596

25

26                     By _____

27                      Attorneys for Defendant and
                          Counter-Plaintiff ConocoPhillips

28                      Company

CONOCOPHILLIPS' INITIAL DISCLOSURES

*EXHIBIT B*

ED HADAD      January 30, 2008

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

HOUTAN PETROLEUM, INC.,           )
                                  )
          Plaintiff,              )
                                  )
     vs.                          )    No. 3:07-cv-5627.
                                  )
CONOCOPHILLIPS COMPANY, a Texas   )
corporation and DOES 1 through 10,)
Inclusive,                        )
                                  )
          Defendants.             )
                                  )
_____ )

DEPOSITION OF

ED HADAD

_____

January 30, 2008

REPORTED BY:  KAREN A. FRIEDMAN, CSR 5425    JOB # 405637

ED HADAD    January 30, 2008

Page 22

1    A. No.
2    Q. And is Houtan Petroleum engaged in any business
3    activity other than the operation of the two stations
4    you mentioned?
5    A. No.
6    Q. Who manages the day-to-day operations of Houtan
7    Petroleum?
8    A. We have two different managers at the site. We
9    have one of them, Jose, at Capitola and Arnell, at
10    Mountain View.
11    Q. And what do you do on a day-to-day basis?
12    A. I just oversee the operations.
13    Q. And what does that involve?
14    A. You know, involve just -- I don't know what it
15    involves. It involves quite a bit. It just basically
16    involves my office. Involved with management, managing
17    the station; how they manage it. Involved with many --
18    anything that just come up.
19    Q. Can you be more specific? What do you do on a
20    typical day?
21    A. Typical day? I get my coffee, I take my
22    daughter to school, first. So that's the good part of
23    it. I enjoy that. I get my coffee, usually I start
24    with my office and make sure if there is anything need
25    to be done as far as checks or sign the checks.

Page 23

1        Make sure anything related to, anything drastic
2    happen anyplace. Or if it is not, then I go to field.
3        And when I go to field basically is, consists
4    of talking to the manager and discussing the operation.
5    If I see anything that they need to improve, we talk
6    about it, the issues they have.
7    Q. How many hours a week do you generally spend in
8    the field?
9    A. It depends. Some weeks more than the other,
10    but I work probably about between 60 to 70 hours a week.
11    So I would say about 20 percent of these I spend in the
12    office. And the rest of it is field.
13    Q. What are Houtan Petroleum's annual revenues?
14    MR. BLEAU: I'm going to object. That's not
15    relevant. Don't answer the question.
16    THE WITNESS: Okay.
17    MR. FRIEDENBERG: Q. What compensation do you
18    receive from Houtan Petroleum?
19    MR. BLEAU: Objection. That's not relevant
20    either. Don't answer the question.
21    MR. FRIEDENBERG: Q. Let's talk a bit about
22    the Mountain View station that brings us here. Describe
23    the location of the station for me.
24    A. Location? The location is basically at Grant
25    Road and El Camino Real.

Page 24

1    Q. And what's the size of the plot?
2    A. Probably less than an acre.
3    Q. How many pump islands are there?
4    A. Pump islands? When you saying "pump island,"
5    what are you talking about, pumps?
6    Q. How many banks of pumps are there?
7    MR. BLEAU: Why don't you ask how many
8    dispensers there are. You've got to learn the lingo,
9    dude.
10    THE WITNESS: Six dispensers.
11    MR. FRIEDENBERG: Q. And are they arranged in
12    one island or in multiple islands?
13    A. No. Actually, we have two, one, two, and one.
14    So we have two sets of canopies.
15    Q. And what type of, are the dispensers all the
16    same type?
17    A. Yes, look like it, yes.
18    Q. What type of displays do they have?
19    A. I don't know what you mean by "type."
20    Q. Do they have digital displays or some other
21    sort?
22    A. Yeah. Digital displays, yes.
23    Q. Credit card machines?
24    A. Yes.
25    Q. Do you know how old they are?

Page 25

1    A. Older than 15 years old.
2    Q. Are they older than 20 years old?
3    A. Perhaps. I'm not sure, but I know is older
4    than 15.
5    Q. How about the underground tanks; do you know
6    how old they are?
7    A. What I read is 22 years old. I think that was
8    in one of the reports that I see.
9    Q. One of which reports?
10    A. Was it on -- I'm not sure, but it perhaps was
11    in your --
12    MR. BLEAU: The motion?
13    THE WITNESS: Appraisal?
14    MR. BLEAU: Or the appraisal?
15    THE WITNESS: I think it was in the appraisal
16    that you have. I read, yes, once.
17    MR. FRIEDENBERG: Q. Do you have any other
18    knowledge regarding the age of the tanks?
19    A. No.
20    Q. Do you have any other knowledge regarding the
21    age of the dispensers?
22    A. No.
23    Q. And how about the canopies? Do you know how
24    old they are?
25    A. They're old. I think they build with the

7 (Pages 22 to 25)

Merrill Legal Solutions
(800) 869-9132

ED HADAD    January 30, 2008

Page 26

1  buildings, 40 years ago.
2     Q. And how do you know that?
3     A. Because the configuration and the looks of it.
4  When you look at the station you can see the way they
5  built it; all of them. Just those ranch-style buildings
6  that the Union 76 had many years ago.
7     Q. And do you have a snack shop?
8     A. Yes, I do have a snack shop, yes.
9     Q. How large is the store?
10    A. About, I would say probably 3- to 400 square
11 feet.
12    Q. How much revenue does the store produce?
13    A. I don't know. I have to -- as far as exact
14 numbers? I don't.
15    Q. Can you estimate?
16    A. Probably about 30- to 40,000, gross.
17    Q. How about the entire station? What does the
18 entire station gross?
19      MR. BLEAU: Objection, relevance. Don't answer
20 the question. Why are we talking about revenues?
21      MR. FRIEDENBERG: Q. When did you first
22 acquire that franchise or the station.
23    A. I believe that was '97.
24    Q. And was it a Union 76 station at the time?
25    A. At the time was Union 76 with an ownership of

Page 27

1  Tosco.
2     Q. At the time you acquired this station, how many
3  others did you own?
4     A. One more; one.
5     Q. Who did you acquire the station from?
6     A. From a gentleman named -- another dealer, named
7  Mr. Said.
8     Q. And do you recall what the price was?
9     A. No.
10    Q. Do you recall how you determined what the price
11 would be?
12    A. I don't remember.
13    Q. Did you get the business appraised?
14    A. No.
15    Q. Did you do any other due diligence?
16    A. We take a look at the location and the
17 gallonage it was pumping at the time.
18    Q. What was the gallonage it was pumping?
19    A. About, at the time, it was about 120,000.
20    Q. A month?
21    A. Yes.
22    Q. And what's the gallonage now?
23    A. Right now, today?
24    Q. Yes.
25    A. About three hundred.

Page 28

1     Q. Per month?
2     A. Yes.
3     Q. And what was the gallonage in 2007?
4       MR. BLEAU: Before or after the termination?
5       MR. FRIEDENBERG: Before.
6       THE WITNESS: Two-twenty.
7       MR. FRIEDENBERG: Q. And after?
8     A. Three hundred.
9     Q. And to what do you attribute the increase in
10 gallonage to?
11    A. I think better pricing.
12    Q. Have your profits increased since the
13 termination?
14      MR. BLEAU: Objection, relevance.
15      MR. FRIEDENBERG: It's relevant to damages.
16      MR. BLEAU: You're right. Objection; vague as
17 to time.
18      THE WITNESS: In a way you can say, on volume,
19 yes, we did. We did.
20      On a profit on gasoline yes, we definitely have
21 more profit on gasoline. As far as the repair shop, no;
22 we end up to close the repair shop.
23      MR. FRIEDENBERG: Q. Why did you close the
24 repair shop?
25    A. Because it was pretty slow.

Page 29

1     Q. And when did you close the repair shop?
2     A. Exact date for it was January, I think January
3  -- first week of January. Let's put it that way.
4     Q. And did that have something to do, in your
5  mind, with the termination of the franchise agreement?
6     A. I'm not clear of your question. Please clear
7  the question.
8     Q. You testified that you closed the garage
9  because business was slow. Correct?
10    A. That's correct.
11    Q. What do you believe caused business to slow
12 down?
13    A. I -- interruption in a business is --
14 interruption when people coming for gas, for the price
15 of it, the way I see now. But for the repair shop,
16 people take their cars because of the integrity of the
17 place. And we have so much interruption back and forth
18 with the names. And people just not, they really
19 distrust the place. Because if you change names all of
20 a sudden, with no notice to your people why you're doing
21 it, you don't have no explanation, you close the gas.
22 You don't accept credit cards.
23      So there are a lot of things happen. And when
24 people take their cars to repair, they want to take it
25 to somewhere that's reputable. The average car is

8 (Pages 26 to 29)