1  Thomas P. Bleau, Esq., SBN 152945
   Gennady L. Lebedev, Esq., SBN 179945
2  BLEAU / FOX, A P.L.C.
   3575 Cahuenga Boulevard West, Suite 580
3  Los Angeles, California 90068
   Telephone    :  (323) 874-8613
4  Facsimile    :  (323) 874-1234
   e-mail:       bleaushark@aol.com
5  e-mail:       glebedev@bleaufox.com

6  Attorneys for Plaintiff,
   HOUTAN PETROLEUM, INC.

7

8

9                 **UNITED STATES DISTRICT COURT IN AND FOR**

10                **THE NORTHERN DISTRICT OF CALIFORNIA**

11

12  HOUTAN PETROLEUM, INC.            )  CASE NO.  3:07-CV-05627-SC
                                      )
13              Plaintiff,            )  **PLAINTIFF, HOUTAN PETROLEUM,**
    vs.                               )  **INC.'S MEMORANDUM OF POINTS AND**
14                                    )  **AUTHORITIES IN SUPPORT OF ITS**
                                      )  **MOTION FOR JUDGMENT AS A MATTER**
15  CONOCOPHILLIPS COMPANY, a Texas   )  **OF LAW**
    Corporation  and DOES 1 through 10, )
16  Inclusive                         )
                                      )  Courtroom:    1
17              Defendants.           )  Before:       Hon. Samuel Conti
                                      )  Date:         TBD
18                                    )
                                      )
19                                    )
                                      )
20                                    )
    _____ )
21

22        Pursuant to the Court's Order on August 21, 2008, Plaintiff, Houtan Petroleum, Inc. ("Houtan

23  Petroleum"), submits this memorandum of points and authorities in support of its motion for

24  judgment as a matter of law.

25                                  **I.**

26                            **INTRODUCTION**

27        On November 5, 2007, Houtan Petroleum filed its Complaint against ConocoPhillips, alleging

28  violations of the Petroleum Marketing Practices Act ("PMPA") (15 U.S.C. §2801, et seq.) arising out

                                   -1-

1   of ConocoPhillips' termination of its franchise relationship with Houtan Petroleum.  On January 18,

2   2008, Defendant ConocoPhillips filed its Answer to Houtan Petroleum's Complaint in this case,

3   along with Counterclaims consisting of three counts: (1) Breach of Contract, (2) Conversion and

4   (3)Unjust Enrichment.

5          Trial commenced on August 18, 2008, and an advisory jury found in favor of ConocoPhillips

6   on August 21, 2008.   Notwithstanding the verdict, Houtan Petroleum is entitled to judgment as a

7   matter of law on its PMPA claim because ConocoPhillips' offer was conditioned on an unlawful

8   release and waiver of rights and, based on the evidence, no reasonable jury could find in favor of

9   ConocoPhillips. Moreover, ConocoPhillips' counterclaims are barred as a matter of law because they

10  are preempted by the Petroleum Marketing Practices Act, which preempts all state law claims arising

11  out of or relating to a termination of a petroleum franchise.

12         ConocoPhillips' First Claim for Relief alleges that Houtan Petroleum breached the Franchise

13  Agreement by failing to surrender the Station Property to ConocoPhillips so that ConocoPhillips

14  could remove its structures, equipment and improvements from Station Property.  (Counterclaims,

15  ¶87).  ConocoPhillips Second Claim for Relief asserts that Houtan Petroleum's conduct of refusing

16  to allow ConocoPhillips to remove its structures, improvements and equipment from the Station

17  Property, constituted conversion. (Counterclaims, ¶91).  ConocoPhillips' Third Claim for Relief for

18  alleged unjust enrichment, notwithstanding the fact that Houtan Petroleum lawfully acquired

19  possession and demanded a bona fide offer pursuant to the PMPA.  In can not be disputed that each

20  one of ConocoPhillips' counterclaims arise out of the termination of Houtan Petroleum's franchise

21  agreement and relate to the termination of the parties' franchise relationship.

22                                         **II.**

23                                      **ARGUMENT**

24  **A.    Plaintiff/Counterdefendant Is Entitled To Judgment As A Matter Of Law Because**

25          **ConocoPhillips' Counterclaims Are Preempted By The PMPA.**

26         Federal Rules of Civil Procedure, Rule 50(a) states:

27         "If a party has been fully heard on an issue during a jury trial and the court finds that a

28  reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue,

1  the court may:

2        (A) resolve the issue against the party; and

3        (B) grant a motion for judgment as a matter of law against the party on a claim or

4        defense that, under the controlling law, can be maintained or defeated only with a

5        favorable finding on that issue."

6      On August 21, 2008 and prior to the case being submitted to the jury, Houtan Petroleum

7  moved for a judgment as a matter of law on ConocoPhillips' counterclaims, which the court took

8  under advisement. After the jury returned the verdict, the Court requested further briefing on Houtan

9  Petroleum's motion for judgment as a matter of law.

10      Statutory and common law claims are preempted where they pertain to termination or

11  nonrenewal pursuant to the PMPA. *Nesheiwat v Mobil Oil Company*, CCH, BFG ¶ 8283 (C.D. Cal.

12  12-18-84). The PMPA preempts state law claims for breach of contract, fraud, breach of the covenant

13  of good faith and fair dealing and interference with prospective economic advantage. *Arabian v BP*

14  *America*, 898 F. Supp. 703, 708 (N.D. Cal. 1995); *Mobil Oil Corp. v. Superior Court,* 189

15  Cal.App.3d 485, 489, 234 Cal.Rptr. 2d 482 (1987).

16      The PMPA provides for the preemption of all state law claims inconsistent with the terms of

17  the Act. 15 U.S.C. §2806(a); *Millet v. Union Oil Company of California*, 24 F.3d 10, 12-13 (9th

18  Cir.1994). The "PMPA *was intended to preempt all state law* with respect to termination of a

19  petroleum franchise." *In Re Herbert*, 806 F.2d 889, 892 (9th Cir. 1986) (italics in original). To the

20  extent application of any state would frustrate the federal objective of uniformity related to petroleum

21  franchise termination law, the state law is preempted by the PMPA. *Humbolt Oil Co. v. Exxon Co.,*

22  *U.S.A.*, 823 F.2d 373, 374-75 (9th Cir. 1987), citing *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 158

23  (1978), *Benevento v. Mobil Oil Corp.*, 494 U.S. 897, 98 L.Ed.2d 189, 108 S.Ct. 231 (1987).

24      To allow a petroleum franchisor to subject a franchisee to counterclaims relating to the

25  purported bona fides of an offer in a PMPA case would nullify the purpose and intent of the PMPA.

26  The claims and issues in this case must be decided in the context of the overriding purpose of the

27  PMPA. In *Doebereiner v. Sohio Oil Company*, 880 F.2d 329, 331-332 (11 Cir. 1989), the Court set

28  forth the purpose behind the PMPA:

> "The legislative history of the PMPA reveals that the Act was designed to protect franchisees from arbitrary or discriminatory termination or non-renewal. (Citation omitted.) Congress sought to equalize the obvious disparity in bargaining power between major oil companies and service station operators. (Citations omitted.) ... To attain these ... goals, Congress specifically set forth the permissible grounds for termination or non-renewal of franchise relationships, and bestowed on federal courts jurisdiction to remedy violations of the Act." *Id.*

This case is precisely the type of case which Congress had in mind when it enacted the PMPA. The PMPA is intended to protect gas station franchise owners from arbitrary and discriminatory termination of their franchises with large oil corporations and gasoline distributors, and to remedy the disparity in bargaining power between the parties to gasoline franchise contracts. *DuFresne's Auto Service, Inc. v. Shell Oil Company*, 992 F.2d 920, 925 (9th Cir. 1993) and *Mobil Oil Corporation v. Virginia Gasoline Marketers and Automotive Repair Association*, 34 F.3d 220, 223 (4th Cir. 1994).

The PMPA provides in relevant part as follows:

> "To the extent that any provision of this subchapter applies to the termination (or the furnishing of notification with respect thereto) of any franchise, or to the nonrenewal (or the furnishing of notification with respect thereto) of any franchise relationship, **no State or any political subdivision thereto may adopt, enforce, or continue in effect any provision of any law or regulation (including any remedy or penalty applicable to any violation thereof) with respect to termination** (or the furnishing of notification with respect thereto) of any such franchise or the nonrenewal (or the furnishing of notification with respect thereto) of any such franchise relationship unless such provision of such law or regulation is the same as the applicable provision of this subchapter." 15 U.S.C. §2806(a)(1) (emphasis added).

The primary purpose of the PMPA is to govern the termination and nonrenewal of franchise relationships by franchise owners. *DuFresne's Auto Serve., Inc. v. Shell Oil Co.,* 992 F.2d 920 (9th Cir. 1993). "In enacting the PMPA, Congress attempted to provide national uniformity of petroleum franchise termination law." *Unocal Corp. v. Kaabipour*, 177 F.3d 755, 768 (9th Cir. 1999) (internal quotations and citations omitted). That uniformity would be frustrated if the PMPA did not preempt all inconsistent state law. *Id.* Each one of ConocoPhillips' counterclaims are preempted because they would allow ConocoPhillips to circumvent PMPA obligations to make a *bona fide* offer to Houtan Petroleum and would create a hammer to unfairly punish a franchisee merely for contesting a PMPA offer.

In *Rhodes v. Amoco Oil Company* (supra) the Court underscored the language in *Sadlin v.*

1    *Texaco Refining and Marketing* 900 F.2d 1480, 1481 (1990) and *Slatky v. Amoco Oil Co.* 830 F.2d

2    476, 484 (1987) as follows:

3       "the bona fide offer provision therefore serves as a second, and distinct, layer of protection,
        assuring the franchisee an opportunity to continue to earn a livelihood from the property while

4       permitting the distributor to end the franchise relationship." *Rhodes v. Amoco Oil Company*
        143 F.3d at 1371 (quoting, *Sadlin v. Texaco Refining and Marketing* 900 F.2d at 1481

5       (quoting, *Slatky v. Amoco Oil Co.* 830 F.2d at 484))."

6    Thus, the *Rhodes* court held that:

7       "[T]he franchisor is not automatically entitled to immunity from having its offer scrutinized
        and from that offer's bona fides being tested against other evidence as to what "approached

8       fair market value." Hence the franchisor may not avoid the raising of a genuine issue of fact
        concerning his offer, and may not obtain a summary judgment merely because he has based

9       the offer in question on the results of an independent appraisal. That approach would not
        protect the franchisee in a case, which we would hope would be the unusual one, in which the

10      appraisal is flawed 'through sloppiness or mere error.'"*Rhodes v. Amoco Oil Company* 143
        F.3d at 1372.

11

12   Consequently, ConocoPhillips' counterclaims cannot be used as a way around its PMPA

13   obligations and are therefore preempted by the PMPA. That does not mean that ConocoPhillips is

14   without a remedy under the circumstances if they had asserted proper counterclaims (which they

15   failed to do) under the PMPA. Under the PMPA, this Court has broad discretion to grant equitable

16   relief as the court determines is necessary on a case by case basis. 15 U.S.C. §2805(b)(1).

17   **B.    Plaintiff/Counterdefendant Is Entitled To Judgment As A Matter Of Law Because**

18   **ConocoPhillips' "PMPA Offer" Was Contingent Upon A Waiver Of Rights**

19   The PMPA requires ConocoPhillips to make a bona fide offer to sell, transfer or assign to the

20   franchisee "**the interest of the franchisor**" in any improvements or equipment located on the

21   premises. 15 U.S.C. §2802(c)(4)(C)(i) (emphasis added). A franchisor may not condition the sale of

22   the improvements on a waiver of rights because a franchisor must offer its entire "interest" in the

23   improvements. The PMPA does not provide a franchisor the option of making a PMPA offer

24   contingent on the dealer waiving any rights or indemnifying ConocoPhillips for its own liability for

25   potential claims related to the Underground Storage Tanks system, the old, used waste oil tank and

26   the old, cracked piping that ConocoPhillips had been using for many years prior to the offer.

27   ConocoPhillips offer was not "bona fide" at any price because the offer was contingent on

28   Houtan Petroleum executing a release and waiver of rights that required Houtan Petroleum to

1    indemnify ConocoPhillips for its own liability "arising out of or relating to the physical condition of

2    the Property." Richard Mathews testified that Houtan Petroleum was required to execute the Bill of

3    Sale containing a release. (See Plaintiffs' Trial Exhibit 5 attached hereto for convenience). Mr.

4    Mathews also testified that normally, ConocoPhillips indemnifies the dealer, rather than the dealer

5    indemnifying ConocoPhillips.

6         The language set forth in the Bill of Sale is an unlawful and unconscionable waiver of rights.

7    The bill of sale states, in pertinent part:

8         "BUYER AGREES THAT ANY LEAK DISCOVERED AT ANY TIME
     HEREAFTER SHALL BE BUYER'S RESPONSIBILITY AND SHALL
9    BE DEEMED TO HAVE OCCURRED AFTER SUCH OWNERSHIP
     HAS PASSED TO BUYER.
10

11   As of the Effective Date, as defined below, Buyer hereby agrees to assume
     and hereby waives, releases, indemnifies, defends and holds harmless Seller
12   and its directors, officers, employees, contractors, agents, representatives
     successors and assigns, from and against any and all claims, demands,
     damages, costs and expenses, including attorney's fees , court costs,
13   awards, settlements, judgments, penalties, fines, liens or causes of action,
     at law or in equity, including without limitation actions under the
14   Comprehensive Environmental Response, Compensation and Liability Act
     of 1980, 42 U.S.C. 9601, et seq., as amended, the Resource Conservation
15   and Recovery Act, 42 U.S.C. 6901, et seq., and any other applicable
     environmental laws, statutes, ordinances, rules, regulations and orders (
16   "Laws"), arising out of or relating to the physical condition of the Property
     or other property abandoned thereon by Seller..."
17

18        ConocoPhillips required Houtan Petroleum to agree to be responsible for "any leak discovered

19   at any time," even if the leak preexisted the date of sale, and to be liable for "any and all claims"

20   related to the equipment as a condition of the sale. ConocoPhillips' own contractor, Tanknology,

21   acknowledged that the secondary containment pipes and sump failed SB989 testing. (See Plaintiff's

22   Trial Exhibit 78 attached hereto for convenience). Houtan Petroleum's contractor confirmed that the

23   reason for the failure was due to "fiberglass patch work in lieu of industry standard flexible

24   penetrations. The piping entries are cracked and obviously defective." "The secondary piping system

25   has a small breech somewhere between the tank slab and the dispensers." (See Plaintiff's Trial

26   Exhibit 79 attached hereto for convenience) Although the release in and of itself makes the offer not

27   bona fide, combined with the information about the Underground Storage Tank system's failure to

28   comply with California's SB989, it is an unlawful sale of the Underground Storage Tank system.

1    **C.    Plaintiff/Counterdefendant Is Entitled To Judgment As A Matter Of Law Because**

2    **ConocoPhillips Failed To Meet Its Burden of Proof That The Offer Approached Fair**

3    **Market Value.**

4    ConocoPhillips had the burden of proof that its offer to Houtan Petroleum was in fact bona

5    fide.  In support of its contention that the improvements and equipment were worth $340,000,

6    ConocoPhillips offered the testimony of Peter Morrison employed by Valuation Research Company

7    in Wisconsin.  Mr. Morrison is not licensed to do appraisals in the State of California and does not

8    hold an MAI certification from the Appraisal Institute ( a common industry standard).  Mr. Morrison

9    testified that he was instructed by ConocoPhillips to appraise the improvements, equipment and the

10   land assuming that the subject property was owned in fee simple.  Mr. Morrison never visited the site

11   before preparing a report (Defendant's Trial Exhibit 503).   Mr. Morrison assumed that the

12   improvements and equipment were in "full compliance with federal, state and local environmental

13   regulations and laws" (Page iii, Paragraph 20 in Defendant's Trial Exhibit 503) and gave no

14   consideration of California's Enhanced Vapor Recovery requirements that the pumps/dispensers be

15   upgraded or replaced no later than April 1, 2009, and that the Underground Storage Tank system

16   comply with SB989 (which it is not according to ConocoPhillips' own contractor).  (See Plaintiff's

17   Trial Exhibit 78).  Simply put, Mr. Morrison's failed to demonstrate that he is qualified to render an

18   expert opinion and that the methodology he used was reliable (i.e. appraising the property as if it were

19   owned in fee simple just because ConocoPhillips told him to do so).

20   Plaintiff's qualified expert witness, Andrew Plaine, testified that the only proper way to

21   appraise ConocoPhillips' "interest" in the improvements and equipment is to appraise them taking

22   into consideration the fact that ConocoPhillips only had a leasehold interest in the subject property

23   at the time of the offer.  Although VRC prepared another spreadsheet entitled "Exhibit 3 Valuation

24   Summary 2006- Valuation of Improvements Adjusted for Remaining Term of Lease," ConocoPhillips

25   deliberately concealed and withheld that evidence relying solely on VRC's appraisal as if everything

26   was held in fee simple.   Consequently, Mr. Morrison's opinion is unreliable, which is why

27   ConocoPhillips' never tendered Mr. Morrison as an expert witness to the Court during the trial.

28   Mr. Morrison's testimony did not satisfy the admissibility standards for expert testimony

-7-

under <u>Federal Rules of Evidence</u> 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Under the Federal Rules, the Court has a "gatekeeping function" when it comes to expert testimony. The Court has a duty to exclude testimony that is unreliable, irrelevant, unduly prejudicial or confusing, or otherwise that will not assist the finder of fact. Rule 702 permits a qualified expert to offer an opinion if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Rule 702 "establishes a standard of evidentiary reliability... and requires a valid... connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 590, 592: *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999).

Assessment of the reliability of an expert's opinion involves an examination of both the factual bases and assumptions underlying the opinion and the soundness of the expert's methodology. *Burlington Northern, Inc. v. Boxberger*, 529 F.2d 284, 287 (9th Cir. 1975) It is for the trial court to determine, in the exercise of its discretion, whether the expert's sources of information are sufficiently reliable to warrant reception of the opinion. As gatekeeper, the Court needs to make a "preliminary assessment of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. Where an expert incorrectly or improperly uses a known tool in an analysis, the analysis become unreliable. *Bazemore v. Friday*, 478 U.S. 385, 400 n. 10 (1986).

The burden of demonstrating that expert testimony is admissible rests with the party offering the testimony. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). ("The proponent of expert testimony always bears the burden to show that his expert is qualified to testify competently regarding the matters he intend[ed] to address; the methodology by which the expert reach[ed] his conclusions is sufficiently reliable; and the testimony assists the trier of fact") (citations omitted). The Court has "broad latitude" in determining whether to admit or exclude expert testimony. *Elsayed Mukhtar v. Cal. Sate Univ., Hayward*, 299 F.3d 1053, 1063-64 (9th Cir. 2002).

Both Mr. Mathews and Mr. Whalen testified that the improvements were worthless to ConocoPhillips if they had to be removed and that the cost of removal was a $75,000 liability. Mr. Morrison did not testify as to the fair market value of the improvements considering ConocoPhillips' leasehold interest in the subject property. Rather, he testified as to the value of the improvements and

equipment with the improper hypothetical assumptions that ConocoPhillips owned the subject property in fee simple and that the improvements were in compliance with state and federal law, failing to consider the UST system's SB989 failures and EVR upgrade requirements. Mr. Morrison's report states "any discrepancy from this information could have a significant impact on our concluded opinion of value as stated." (Page 2 of Defendant's Trial Exhibit 503) Mr. Morrison's failure to testify as to the leasehold valuation of the improvements that was withheld by ConocoPhillips and VRC demonstrates the unreliability of Mr. Morrison's appraisal of the improvements as if the subject property was owned in fee simple, which is not the case.

### III.

### CONCLUSION

Since ConocoPhillips' counterclaims arise out of and relate to the termination of a petroleum franchise, the PMPA preempts ConocoPhillips' counterclaims and Houtan Petroleum is entitled to judgment as a matter of law. Houtan Petroleum is also entitled to judgment as a matter of law on its PMPA claim because a "bona fide offer" may not be conditioned on an unlawful waiver of rights and ConocoPhillips failed to meet its burden of proof that the offer approached fair market value because its expert's testimony was unreliable and based solely upon proven-to-be false presumptions.

Respectfully submitted,

Dated: August 28, 2008                    BLEAU/FOX, A P.L.C.

                                          _____
                                                   //s//
                                          By:    Thomas P. Bleau, Esq.
                                                 Gennady L. Lebedev, Esq.
                                                 Attorneys for Plaintiff and
                                                 Counterclaimant, Houtan
                                                 Petroleum, Inc.

# TRIAL EXHIBIT 5



ConocoPhillips Company
76 Broadway
Sacramento, CA 95818
phone 916-558-7607
fax 916-558-7696

October 22, 2007

Houtan Petroleum ("DEALER")
101 E. El Camino Real
Mountain View, CA 94040

RE:   Offer to Sell Improvements at Site #255661, located at
      101 E. El Camino Real, Mountain View, California ("Station").

OFFER TO SELL IMPROVEMENTS

Dear DEALER,

    By hand delivered letter on September 18, 2007, you were notified of the Notice of Termination ("Notice") of the Union 76 Dealer Station Lease and Motor Fuel Supply Agreement, with an effective date of September 1, 2007, , 2007 ("Agreement"), which Notice terminates your franchise relationship with CONOCOPHILLIPS COMPANY, a Delaware corporation ("COP") for the above referenced Station. The termination of the Agreement shall be effective at 12:00 noon on October 31, 2007 ("Termination Date").

    The reason for the termination is that, despite COP's efforts to get additional tenancy at the Station you operate, the underlying ground lease between COP the third party landlord shall expire on October 31, 2007. The duration of the lease and the fact it might expire during the term of the franchise were disclosed to you. Under these facts, it would not have been reasonable for COP to furnish not less than 90 days notice.

    You have informed COP on October 18, 2007 that you have obtained a lease with the third party landlord for the Station and have requested from COP a bona fide offer to purchase the improvements and equipment at the Station.

    In accordance with the provisions of the Petroleum Marketing Practices Act, 15 U.S.C. Section 2801 et seq., COP offers to sell you our interest in the improvements and equipment located on the marketing premises.

    This offer is conditioned upon COP being paid by certified check the sum of Three Hundred Forty Thousand Dollars ($340,000.00) for the improvements and equipment located at the Station (summarized on the attached Bill of Sale, Schedule 1, and Attachment "A" to Bill of Sale).

    Please note that under the Lease, COP has only 10 days after expiration of the Lease to remove the improvements and equipment. Thus, your written notification to COP of your acceptance and/or rejection of the offer to purchase COP's interest in the improvements and equipment must be provided to COP no later than 5:00 p.m. PT on

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
3:Case No.   07-cv-05627-SC
**PLAINTIFF** Exhibit No. __ P-5 __
Date Entered:_____
RICHARD W. WIEKING, CLERK
By:_____
          Deputy Clerk

October 29, 2007. COP must receive your certified check for the full purchase price no later than 12:00 noon on October 31, 2007. Escrow information will follow.

Sincerely,

R. L. (Dick) Mathews
Contractor – ConocoPhillips Real Estate Department

Acknowledged/agreed to:

Houtan Petroleum - Dealer

By: _____

Its: _____

Date: _____

Attachments:

Bill of Sale with Schedule 1 ("Property") and Attachment "A" to Bill of Sale.

cc:     Dan Pellegrino, Account Representative
        Phillip Bonina, Director, Real Estate
        David Nash, Contracts Administration
        Station File 255661

# BILL OF SALE
(Including Tanks)

In consideration of the covenants and agreements herein contained and in further consideration of Three Hundred Forty Thousand Dollars ($340,000.00) paid to it by Houtan Petroleum, with an address of 101 E. El Camino Real, Mountain View, California 94040 ("Buyer"), the receipt of which is hereby acknowledged, ConocoPhillips Company, successor by merger and name change to Tosco Corporation, having an office at 3611 Harbor Boulevard, Suite 200, Santa Ana, California 92704 ("Seller"), does hereby transfer and convey to Buyer all of Seller's right, title, and interest in and to the personal property described in Schedule 1 attached hereto and made a part hereof located at Site No 255661, 101 E. El Camino Real, Mountain View, CA ("Property").

TO HAVE AND TO HOLD unto Buyer and buyer's representatives, heirs, devisees, successors, and assigns forever. Buyer acknowledges that Seller is selling only such right, title, or interest in the Property as Seller may have without Seller representing or warranting the extent of Seller's right, title or interest therein. Buyer shall pay any federal, state or local sales, use or value added tax which may be due as a result of this transfer.

Buyer affirms by acceptance of this Bill of Sale that Buyer has inspected to its full satisfaction all of the Property conveyed pursuant to this Bill of Sale and has full knowledge of its condition and location. This sale is made on an "AS-IS, WHERE-IS BASIS" WITHOUT REPRESENTATION OR WARRANTY BY SELLER, EXPRESS OR IMPLIED, REGARDING THE HABITABILITY, CONDITION, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR USE OR PURPOSE of the Property conveyed hereby. This sale does not include any title in, or any right to use, any advertising, trade names, trade marks, trade dress, service marks, signs, sign poles, slogans identifications, copyrights or copyrighted materials of the Seller and its affiliates, parents and subsidiaries.

Buyer acknowledges that any underground storage tanks and associated product piping systems ("USTs") included in, on or under the Property may contain explosive gases and may have been used for the storage of motor fuels containing tetraethyl, lead or other "antiknock" compounds which have made such USTs unfit for the storage of water or any other article or commodity intended for human or animal contact or consumption. Buyer expressly agrees not to use or permit the use of such USTs for such purpose.

BUYER IS WARNED THAT USTs MAY DEVELOP LEAKS AT ANY TIME AND THAT ANY LEAKAGE THEREFROM MAY CAUSE SERIOUS DAMAGE TO PERSONS AND PROPERTY WITHIN AND BEYOND THE CONFINES OF THE IMMEDIATE AREA. BUYER AGREES THAT ANY LEAK DISCOVERED AT ANY TIME HEREAFTER SHALL BE BUYER'S RESPONSIBILITY AND SHALL BE DEEMED TO HAVE OCCURRED AFTER SUCH OWNERSHIP HAS PASSED TO BUYER.

As of the Effective Date, as defined below, Buyer hereby agrees to assume and hereby waives, releases, indemnifies, defends and holds harmless Seller and its directors, officers, employees, contractors, agents, representatives successors and assigns, from and against any and all claims, demands, damages, costs and expenses, including attorneys' fees, court costs, awards, settlements, judgments, penalties, fines, liens or causes of action, at law or in equity, including without limitation actions under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. 9601, et seq., as amended, the Resource Conservation and Recovery Act, 42 U.S.C. 6901, et seq., and any other applicable environmental laws, statutes, ordinances, rules, regulations or orders ("Laws"), arising out of or relating to the physical condition of the Property or other property abandoned thereon by Seller, or arising out or relating to the ownership or use of the Property after the date hereof.

The provisions of the Bill of Sale shall be effective as of **12:01 A.M on November 1, 2007** ("Effective Date").

IN WITNESS WHEREOF, this Bill of Sale has been duly executed by the undersigned this ____ day of _____, 2007, having first read and understood the terms contained herein and the purpose, intent and effects hereof.

DEALER:

ConocoPhillips Company, a Delaware corporation

By: _____

By: _____

Name ___Houtan Petroleum_____

Name _____R. L. Mathews_____
Contractor, ConocoPhillips Real Estate Department

WITNESSED:

By: _____

By: _____

Name: _____

Name: _____

## SCHEDULE 1 ("Property") at
## Site No. 255661
## 101 E. El Camino Real, Mountain View, CA

| | |
|---|---|
| Service station building (1,624 sq. ft.) | 1 |
| MPD dispensers with CRIND | 6 |

UST's – gasoline
(With associated piping for all UST's)

| | |
|---|---|
| 12,032 gallon Double Steel | 1 |
| 12,032 gallon Double Steel | 1 |
| UST – waste oil (550 gallon) | 1 |
| Canopy | 2 |
| Monument sign | 1 |
| G-Site | 1 |

Any/all moveable equipment, air compressor and hoists.

Asphalt and concrete paving, landscaping and trash enclosure.

Site No.255661
101 E. El Camino Real, Mountain View, CA

## ATTACHMENT "A" TO BILL OF SALE

### UNDERGROUND STORAGE TANK INFORMATION
### PAGE ONE OF ONE
#### EXHIBIT D
#### UNDERGROUND STORAGE TANK INFORMATION
Site No.  255661

To Seller's Actual Knowledge, information about the UST's and monitoring system are as follows:

| Tank | 1 | 2 | 3 |
|------|---|---|---|
| Product | UNLEADED | PREMIUM UNLEADED | WASTE OIL |
| Approximate Capacity | 12032 | 12032 | 550 |
| Approximate Tank Install Date | 1/1/1988 | 1/1/1988 | 1/1/1988 |
| DW or SW Tank | DOUBLE | DOUBLE | DOUBLE |
| Tank Material | STEEL - FG CLAD | STEEL - FG CLAD | STEEL - FG CLAD |
| Tank Monitoring Method | CONTINUOUSLY MONITORED | CONTINUOUSLY MONITORED | CONTINUOUSLY MONITORED |
| Approximate Piping Install Date | 1/1/1994 | 1/1/1994 | N/A |
| DW or SW Piping | DOUBLE | DOUBLE | N/A |
| Piping Material | FIBERGLASS | FIBERGLASS | N/A |
| Line Monitoring Method | CONTINUOUSLY MONITORED | CONTINUOUSLY MONITORED | N/A |
| ATTACH ADDITIONAL PAGES IF NECESSARY | | | |

# TRIAL EXHIBIT 78

# Secondary Containment Testing Report Form

*This form is intended for use by contractors performing periodic testing of UST secondary containment systems. Use the appropriate pages of this form to report results for all components tested. The completed form, written test procedures, and printouts from tests (if applicable), should be provided to the facility owner/operator for submittal to the local regulatory agency.*

## 1. FACILITY INFORMATION

| | |
|---|---|
| Facility Name: CONOCO PHILLIPS 255661 | Date of Testing: 01/28/2008 |
| Facility Address: 101 E. EL CAMINO REAL , MOUNTAIN VIEW, CA, 94040 | |
| Facility Contact: MANAGER | Phone: (650) 967-1776 |
| Date Local Agency Was Notified of Testing : / / | |
| Name of Local Agency Inspector (if present during testing): | |

## 2. TESTING CONTRACTOR INFORMATION

| | | |
|---|---|---|
| Company Name: TANKNOLOGY, INC. | | |
| Technician Conducting Test: JARROD COOKE | | |
| Credentials: | X  CSLB Licensed Contractor | SWRCB Licensed Tank Tester |
| License Type: a | | License Number: 743160 |

| Manufacturer | Manufacturer Training Component(s) | Date Training Expires |
|---|---|---|
| tanknology | all | 07/17/2009 |
| | | / / |
| | | / / |
| | | / / |

## 3. SUMMARY OF TEST RESULTS

| Component | Pass | Fail | Not Tested | Repairs Made | Component | Pass | Fail | Not Tested | Repairs Made |
|---|---|---|---|---|---|---|---|---|---|
| Tank Annular 1 REG | X | | | | UDC 9/10 | X | | | |
| Tank Annular 2 PRE | X | | | | UDC 11/12 | X | | | |
| Tank Annular 3 USE | X | | | | | | | | |
| Secondary Pipe 1 REG REG | | X | | | | | | | |
| Secondary Pipe 2 PRE SUP | | X | | | | | | | |
| Piping Sump 1 REG | X | | | | | | | | |
| Piping Sump 2 PRE | | X | | | | | | | |
| Piping Sump 2 PRE | | | | | | | | | |
| UDC 1/2 | X | | | | | | | | |
| UDC 3/4 | X | | | | | | | | |
| UDC 5/6 | X | | | | | | | | |
| UDC 7/8 | X | | | | | | | | |

If hydrostatic testing was performed, describe what was done with the water after completion of tests:

taken water dog

### CERTIFICATION OF TECHNICIAN RESPONSIBLE FOR CONDUCTING THIS TESTING

*To the best of my knowledge, the facts stated in this document are accurate and in full compliance with legal requirements*

Technician's Signature: _____    Date: 01/28/2008

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
3:Case No.  07-cv-05627-SC
PLAINTIFF Exhibit No. 78
Date Entered: _____
RICHARD W. WIEKING, CLERK
By:_____
      Deputy Clerk

## 4. TANK ANNULAR TESTING

| Test Method Developed By: | Tank Manufacturer | [X] Industry Standard | [ ] Professional Engineer |
|---|---|---|---|
| | [ ] Other *(Specify)* | | |

| Test Method Used: | [ ] Pressure | [X] Vacuum | [ ] Hydrostatic |
|---|---|---|---|
| | [ ] Other *(Specify)* | | |

| Test Equipment Used: | | | | Equipment Resolution: | |
|---|---|---|---|---|---|

| | Tank # 1 REG | Tank # 2 PRE | Tank # 3 USE | Tank # |
|---|---|---|---|---|
| Is Tank Exempt From Testing? [1] | [ ] Yes [X] No | [ ] Yes [X] No | [ ] Yes [X] No | [ ] Yes [ ] No |
| Tank Capacity: | 13,000 | 13,000 | 500 | |
| Tank Material: | DW STEEL | DW STEEL | DW STEEL | |
| Tank Manufacturer: | unknown | unknown | unknown | |
| Product Stored: | REGULAR | PREMIUM | USED OIL | |
| Wait time between applying pressure/vacuum/water and starting test: | 5min | 5min | 5min | |
| Test Start Time: | 11:00 | 11:02 | 11:19 | |
| Initial Reading ($R_I$): | 7hg | 7hg | 7hg | |
| Test End Time: | 12:00 | 12:02 | 12:19 | |
| Final Reading ($R_F$): | 7hg | 7hg | 7hg | |
| Test Duration: | 1hr | 1hr | 1hr | |
| Change in Reading ($R_F - R_I$): | 0 | 0 | 0 | |
| Pass/Fail Threshold or Criteria: | 1.7hg | 1.7hg | 1.7hg | |
| Test Result: | [X] Pass [ ] Fail | [X] Pass [ ] Fail | [X] Pass [ ] Fail | [ ] Pass [ ] Fail |
| Was sensor removed for testing? | [X] Yes [ ] No [ ] NA | [X] Yes [ ] No [ ] NA | [X] Yes [ ] No [ ] NA | [ ] Yes [ ] No [ ] NA |
| Was sensor properly replaced and verified functional after testing? | [X] Yes [ ] No [ ] NA | [X] Yes [ ] No [ ] NA | [X] Yes [ ] No [ ] NA | [ ] Yes [ ] No [ ] NA |

**Comments** - *(include information on repairs made prior to testing, and recommended follow-up for failed tests)*

[1] Secondary containment systems where the continuous monitoring automatically monitors both the primary and secondary containment, such as systems that are hydrostatically monitored or under constant vacuum, are exempt from periodic containment testing. {California Code of Regulations, Title 23, Section 2637(a)(6)}

SWRCB, January 2002

Page 3.

## 5. SECONDARY PIPE TESTING

| Test Method Developed By: | [X] Tank Manufacturer | | [ ] Industry Standard | [ ] Professional Engineer |
|---|---|---|---|---|
| | [ ] Other *(Specify)* | | | |

| Test Method Used: | [X] Pressure | | [ ] Vacuum | [ ] Hydrostatic |
|---|---|---|---|---|
| | [ ] Other *(Specify)* | | | |

| Test Equipment Used: | | | Equipment Resolution: | |
|---|---|---|---|---|

| | Piping Run # 1 REG REG | Piping Run # 2 PRE SUP | Piping Run # | Piping Run # |
|---|---|---|---|---|
| Piping Material: | fiberglass | fiberglass | | |
| Piping Manufacturer: | smith | smith | | |
| Piping Diameter: | 3" | 3" | | |
| Length of Piping Run: | 320' | 320'. | | |
| Product Stored: | REGULAR | PREMIUM | | |
| Method and location of piping-run isolation: | REGULAR | PREMIUM | | |
| Wait time between applying pressure/vacuum/water and starting test: | 5min | 5min | | |
| Test Start Time: | - - - - | - - - | | |
| Initial Reading ($R_I$): | - - - | - - - | | |
| Test End Time: | - - - - | - - - | | |
| Final Reading ($R_F$): | - - - | - - - | | |
| Test Duration: | - - - | - - | | |
| Change in Reading ($R_F - R_I$): | - - - | - - - | | |
| Pass/Fail Threshold or Criteria: | - - | - - | | |
| Test Result: | [ ] Pass [X] Fail | [ ] Pass [X] Fail | [ ] Pass [ ] Fail | [ ] Pass [ ] Fail |

**Comments -** *(include information on repairs made prior to testing, and recommended follow-up for failed tests)*

lines would not pressure up to test pressure.

SWRCB, January 2002

Page 4.

# 6. PIPING SUMP TESTING

| Test Method Developed By: | ☐ Sump Manufacturer   ☐ Industry Standard   ☒ Professional Engineer |
| | ☐ Other *(Specify)* |
| Test Method Used: | ☐ Pressure   ☐ Vacuum   ☒ Hydrostatic |
| | ☐ Other *(Specify)* |

Test Equipment Used: vplt                    Equipment Resolution: vplt to gph

| | Sump #    1 REG | Sump #    2 PRE | Sump #    2 PRE | Sump # |
|---|---|---|---|---|
| Sump Diameter: | 42" | 42" | 42" | |
| Sump Depth: | 56" | 56" | 56" | |
| Sump Material: | fiberglass | fiberglass | FIBERGLASS | |
| Height from Tank Top to Top of Highest Piping Pentration: | 18" | 18" | 18" | |
| Height from Tank Top to Lowest Electrical Pentration: | 21" | 21" | 21" | |
| Condition of sump prior to testing: | good | good | good | |
| Portion of Sump Tested: [1] | 20" | 20" | 10" | |
| Does turbine shut down when sump sensor detects liquid (both product and water)?* | ☒ Yes ☐ No ☐ NA | ☒ Yes ☐ No ☐ NA | ☒ Yes ☐ No ☐ NA | ☐ Yes ☐ No ☐ NA |
| Turbine shutdown response time: | 2-5sec | 2-5sec | 2-5sec | |
| Is system programmed for fail-safe shutdown?* | ☒ Yes ☐ No ☐ NA | ☒ Yes ☐ No ☐ NA | ☒ Yes ☐ No ☐ NA | ☒ Yes ☐ No ☐ NA |
| Was fail-safe verified to be operational?* | ☒ Yes ☐ No ☐ NA | ☒ Yes ☐ No ☐ NA | ☒ Yes ☐ No ☐ NA | ☒ Yes ☐ No ☐ NA |
| Wait time between applying pressure/vacuum/water and starting test: | 5min | 5min | 5min | |
| Test Start Time: | 10:53 | 10:54 | 11:14 | |
| Initial Reading ($R_I$): | 9.012 | 6.372 | .620 | |
| Test End Time: | 11:23 | 11:05 | 11:44 | |
| Final Reading ($R_F$): | 9.012 | -7.949 | .620 | |
| Test Duration: | 30min | 11min | 30min | |
| Change in Reading ($R_F - R_I$): | .000gph | 1.1gph | .000gph | |
| Pass/Fail Threshold or Criteria: | .05gph | .05gph | .05gph | |
| Test Result: | ☒ Pass ☐ Fail | ☐ Pass ☒ Fail | ☐ Pass ☐ Fail | ☐ Pass ☐ Fail |
| Was sensor removed for testing? | ☒ Yes ☐ No ☐ NA | ☒ Yes ☐ No ☐ NA | ☒ Yes ☐ No ☐ NA | ☐ Yes ☐ No ☐ NA |
| Was sensor properly replaced and verified functional after testing? | ☒ Yes ☐ No ☐ NA | ☒ Yes ☐ No ☐ NA | ☒ Yes ☐ No ☐ NA | ☐ Yes ☐ No ☐ NA |

**Comments -** *(include information on repairs made prior to testing, and recommended follow-up for failed tests)*
the third set of data is for troubleshotting pourposes only.

[1] If the entire depth of the sump is not tested, specify how much was tested. If the answer to any of the questions indicated with an asterisk (*) is "NO" or "NA", the entire sump must be tested. (See SWRCB LG-160)

SWRCB, January 2002

Page 5.

## 7.  UNDER-DISPENSER CONTAINMENT (UDC) TESTING

| Test Method Developed By: | UDC Manufacturer | | Industry Standard | | X | Professional Engineer |
|---|---|---|---|---|---|---|
| | Other *(Specify)* | | | | | |

| Test Method Used: | Pressure | | Vacuum | | X | Hydrostatic |
|---|---|---|---|---|---|---|
| | Other *(Specify)* | | | | | |

| Test Equipment Used: vplt | | Equipment Resolution: vplt to gph |
|---|---|---|

| | UDC #    1/2 | UDC #    3/4 | UDC #    5/6 | UDC #    7/8 |
|---|---|---|---|---|
| UDC Manufacturer: | bravo | bravo | bravo | bravo |
| UDC Material: | metal | metal | metal | metal |
| UDC Depth: | 10" | 10" | 10" | 10" |
| Height from UDC Top to Top of Highest Piping Pentration: | 0 | 0 | 0 | 0 |
| Height from UDCTop to Lowest Electrical Pentration: | 0 | 0 | 0 | 0 |
| Condition of UDC prior to testing: | good | good | good | good |
| Portion of UDC Tested: [1] | 2" | 2" | 2" | 2" |
| Does turbine shut down when sump sensor detects liquid (both product and water)?* | X Yes ☐No ☐NA | X Yes ☐No ☐NA | X Yes ☐No ☐NA | X Yes ☐No ☐NA |
| Turbine shutdown response time: | 2-5sec | 2-5sec | 2-5sec | 2-5sec |
| Is system programmed for fail-safe shutdown?* | ☐Yes X No ☐NA | ☐Yes X No ☐NA | ☐Yes X No ☐NA | ☐Yes X No ☐NA |
| Was fail-safe verified to be operational?* | ☐Yes X No ☐NA | ☐Yes X No ☐NA | ☐Yes X No ☐NA | ☐Yes X No ☐NA |
| Wait time between applying pressure/vacuum/water and starting test: | 5min | 5min | 5min | 5min |
| Test Start Time: | 12:15 | 12:16 | 12:32 | 13:18 |
| Initial Reading ($R_I$): | 4.364 | 9.332 | 6.737 | 7.470 |
| Test End Time: | 12:30 | 12:31 | 12:47 | 13:33 |
| Final Reading ($R_F$): | 4.364 | 9.332 | 6.737 | 7.470 |
| Test Duration: | 15MIN | 15MIN | 15MIN | 15MIN |
| Change in Reading ($R_F$ - $R_I$): | .000gph | .000gph | .000gph | .000gph |
| Pass/Fail Threshold or Criteria: | .05gph | .05gph | .05gph | .05gph |
| **Test Result:** | X Pass ☐ Fail | X Pass ☐ Fail | X Pass ☐ Fail | X Pass ☐ Fail |
| Was sensor removed for testing? | ☐Yes X No ☐NA | ☐Yes X No ☐NA | ☐Yes X No ☐NA | ☐Yes X No ☐NA |
| Was sensor properly replaced and verified functional after testing? | ☐Yes X No ☐NA | ☐Yes X No ☐NA | ☐Yes X No ☐NA | ☐Yes X No ☐NA |

**Comments** - *(include information on repairs made prior to testing, and recommended follow-up for failed tests)*

_____

_____

_____

_____

[1] If the entire depth of the UDC is not tested, specify how much was tested. If the answer to <u>any</u> of the questions indicated with an asterisk (*) is "NO" or "NA", the entire UDC must be tested. (See SWRCB LG-160)

SWRCB, January 2002

Page 6.

## 7. UNDER-DISPENSER CONTAINMENT (UDC) TESTING

| Test Method Developed By: | ☐ UDC Manufacturer  ☐ Industry Standard  ☒ Professional Engineer  ☐ Other *(Specify)* |
|---|---|
| Test Method Used: | ☐ Pressure  ☐ Vacuum  ☒ Hydrostatic  ☐ Other *(Specify)* |

| Test Equipment Used: vplt | Equipment Resolution: vplt to gph |
|---|---|

|  | UDC # 9/10 | UDC # 11/12 | UDC # | UDC # |
|---|---|---|---|---|
| UDC Manufacturer: | bravo | bravo |  |  |
| UDC Material: | metal | metal |  |  |
| UDC Depth: | 10" | 10" |  |  |
| Height from UDC Top to Top of Highest Piping Pentration: | 0 | 0 |  |  |
| Height from UDCTop to Lowest Electrical Pentration: | 0 | 0 |  |  |
| Condition of UDC prior to testing: | good | good |  |  |
| Portion of UDC Tested: [1] | 2" | 2" |  |  |
| Does turbine shut down when sump sensor detects liquid (both product and water)?* | ☒ Yes ☐ No ☐ NA | ☒ Yes ☐ No ☐ NA | ☐ Yes ☐ No ☐ NA | ☐ Yes ☐ No ☐ NA |
| Turbine shutdown response time: | 2-5sec | 2-5sec |  |  |
| Is system programmed for fail-safe shutdown?* | ☐ Yes ☒ No ☐ NA | ☐ Yes ☒ No ☐ NA | ☐ Yes ☐ No ☐ NA | ☐ Yes ☐ No ☐ NA |
| Was fail-safe verified to be operational?* | ☐ Yes ☒ No ☐ NA | ☐ Yes ☒ No ☐ NA | ☒ Yes ☐ No ☐ NA | ☐ Yes ☐ No ☐ NA |
| Wait time between applying pressure/vacuum/water and starting test: | 5min | 5min |  |  |
| Test Start Time: | 13:18 | 13:50 |  |  |
| Initial Reading ($R_I$): | 11.477 | 8.446 |  |  |
| Test End Time: | 13:33 | 14:05 |  |  |
| Final Reading ($R_F$): | 11.477 | 8.446 |  |  |
| Test Duration: | 15MIN | 15MIN |  |  |
| Change in Reading ($R_F - R_I$): | .000gph | .000gph |  |  |
| Pass/Fail Threshold or Criteria: | .05gph | .05gph |  |  |
| **Test Result:** | ☒ **Pass** ☐ **Fail** | ☒ **Pass** ☐ **Fail** | ☐ **Pass** ☐ **Fail** | ☐ **Pass** ☐ **Fail** |
| Was sensor removed for testing? | ☐ Yes ☒ No ☐ NA | ☐ Yes ☒ No ☐ NA | ☐ Yes ☐ No ☐ NA | ☐ Yes ☐ No ☐ NA |
| Was sensor properly replaced and verified functional after testing? | ☐ Yes ☒ No ☐ NA | ☐ Yes ☒ No ☐ NA | ☐ Yes ☐ No ☐ NA | ☐ Yes ☐ No ☐ NA |

**Comments -** *(include information on repairs made prior to testing, and recommended follow-up for failed tests)*

_____

_____

_____

_____

_____

[1] If the entire depth of the UDC is not tested, specify how much was tested. If the answer to _any_ of the questions indicated with an asterisk (*) is "NO" or "NA", the entire UDC must be tested. (See SWRCB LG-160)

# TRIAL EXHIBIT 79



5-5-08

Mr. Chris Steck
Mountain View Fire Department
1000 Villa St.
Mountain View, CA 94041
Phone: 650-903-6816

Mr. Ed Hadad
Hadad Inc.
700 South Bernardo Ave. Suite 103
Sunnyvale, CA 94087
Phone: 408-736-2500
Fax: 408-736-2503

Re:    Results from SB 989 Retest @ 101 East El Camino Real Mountain View, CA 94040

Dear Mr. Steck,

Slunaker Construction (SC) is pleased to provide the following summary of work completed at the above referenced facility. SC is a California Licensed Contractor, License #778098. All SC technicians performing tests are individually certified by the equipment manufacturers and hold ICC certifications.

**Original Scope of Services:**

SC to provide labor and materials to perform SB 989 retesting as required to determine extent of secondary containment underground failures. SC will utilize helium pin pointing leak detection to locate leak points. SC will install/drill access ports through the concrete drive slab in front of each dispenser. SC will pressurize the secondary up with helium and test backfill for the presence of helium at each dispenser. SC will also perform retest of turbine sump to locate defective components.

**Summary of current SB 989 Testing:**
1. All tank annulars passed SB 989 testing.
2. 87 & 91 secondary product line _failed_ pressure testing.
3. 87 STP (turbine) sumps passed hydrostatic testing.
4. 91 STP (turbine) sumps _failed_ hydrostatic testing.
5. All six UDC pans passed hydrostatic testing.

**Recommended Corrective actions:**
1. Perform helium pinpoint to locate breech under dispenser pans.
2. Retest 91 turbine sump to locate leak point.

**Results & Findings from testing completed 5-1-08**

**Summary of Helium Pinpoint**
1. SC pressurized secondary piping with helium to 5 PSIG.
2. SC tested all dispenser pan backfill and found no leaks at dispenser pans.
3. SC tested backfill outside of the tank pit and found small leaks (200PPM) along the piping trench leading to the dispensers. Highest helium concentration was located at both ends of the piping trench to each set of dispensers. It appears that the leak is also under the tank slab closest to dispenser 5/6.
4. See attached site map and field report.

*General Contracting Company  License: 778098 A, B, C21, HAZ*
3672 Chicago Ave Suite B  Riverside, CA 92507 Phone: 951-788-7070  Fax: 951-788-7089

1

**SLUNAKER CONSTRUCTION**
GENERAL CONTRACTING

5-5-08
101 East El Camino Real - SB 989 test continued

**Summary of the Turbine Sump Retest**
1. SC found the all the turbine sump penetrations to be made up of fiberglass patch work in lieu of industry standard flexible penetrations. The piping entries are cracked and obviously defective.
2. SC would need to install new Blue Penetration fitting in order to ascertain if the sump would past SB 989 hydro static testing.
3. See attached pictures for more details.

**Summary of Precision line test.**
1. Both product lines passed a precision line test, see attached test result.

Based on the site inspections, helium testing, and the precision line test SC is confident that is no underground product releases or leaks from the piping system at this time. The secondary piping system has a small breech some where between the tank slab and the dispensers, please see attached helium pinpoint field report for actual helium detection values.

SC would be happy to perform semi monthly inspections at the site until permits for the upgrade of the UST's are approved.

Please call or email me should you have any questions regarding this Summary of work performed on 5-1-08.

Submitted by:

*Matt Thomas*

Matt Thomas
Slunaker Construction
E-mail: MattThomas999@aol.com
Cell: 626-627-8316
Fax: 661-722-1206